Paul V. Shalhoub
Andrew S. Mordkoff
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Aegerion Pharmaceuticals, Inc., <u>et al.</u>,[1] | : | Case No. 19-_____ (      ) |
| | : | |
| Debtors. | : | (Joint Administration Pending) |

--------------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING POSTPETITION FINANCING; (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) AFFORDING ADEQUATE PROTECTION; (V) SCHEDULING A FINAL HEARING; (VI) MODIFYING THE AUTOMATIC STAY; AND (VII) GRANTING RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively,

the "**Debtors**"), by and through their proposed attorneys, Willkie Farr & Gallagher LLP,

represent:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are Aegerion Pharmaceuticals, Inc. (0116), and Aegerion Pharmaceuticals Holdings, Inc. (1331). The Debtors' executive headquarters are located at 245 First Street, Riverview II, 18th Floor, Cambridge, MA 02142.

## RELIEF REQUESTED

1.         The Debtors hereby move for entry of an interim order, substantially in the form annexed hereto as <u>Exhibit A</u> (the "**Interim Order**"), and a final order, substantially in the form annexed hereto as <u>Exhibit B</u> (the "**Final Order**" and, together with the Interim Order, the "**Orders**"), pursuant to sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), *inter alia*:  (a) authorizing the Debtors to enter into postpetition financing arrangements as provided in that certain DIP Credit Agreement (as defined below); (b) granting superpriority liens and claims; (c) authorizing the Debtors to use Cash Collateral (as defined below); (d) granting adequate protection; (e) scheduling a final hearing pursuant to Bankruptcy Rule 4001 with respect to the relief requested herein; (f) modifying the automatic stay; and (g) granting related relief (the "**Motion**").

2.         In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of John R. Castellano in Support of Chapter 11 Petitions and First Day Pleadings (the "**First Day Declaration**"), which is being filed with the Court concurrently herewith.  The Debtors respectfully request entry of (a) the Interim Order, which authorizes the use of Cash Collateral, provides adequate protection and grants other related relief, and (b) the Final Order, which approves the DIP Credit Agreement and the incurrence of debtor-in-possession financing thereunder, the continued use of Cash Collateral, and other related relief. The Debtors respectfully seek entry of the Orders, <u>inter alia</u>:

(a)         authorizing the Debtor designated as "Borrower" under, and as defined in, the DIP Credit Agreement (the "**Borrower**") to obtain, and the other guarantors (the "**DIP Guarantors**") under the DIP Loan Documents (as defined below) to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of, a senior secured priming and superpriority postpetition term loan facility in a principal amount

of up to $20,000,000 (the "**DIP Facility**") and the loans extended under the DIP Facility, the "**DIP Loans**"), pursuant to the terms of (x) the Final Order, (y) that certain Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "**DIP Credit Agreement**"),[2] by and among the Borrower, the DIP Guarantors, Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, collectively, the "**DIP Agent**"), and the other financial institutions party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (collectively, the "**DIP Lenders**," and together with the DIP Agent and any other party to which DIP Obligations (as defined in the Final Order) are owed, the "**DIP Secured Parties**"), in substantially the form attached to this Motion, and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**"), to fund, among other things, ongoing working capital, general corporate expenditures and other financing needs of the Debtors;

(b)    approving the terms of, and authorizing the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizing and directing the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and the Final Order;

(c)    granting (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens on all of the Adequate Protection Collateral (as described below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens (1) shall be senior to the Primed Liens (as described below) and (2) shall be junior solely to any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date (as defined below), (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition Liens (as defined in the Orders) (all such Liens, collectively, the "**Prepetition Prior Liens**") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including, upon entry of the Final Order, and any Avoidance Action Proceeds;

(d)    authorizing the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including Cash Collateral in which the Prepetition Secured Parties (as defined in the Orders) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Final Order or otherwise;

---

[2]    Unless otherwise specified herein, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement, the Interim Order or the Final Order.  A copy of the DIP Credit Agreement (without exhibits and schedules) is attached hereto as Exhibit C.

(e)     vacating the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the Orders and the DIP Loan Documents;

(f)     granting the Prepetition Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth in the Orders, the Prepetition Secured Party Adequate Protection (as defined in the Orders), which consists of, among other things, Adequate Protection Liens (as described below),  Adequate Protection Superiority Claims (as described below), and current payment (in-kind) of accrued and unpaid prepetition and postpetition interest at the non-default rate, payment of certain specified postpetition payments due to the Prepetition Secured Parties, and reimbursable fees and expenses;

(g)     waiving certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(h)     the scheduling of a final hearing (the "**Final Hearing**") on this Motion to consider entry of the Final Order authorizing the Debtors to access the full amount of the DIP Facility and use Cash Collateral on a final basis and approving the form of notice procedures with respect thereto.

## **PRELIMINARY STATEMENT**

3.     The Debtors have adequate cash on hand, and expect to generate additional cash from operations sufficient to fund the Debtors' operating and other needs through the use of Cash Collateral and without the need to access any of the additional liquidity to be provided by the DIP Facility, for at least the first few months of these chapter 11 cases. Nevertheless, to ensure the Debtors will have adequate long-term liquidity to fund the full expected period of these cases, the Debtors have arranged for $20 million in new money financing under the DIP Facility.  In connection with the use of Cash Collateral, that financing will provide the necessary liquidity to (i) fund the Debtors' operating, working capital and capital expenditure needs during the course of these chapter 11 cases, (ii) provide the Debtors with continued access to the use of Cash Collateral and (iii) implement and consummate their contemplated restructuring.

4.      As described in the First Day Declaration, the Debtors faced significant challenges leading to the commencement of these chapter 11 cases.  Ultimately, the Debtors determined that the most value-maximizing approach was to proceed with an all stock investment from Amryt Pharma plc (the "**Plan Investor**") through a pre-negotiated chapter 11 plan (the "**Plan**") and restructuring, with such stock and other consideration to be distributed to the Debtors' creditors under the Plan (the "**Proposed Restructuring Transaction**").  To effectuate the Proposed Restructuring Transaction, the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with the Plan Investor, the Debtors' non-debtor parent Novelion Therapeutics Inc. ("**Novelion**"), and certain prepetition lenders representing (i) 100% in principal amount and number of holders under the Debtors' Bridge Loan (as defined below), and (ii) 67% in principal amount of the Debtors' Convertible Notes (as defined below).  The RSA provides for a consensual restructuring of the Debtors and secures each party's support of the Debtors' proposed Plan.

5.      In connection with executing the RSA, the Debtors also entered into a plan funding agreement (the "**Plan Funding Agreement**") with the Plan Investor, which, subject to certain terms and conditions, provides that the Plan Investor will acquire 100% of the equity interests of reorganized Aegerion in exchange for new common stock of the Plan Investor. Following the transaction, the Plan Investor will continue as a public company, with reorganized Aegerion as its wholly-owned subsidiary, diversely held by its former creditors and the Plan Investor's existing shareholders.  The consensual use of Cash Collateral and proposed DIP Facility provide the Debtors with the necessary liquidity and time to implement the Proposed Restructuring Transaction.

6.          Several compelling reasons justify approval of the DIP Facility and use of

Cash Collateral.  First, the Debtors' ability to use Cash Collateral (and ultimately access the

incremental liquidity provided by the DIP Facility) are vital to preserving the value of their

enterprise during the course of these chapter 11 cases.  The Debtors must obtain the ability to use

Cash Collateral and access the DIP Facility in order to continue operating their business,

maintain business relationships with vendors and suppliers, continue providing products to

customers, retain their workforce by making payroll, and satisfy other working capital and

operational needs—all with the aim of ensuring a value maximizing restructuring for the benefit

of its stakeholders.

7.          Second, the Debtors believe the DIP Facility contains the best available

pricing under the circumstances and it was negotiated in good faith and at arms' length with the

DIP Lenders.  Third, authorization to use Cash Collateral and access the financing provided by

the DIP Facility are critical steps in the implementation of the Proposed Restructuring

Transaction, which is designed to provide the greatest return for the benefit of the Debtors'

stakeholders.  Stated otherwise, use of Cash Collateral and approval of the DIP Facility are keys

to these chapter 11 cases as they provide for working capital and will allow the Debtors to

continue operating until the Proposed Restructuring Transaction is fully consummated.

## **BACKGROUND**

### A.    **General Background.**

8.          On the date hereof (the "**Petition Date**"), each of the Debtors filed a

voluntary petition in the Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors

intend to continue in the possession of their respective properties and the management of their

respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  The Debtors have requested that these chapter 11 cases be consolidated for

procedural purposes only.  As of the date hereof, no trustee, examiner or official committee has

been appointed in any of the Debtors' cases.

   9. The events leading up to the Petition Date and the facts and circumstances

supporting the relief requested herein are further set forth in the First Day Declaration.

**B.**  **Prepetition Capital Structure.**

   10. As of the Petition Date, the Debtors had approximately $441 million of

consolidated outstanding indebtedness, which includes approximately $414 million of debt that

matures in 2019.  The components of the Debtors' outstanding indebtedness are summarized

below.

   **i.**  **Convertible Notes**

   11. On August 15, 2014, Aegerion Pharmaceuticals, Inc. ("**Aegerion**")

entered into a convertible note indenture with The Bank of New York Mellon, as indenture

trustee, pursuant to which Aegerion issued 2% senior unsecured convertible notes in the original

aggregate principal amount of $325 million due August 15, 2019 (the "**Convertible Notes**").  As

of the Petition Date, approximately $304.1 million remains outstanding under the Convertible

Notes, including interest and fees.

   **ii.**  **Intercompany Loan**

   12. In connection with Novelion merger with Aegerion, on June 14, 2016

Aegerion and Novelion entered into a loan and security agreement (the "**Novelion**

**Intercompany Loan Credit Agreement**"), pursuant to which Novelion provided a senior

secured term loan to Aegerion in the principal amount of $40 million, bearing paid-in-kind

interest at 8% and maturing on July 1, 2019 (the "**Novelion Intercompany Loan**").  The

Novelion Intercompany Loan is secured by, among other things, Aegerion's intellectual property

and all of Aegerion's equity interests (including up to 65% of Aegerion's equity interests of any

first-tier foreign subsidiary).  As of the Petition Date, approximately $36.3 million remains

outstanding under the Novelion Intercompany Loan, including interest and fees.

### iii.    Bridge Loan

13.    On November 8, 2018, Aegerion entered into a bridge credit agreement

(the "**<u>Bridge Loan Credit Agreement</u>**") with certain funds managed by Highbridge Capital

Management, LLC and Athyrium Capital Management, LP as lenders (the "**<u>Bridge Loan</u>**

**<u>Lenders</u>**"), Cantor Fitzgerald Securities as agent, Aegerion as borrower, and Debtor Aegerion

Pharmaceuticals Holdings, Inc. as guarantor.  Pursuant to the Bridge Loan Credit Agreement, the

Debtors borrowed secured first lien term loans in the aggregate principal amount of $50 million

(the "**<u>New Money Bridge Loan</u>**") and $22.5 million of secured term loans that were funded to

repurchase and retire, at par, an equal amount of Convertible Notes held by the Bridge Loan

Lenders (collectively, the "**<u>Roll Up Loan</u>**" and together with the New Money Bridge Loan, the

"**<u>Bridge Loan</u>**").  The New Money Bridge Loan accrues interest at the rate of 11% per annum

and the Roll Up Loan accrues interest at the rate of 2% per annum.  Interest accrues and

compounds quarterly in arrears and is not payable in cash until maturity.

14.    The Bridge Loan is secured by a lien on substantially all of the assets of

the Debtors, including a pledge of 65% of the obligors' first-tier foreign subsidiaries' equity

interests.  The liens granted to secure the obligations under the New Money Bridge Loan are

senior to the liens granted to secure the Debtors' obligations under the Novelion Intercompany

Loan; however, the liens granted to secure the Roll Up Loan are junior to those granted under the

Novelion Intercompany Loan.

15.    The Bridge Loan had an initial maturity of February 15, 2019, subject to

the Debtors' right to extend pursuant to the terms thereof.  On January 31, 2019, Aegerion sent

notice to the agent under the Bridge Loan Credit Agreement electing to extend the initial

maturity date to June 30, 2019, as permitted under and in accordance with the terms of the

Bridge Loan Credit Agreement.  As of the Petition Date, approximately $73.8 million remains

outstanding under the Bridge Loan, including interest and fees.

### iv.    Trade Claims

16.    In addition to the Debtors' funded debt, the Debtors estimate that, as of the

Petition Date, they had approximately $1.7 million in unpaid trade and other ordinary course

obligations.

### v.    Equity Ownership

17.    Novelion, the Debtors' non-Debtor ultimate parent, owns 100% of the

outstanding equity interests in Aegerion.  As of the Petition Date, Novelion had 19,017,310

shares of common stock outstanding, which is listed on NASDAQ.  Novelion is not a debtor in

these chapter 11 cases.

## C.    The Debtors' Decision to Enter into the DIP Credit Agreement.

18.    As a bankruptcy filing became more of a possibility, the Debtors, along

with their advisors, began informal discussions with the DIP Lenders (who also are the Debtors'

Bridge Loan Lenders) to secure the funding necessary to facilitate the Proposed Restructuring

Transaction in a chapter 11 restructuring.  In evaluating their financing options, the Debtors were

cognizant of the challenges presented by the fact that substantially all of the Debtors' assets were

encumbered by liens securing their obligations under the Bridge Loan Credit Agreement and the

Novelion Intercompany Loan, as well as the fact that the Bridge Loan Lenders held over

majority of the Debtors' Convertible Notes.  Moreover, in negotiating the terms of the DIP

Facility and the Proposed Restructuring Transaction, the DIP Lenders indicated a willingness to

allow the Debtors to satisfy their obligations under the DIP Facility through the issuance of new

unsecured convertible debt to be issued under the Plan (to the extent the Debtors do not have

sufficient cash on the effective date of the Plan to satisfy the DIP Obligations in full in cash).

Indeed, the pre-negotiated Plan provides for that result. This provides necessary certainty

regarding the Debtors' ability to implement and consummate the carefully negotiated Proposed

Restructuring Transaction. In light of that agreement and their existing capital structure, it

became clear to the Debtors that any alternative postpetition lender likely would not be willing to

extend credit to them on better terms, nor on an unsecured or junior basis.

19.     The Debtors and their advisors therefore engaged in arm's length, good

faith negotiations with the DIP Lenders and their advisors and ultimately agreed to the terms of

the DIP Facility.

## JURISDICTION

20.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper

before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief

requested herein are sections 105(a), 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code,

Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

## THE DIP FACILITY

### A.     The Debtors' Need for Liquidity.

21.     The Debtors require the use of Cash Collateral (and ultimately access to

the financing available under the DIP Facility) to have sufficient liquidity to operate their

business and administer their estates during these chapter 11 cases. The value of the Debtors'

estates is dependent primarily on the continued dedication of their employees' abilities and their

ability to continue providing pharmaceutical products to their customers. Interruption of the

Debtors' business would severely impede the Debtors' ability to continue operations and

maintain the value of the estates for the benefit of their stakeholders. Consequently, the Debtors

require the DIP Facility and the use of Cash Collateral as critical, value-maximizing elements of these chapter 11 cases.

22.     Access to the DIP Facility and use of Cash Collateral is also necessary to provide comfort to third parties, such as the Debtors' employees, customers, vendors and suppliers, that the Debtors have sufficient capital to continue their operations in the ordinary course while they pursue their Proposed Restructuring Transaction.

23.     The DIP Facility, totaling $20 million in the aggregate, will provide the necessary liquidity to fund, in combination with the use of Cash Collateral, the Debtors' operating, working capital and capital expenditure needs during the course of these chapter 11 cases.  Through the Interim Order, the Debtors seek authorization to use Cash Collateral and grant related adequate protection on an interim basis (the Debtors do <u>not</u> require access to the financing available under the DIP Facility during this interim period).  Upon entry of the Final Order, the Debtors will be able to access the financing under the DIP Facility (subject to its terms).

**B.      Terms of the DIP Facility and Orders.**

24.     The principal terms of the proposed DIP Facility, including the provisions of the DIP Credit Agreement, the Interim Order and the Final Order required to be highlighted in this Motion pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2, are as follows:[3]

| | |
|---|---|
| **Borrower**: | Aegerion Pharmaceuticals, Inc. |
| | |
| **Guarantor:** | Aegerion Pharmaceuticals Holdings, Inc. |
| | |

---

[3]     This summary is qualified in its entirety by the provisions of the DIP Loan Documents, the Interim Order and the Final Order, as applicable, the terms of which govern in all respects.

| | |
|---|---|
| **Administrative & Collateral Agent**: | Cantor Fitzgerald Securities |
| | |
| **DIP Lenders**: | Athyrium Opportunities II Acquisition, LP, Athyrium Opportunities III Acquisition, LP, 1992 MSF International, Ltd., 1992 Tactical Credit Master Fund, L.P. |
| | |
| **DIP Facility**:<br>*FBR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(1)* | $20 million senior secured super-priority multi-draw term loan facility. |
| | |
| **Approved Budget**<br>*LBR 4001-2(a)(2)*<br>*Interim Order ¶ 2*<br>*Final Order ¶ 2* | Please see Exhibit A to the Interim Order. The Debtors believe that the budget will be adequate to pay all administrative expenses during the period when financing is needed. |
| | |
| **Interest Rate**:<br>*FBR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(3)*<br>*DIP Credit Agreement Section 2.05* | 12.5% per annum, payable monthly in cash on the last Business Day of each calendar month, commencing June 30, 2019, and the Maturity Date.<br><br>Upon the occurrence and during the continuance of any Event of Default, at the request of the Administrative Agent the Borrower shall pay interest on (i) the principal amount of the Loans and (ii) to the extent then due and payable all other outstanding Obligations under the DIP Credit Agreement, in each case under clauses (i) and (ii), at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. The "Default Rate" means an interest rate equal to the interest rate above plus 2.0% per annum. |
| | |

| | |
|---|---|
| **Fees**:<br>*LBR 4001-2(a)(3), (16)*<br>*DIP Credit Agreement Section 2.06, 10.04*<br>*Final Order ¶ 2* | *Commitment Fee*: 2.5% of the Commitment, paid in cash on the Closing Date.<br><br>*Exit Fee*: The Borrowers shall pay an Exit Fee equal to 1.5% of the aggregate Loans actually advanced, payable to each Lender ratably based on the amount of Loans actually advanced by such Lender (whether or not such Lender is a Lender as of the date of payment of the Exit Fee). The Exit Fee shall be payable in cash on the earlier of (i) the date of repayment of all or a portion of any Loans and (ii) the Maturity Date.<br><br>*Ticking Fee*: The Borrowers shall pay a Ticking Fee equal to such Lender's Pro Rata Share of the product of (i) 4.0% per annum multiplied by (ii) for each monthly period (or partial period if applicable), the actual daily amount by which the Aggregate Commitment exceeds the aggregate amount of Loans advanced during the period since the last payment in respect of the Ticking Fee was made. The Ticking Fee shall be payable in cash monthly in arrears on the last Business Day of each calendar month, commencing May 31, 2019 and shall accrue at all times from and after the execution and delivery of this Agreement through earlier of (a) the Commitment Expiration Date and (b) the Termination of the DIP Financing.<br><br>*Administration Fee*: Borrower shall pay to the Lenders or their respective designees on the Closing Date, for the account of each Lender, an Administration Fee, paid in cash, in the aggregate amount for all such Lenders equal to $50,000, paid ratably to the Lenders based on their Pro Rata Share of the Commitments.<br><br>*Fees and Expenses of the DIP Lenders*: The Debtors shall pay, in accordance with the DIP Credit Agreement and the Final Order, the reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and DIP Lenders (including the reasonable and documented fees, out-of-pocket expenses and actual disbursements of outside counsel) as set forth in the DIP Credit Agreement. |
| | |
| **Maturity Date**:<br>*FBR 4001(c)(1)(B)*<br>*DIP Credit Agreement Section 1.01* | The date which is the earliest to occur of (i) the effective date of a confirmed chapter 11 reorganization, (ii) the date that is one hundred and fifty (150) days after the Petition Date, which may be extended by an additional sixty (60) days to the extent the "Outside Date" (as defined in the Plan Funding Agreement) is extended in accordance with Section 8.1(b)(ii) of the Plan Funding Agreement and (iii) the date on which the Loans and other Obligations hereunder are accelerated and become due and payable following the occurrence of an Event of Default, in each case, pursuant to Section 8.02 of the DIP Credit Agreement. |

| | |
|---|---|
| **Voluntary Prepayment**<br>*LBR 4001-2(a)(13)*<br>*DIP Credit Agreement Section 2.03* | The Debtors may, upon notice to the DIP Agent, voluntarily prepay the loans in whole or in part without penalty. |
| **Adequate Protection Collateral**:<br>*FBR 4001(c)(1)(B)(i) and (vii)*<br>*LBR 4001-2(a)(4)*<br>*Interim Order ¶ 3*<br>*Final Order ¶ 3* | Any and all tangible and intangible pre- and post-petition property of the Debtors, whether existing before, on or after the Petition Date, together with any proceeds thereof, including, without limitation, any and all cash and any investment of such cash, inventory, goods, accounts, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, payment intangibles, documents, instruments, securities, chattel paper, interests in leaseholds (*provided, however,* that solely to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event there shall only be a lien on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code), real property, deposit accounts (except for any account created to hold an adequate assurance deposit for utility providers, pursuant to separate order of the Court), securities accounts, investment property, letters of credit, letter-of-credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, commercial tort claims, capital stock of subsidiaries, Avoidance Action Proceeds, wherever located, and the proceeds, products, rents, accession and profits of the foregoing. |
| **DIP Liens**:<br>*FBR 4001(c)(1)(B)(i) and (vii)*<br>*LBR 4001-2(a)(4)*<br>*DIP Credit Agreement Section*<br>*Final Order ¶ 2* | Effective as of the Petition Date, the following DIP Liens will be granted on all Adequate Protection Collateral, in each case subject to the Carve-Out: (i) pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all Adequate Protection Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve-Out; and (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming Lien on all other Adequate Protection Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the Adequate Protection Liens and senior and priming to (A) the Prepetition Liens and (B) any Liens that are junior to the Prepetition Liens or the Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the "<u>Primed Liens</u>") and shall be junior |

| | only to the Prepetition Prior Liens and the Carve-Out. |
|---|---|
| **DIP Superpriority Claims**: <br> *FBR 4001(c)(1)(B)(i) and (vii)* <br> *LBR 4001-2(a)(4)* <br> *DIP Credit Agreement Section 9.14* <br> *Final Order ¶ 2* | The DIP Lenders shall be deemed to have an allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out in accordance with this Final Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Superpriority Claims (as defined in the Final Order)), priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment. <br><br> The DIP Superpriority Claim shall be subject to and subordinate to in all events to the Carve-Out. |
| **Carve-Out**: <br> *LBR 4001-2(a)(5)* <br> *Interim Order ¶ 6* <br> *Final Order ¶ 6* | Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out in accordance with the following: (i) (a) all unpaid fees required to be paid in these chapter 11 cases to the clerk of the Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $50,000 (without regard to the Carve-Out Trigger Notice); (c) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, all unpaid fees, costs, and disbursements of Debtors' Professionals that are incurred prior to the delivery by the DIP Agent or Prepetition Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice, that remain unpaid after application of any retainers being held by such professionals; (c) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, all unpaid fees, costs, and disbursements of Committee's Professionals and all reasonable unpaid out-of-pocket expenses of the members of any Committee Members, in each case that are incurred prior to the delivery by the DIP Agent or Prepetition Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice, and remain unpaid after |

|  | application of any retainers being held by such professionals, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $500,000; (d) the unpaid fees, costs, and disbursements of the Debtors' Professionals that are incurred after the delivery of a Carve-Out Trigger Notice by the DIP Agent or the Prepetition Agent, that are allowed by the Court under sections 327, 330 or 363 of the Bankruptcy Code, after application of any already un-applied retainers being held by such professionals, in an aggregate amount not to exceed $1,000,000; and (e) the reasonable unpaid fees, costs, and disbursements of the Committee Professionals and the reasonable unpaid expenses of Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice by the DIP Agent or the Prepetition Agent, that are allowed by the Court under sections 328, 330 or 1103 of the Bankruptcy Code after application of any retainers being held by such professionals, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $250,000 (provided that any success, completion, or similar fees payable from the Post-Default Carve-Out Cap amount shall be subject and subordinate, and junior in right of payment, to all other Professional Fees payable from such amount). |
|---|---|
| **Validity of DIP Liens and Adequate Protection Liens**:<br>*FBR 4001(c)(1)(B)(iii)*<br>*DIP Credit Agreement Section 9.14*<br>*Interim Order ¶ 4*<br>*Final Order ¶ 4* | The DIP Liens and Adequate Protection Liens shall be deemed valid, binding, enforceable and perfected upon entry of the relevant Order. The DIP Lenders and the Prepetition Lenders shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including possession of the DIP Collateral) in order to validate the perfection of any of the DIP Liens or Adequate Protection Liens. |
| **Use of Funds**<br>*LBR 4001-2(a)(9)*<br>*DIP Credit Agreement Section 6.12*<br>*Interim Order ¶ 2*<br>*Final Order ¶ 2* | The Debtors shall be authorized to use the proceeds (including, without limitation, cash, accounts, negotiable instruments and any other property comprising "Cash Collateral") for funding general working capital purposes, expenses and operating expenses in accordance with the Approved Budget (subject to Permitted Variances), the Final Order and the DIP Credit Agreement. |
| **Conditions Precedent**:<br>*FBR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(2)*<br>*DIP Credit Agreement Section 4.01* | The DIP Credit Agreement incorporates conditions precedent as are usual and customary for financings of this type including (and as set forth in greater detail in the DIP Credit Agreement): |
|  | *Conditions Precedent to advances of initial Loans, including but not limited to:* |

| | |
|---|---|
| | 1.  Execution and delivery of the DIP Loan Documents; |
| | 2.  Administrative Agent's or the Lenders' (as applicable) receipt of the documents described in Sections 4.01(a) and (j) of the DIP Credit Agreement; |
| | 3.  Administrative Agent and each Lender receipt of the Initial Approved Budget; |
| | 4.  All proceedings commenced in connection with the execution of the DIP Credit Agreement, all other Loan Documents and approval thereof by the Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related hereto and thereto) shall be satisfactory in all respects to the Administrative Agent and the Required Lenders; |
| | 5.  The Borrower and each guarantor under the DIP Credit Agreement (i.e. the Loan Parties) shall have commenced these chapter 11 cases and all of the "first day motions," "first day orders" and all related pleadings entered or to be entered at the time of the Petition Date or shortly thereafter shall have been made available to the Administrative Agent and DIP Lenders in advance, and shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders; |
| | 6.  The Final Order shall have been entered by the Court, within forty Business Days of the Petition Date; |
| | 7.  All orders entered by the Court pertaining to cash management and adequate protection, including the Financing Orders, and all other motions and documents filed or to be filed with, and submitted to the Court in connection therewith, shall be satisfactory in all respects in form and substance to the Administrative Agent and the Required Lenders; |
| | 8.  Borrower shall have paid all accrued and unpaid costs, fees and expenses (including applicable Attorney Costs (with respect to the reasonable and documented fees and expenses of Shipman & Goodwin LLP) and the reasonable and documented out-of-pocket fees and expenses of the Financial Advisor, and any other advisors to the Administrative Agent and the DIP Lenders) and any other compensation required to be paid to the Administrative Agent and the DIP Lenders on or prior to closing shall have been received (to the extent an invoice for such costs, fees and expenses has been provided to the |

| | Borrower at least two Business Days prior to closing; |
|---|---|
| | 9. The DIP Lenders shall have received on or prior to the closing all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act, in order to allow the Lenders to comply therewith, in each case, to the extent requested at least five Business Days prior to the closing; |
| | 10. No trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets; |
| | 11. There shall have been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (as defined in the DIP Credit Agreement), except for (i) the commencement of the chapter 11 cases, (ii) the continuation of the circumstances giving rise to the filing thereof or as a result thereof, and (iii) any defaults under agreements as a result of the commencement of the chapter 11 cases that have no effect under the terms of the Bankruptcy Code; and |
| | 12. The Restructuring Support Agreement shall have been executed by all parties thereto and shall be in full force and effect. |
| | |
| | *Conditions Precedent to advances of all Loans, including but not limited to:* |
| | |
| | 1. Administrative Agent's or the Lenders' (as applicable) receipt of the documents described in Sections 4.02(a) of the DIP Credit Agreement; |
| | 2. Representations and warranties of each Loan Party in the DIP Credit Agreement or any other DIP Loan Document shall be true and correct in all material respects and no Default or Event of Default shall exist or would result from the incurrence of the Loans or from the application of the proceeds therefrom; |
| | 3.  The Final Order shall be in full force and effect, and shall not have been vacated, reversed, rescinded or appealed and stayed, and, without the prior written consent of the Administrative Agent and the Required Lenders, shall not have been amended or modified; and |
| | 4. Borrowing shall not be in an amount greater than is |

| | |
|---|---|
| | reasonably necessary to allow the Borrower to (a) maintain a cash reserve of $5,000,000, (b) make the expenditures set forth in the Approved Budget (subject to the Permitted Variances), and (c) following approval by the Court of the Reorganization Plan, maintain a cash reserve reasonably sufficient to make the payments and disbursements (including estimated amounts in respect of professional fees and expenses of the Loan Parties, any statutory committee of unsecured creditors appointed in these chapter 11 case, the Administrative Agent, the Lenders and the Prepetition Secured Parties (as defined in the Final Order) contemplated by the Reorganization Plan. |
| **Waiver of Automatic Stay**: <br> *FBR 4001(c)(1)(B)(iv)* <br> *Interim Order ¶ 14* <br> *Final Order ¶ 15* | Any automatic stay otherwise applicable to the DIP Secured Parties and the Prepetition Secured Parties is hereby modified, without requiring prior notice to or authorization of the Court, to the extent necessary to permit the DIP Secured Parties and the Prepetition Secured Parties (subject to the Subordination Agreement) to exercise (i)  immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under the Orders, Prepetition Bridge Loan Credit Agreement (solely with respect to Bridge Loan Obligation other than Roll Up Loans), the DIP Loan Documents and/or applicable non-bankruptcy law (other than those rights and remedies against the Adequate Protection Collateral as provided in the Orders), including the right to (i)(1) declare all Prepetition Bridge Loan Obligations (other than Roll Up Loans) and/or DIP Obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (3) terminate the Prepetition Bridge Loan Credit Agreement, DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent, Prepetition Agent, and the other DIP Secured Parties and Prepetition Secured Parties, but without affecting any of the DIP Obligations or Prepetition Obligations or the DIP Liens or Prepetition Liens securing such obligations; and/or (ii) to declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration hereunder shall be made to the respective lead counsel to the Debtors, the Committee and the U.S. Trustee, and shall be referred to herein as a "Termination Declaration" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date"). |
| | |

| | |
|---|---|
| **Representations and Warranties**: *DIP Credit Agreement Article V* | The DIP Facility contains representations and warranties consistent with the Prepetition Credit Agreement (with modifications typical for debtor-in-possession facilities of this type). |
| **Indemnification**: *FBR 4001(c)(1)(B)(ix)* *DIP Credit Agreement Section 10.05* | Borrower shall indemnify and hold harmless the Administrative Agent, each DIP Lender and their respective affiliates, directors, officers, employees, counsel, agents, trustees, advisors and attorneys in fact (including without limitation, Latham & Watkins LLP and Ducera Partners LLC) from and against any and all liabilities, obligations, losses, taxes, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including one counsel to the Administrative Agent and a separate counsel to the DIP Lenders, taken as a whole) (and, in the event of any actual conflict of interest, additional counsel to the affected parties) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee to the extent provided in Section 10.05 of the DIP Credit Agreement. |
| **Covenants**: *FBR 4001(c)(1)(B)* *LBR 4001-2(a)(8)* *DIP Credit Agreement Articles VI, VII* *Interim Order ¶ 2* *Final Order ¶ 2* | Customary financial and negative covenants consistent with a DIP financing facility. Financial reporting covenants include, but are not limited to: (i) monthly, quarterly and annual, internally prepared, financial statements, (ii) proposed Supplemental Approved Budgets and variance reports in accordance with the Final Order, and (iii) other reporting as set forth in Section 6.01 of the DIP Credit Agreement.<br><br>The Orders provide that the Debtors may expend Cash Collateral and related proceeds subject to certain permitted variances, including (i) permitted variances with respect to the actual operating disbursements of the Debtors tested weekly and on a basis in accordance with the Orders, and (ii) permitted variances with respect to the actual cash receipts of the Debtors tested weekly. |
| **Events of Default**: *FBR 4001(c)(1)(B)* *LBR 4001-2(a)(10) & (11)* *DIP Credit Agreement Section 8.01* | The DIP Credit Agreement contains such events of default as are usual and customary for financings of this kind, including but not limited to: |
| | 1. The Loan Parties fail to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three Business Days after the same becomes due in cash, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document;<br><br>2. The Borrower fails to perform or observe any term, covenant or agreement in any of Sections 6.01(d), 6.01(f), |

6.03(a), 6.05, 6.07, 6.10(b), 6.12, 6.19 or 6.20 or Article VII of the DIP Credit Agreement;

3.  Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) of the DIP Credit Agreement) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders;

4.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made;

5.  Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any post-Petition Date indebtedness (other than indebtedness under the DIP Credit Agreement) having an aggregate principal amount of not less than the $300,000 (i.e., the Threshold Amount), unless such failure to pay is a result of these chapter 11 cases, or (B) fails to observe or perform any other agreement or condition relating to any such indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, in each case, unless such failure to observe or perform is a result of these chapter 11 cases;

6.  After the Petition Date, there is entered against any Loan Party or any subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny or fail to confirm coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty consecutive days;

7.  The occurrence of certain ERISA-related events;

8.  Any material provision of any Loan Document, at any time after its execution and delivery or entry (with respect to the Final Order) and for any reason other than as expressly permitted thereunder or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document (other than as a result of the Termination of the DIP Financing), purports to revoke or rescind any Loan Document or asserts (including by commencing or joining in any legal proceeding) that any Collateral Document is invalid or unenforceable or contests in any manner that any Loan Document constitutes a valid and enforceable agreement against it;

9.  There occurs any (i) Change of Control (as defined in the DIP Credit Agreement) or (ii) any change to the ownership of direct and indirect Subsidiaries of the Borrower from the ownership structure set forth on Schedule 5.14 of the DIP Credit Agreement

10. Any Collateral Document shall for any reason cease to create a valid and perfected Lien (having the priorities specified in the Final Order) on and security interest in the DIP Collateral;

11. Any Loan Party voluntarily or involuntarily dissolves or is dissolved, liquidates or is liquidated or files a motion with the Court seeking authorization to dissolve or liquidate;

12. If any Loan Party is enjoined, restrained or in any way prevented by court order (other than an approved Court order) from continuing to conduct all or any material part of its business affairs or any Loan Party or any of their respective subsidiaries' cessation of all or any material part of its business operations (other than in connection with a sale of assets permitted by the Loan Documents or otherwise consented to by the Required Lenders);

13. With respect to the board of directors of the Borrower, the independent directors no longer constitute 50% of such board of directors;

14. The Borrower no longer retains AlixPartners as its financial advisor unless replaced with a financial advisor acceptable to the Required Lenders;

15. The Court fails to enter the Final Order within forty calendar days of the Petition Date (with such changes as the Administrative Agent and the Required Lenders may agree to), or the Court enters an order (other than one subject to a stay) that reverses, vacates or stays for a period in excess of ten days the effectiveness of the Final Order whether on appeal or otherwise, in each case without the written consent of the Required Lenders;

16. An order with respect to the Chapter 11 Case shall be entered by the Court (or any of the Loan Parties shall file any pleading or motion requesting entry of an order) (i) appointing a trustee under Section 1104 of the Bankruptcy Code, (ii) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, or (iii) dismissing or converting the Chapter 11 Case to a Chapter 7 case;

17. Any Loan Party fails or neglects to comply with any provision of the Final Order;

18. Any Person other than a Loan Party shall have filed a plan of reorganization or liquidation in the Chapter 11 Case following termination of the Loan Parties' exclusivity periods under Section 1121 of the Bankruptcy Code, unless approved by the Required Lenders;

19. (i) An order (other than one subject to a stay) with respect to these chapter 11 cases shall be entered by the Court (A) permitting any administrative expense claim or any other claim (now existing or hereafter arising, of any kind or nature whatsoever) to have priority as to any of the Loan Parties that is *pari passu* or senior to the Obligations under the DIP Loan Documents, other than the Carve-Out or other claims expressly permitted to have priority over the Obligations under the Final Order; (B) granting or permitting the grant of a Lien on the Collateral (other than a Permitted Lien); or (ii) an order shall be entered by the Court dismissing these chapter 11 cases which does not provide for (x) the termination of the DIP Facility and (y) until the termination of the DIP Facility, the continuity and priority of the Liens of the DIP Agent in the DIP Collateral, the superpriority administrative expense claim status of the Obligations to the same extent as is provided in the Final Order upon such dismissal;

20. The Court enters an order or orders granting relief from

the automatic stay applicable under Section 362 of the Bankruptcy Code for any reason to any Person holding a Lien upon any pre-petition or post-petition assets of any Loan Party with respect to any Collateral as to which the Administrative Agent has been granted a first priority lien, or any other assets of any Loan Party where the aggregate value of the property subject to all such order or orders is greater than the Threshold Amount;

21. Any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (i) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document or (ii) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in the Final Order in favor of the Administrative Agent;

22. Any of the Loan Parties shall make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than those payments in respect of adequate protection permitted pursuant to the terms of the Final Order and payments authorized by the Court in respect of (i) any payments required and/or permitted in the "first day orders" or any subsequent approved Court order or (ii) accrued payroll and related expenses as of the Petition Date;

23. (i) An order shall have been entered modifying (in a manner adverse to the Loan Parties) the adequate protection obligations granted in the Final Order without the prior written consent of the DIP Agent, (ii) an order shall have been entered by the Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations, (iii) any Loan Party shall filed with the Court a motion seeking authority to use any cash proceeds of any of the Collateral to the extent prohibited hereunder, without the written consent of the Required Lenders and the Administrative Agent or (iv) any Loan Party shall file a motion or other request with the Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not require (x) the termination of the DIP Facility and (y) until the termination of the DIP Facility, the continuity and priority of the Liens of the Administrative Agent in the Collateral, the superpriority administrative expense claim status of the Obligations to the same extent as is provided in the

| | |
|---|---|
| | Final Order; |
| | 24. The Borrower shall fail to (i) file, by no later than May 21, 2019, the Reorganization Plan or a plan of reorganization in these chapter 11 cases that contains a provision for the Termination of the DIP Financing on the effective date of such plan (or such other satisfaction of the Obligations for which each Lender has provided its prior consent) and (ii) obtain entry of a confirmation order from the Court with respect to the Reorganization Plan or a plan of reorganization in these chapter 11 cases that contains a provision for (x) the termination of the DIP Facility and (y) until the termination of the DIP Facility, the continuity and priority of the liens of the Administrative Agent in the Collateral, the superpriority administrative expense claim status of the obligations under the DIP Credit Agreement, in each instance, to the same extent as is provided in the Final Order by on hundred twenty-five calendar days after the Petition Date; or |
| | 25. The Restructuring Support Agreement is (i) no longer in effect or (ii) is amended, modified or subject to a waiver, in the case of clause (ii), in a manner materially adverse to the interests of the DIP Lenders without the consent of the Required Lenders. |
| | |
| **Governing Law and Jurisdiction**: *DIP Credit Agreement Section 10.14* | State of New York and the Bankruptcy Code |

25. The Debtors additionally seek approval of the Interim Order regarding the Debtors' use of the Cash Collateral on the terms and conditions set forth in the Interim Order.

26. Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of certain provisions of the Interim Order regarding the terms of the Debtors' use of the Cash Collateral and adequate protection provided therein.

| | |
|---|---|
| **Adequate Protection Liens:** *LBR 4001-2(a)(4)* *Interim Order ¶ 3(i)* | The Interim Order provides that as adequate protection, subject to the Carve-Out, for and to the extent of any diminution in value of their respective interests in the property that existed on or prior to the Petition Date, together with all cash and non-cash proceeds thereof (the "**Prepetition Collateral**"), the Prepetition Agent and Prepetition Bridge Loan Secured Parties are granted valid, duly perfected and non-avoidable replacement security interests and liens in and to all of the Prepetition Collateral as partial adequate |

| | |
|---|---|
| | protection ("**Adequate Protection Liens**").  For purposes of the Interim Order, the Adequate Protection Liens shall not attach to any claims pursuant to sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code or the proceeds thereof. |
| | |
| **Adequate Protection Superpriority Claims:**<br>*LBR 4001-2(a)(4)*<br>*Interim Order ¶ 3(ii)* | The Interim Order provides that as further adequate protection against any diminution in value in the Prepetition Collateral, the Prepetition Bridge Loan Secured Parties, as applicable, are granted a separate allowed superpriority adequate protection claim in these chapter 11 cases (the foregoing superpriority claims shall be referred to as the "**Adequate Protection Superpriority Claims**").   Subject to the Carve-Out, the Superpriority Adequate Protection Claim shall have priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 7), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions but including, subject to entry of the Final Order, all Avoidance Actions Proceeds). |
| | |

## BASIS FOR RELIEF REQUESTED

27.     The Debtors believe that the DIP Facility is the best financing available to the Debtors.  The Debtors do not believe they would be able to procure financing (a) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, or (b) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code.  Given the Debtors' existing capital structure, and the DIP Lenders' agreement to allow a portion of the DIP Obligations to be paid through the issuance of new convertible unsecured notes under the Plan to the extent the Debtors also do not have adequate cash on the effective date of the Plan, the Debtors do not believe they would be able to procure postpetition financing on terms better than those provided by the DIP Lenders.

28.      Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (x) entitled to superpriority administrative expense status or (y) secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both.  Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property (i.e., a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of the existing lienholders are adequately protected.  See 11 U.S.C. §§ 364(c), (d).

29.      As discussed herein, the DIP Facility will be secured by substantially all of the assets of the Debtors' estates, including liens on any unencumbered property, junior liens and senior priming liens, pursuant to section 364 of the Bankruptcy Code, and all DIP Obligations will be granted superpriority administrative expense status.

**A.     The Debtors Should Be Authorized to Obtain
Postpetition Financing Under Section 364(c) of the Bankruptcy Code.**

30.      Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a superpriority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, and (c) secured by a junior lien on the debtor's already encumbered assets.  See 11 U.S.C. § 364(c).  Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-29 (Bankr. S.D.N.Y. 1990) (debtor

must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

31.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:  (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  See In re Ames Dep't Stores, 115 B.R. at 37-39.  The Debtors satisfy each part of this test.

**i.    The Debtors Could Not Obtain Unsecured Financing.**

32.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Say. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id.; see also In re Ames Dep't Stores, 115 B.R. at 40 (holding that debtor made reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from remaining two lenders).

33.    As set forth above, prior to the Petition Date, the Debtors and their advisors discussed debtor-in-possession financing with their Bridge Loan Lenders and evaluated whether they would be able to obtain such financing on terms better than those being offered by the Bridge Loan Lenders.  The Bridge Loan Lenders (who are the DIP Lenders under the DIP Credit Agreement) were not willing to provide the financing needed on simply an unsecured,

administrative claim basis; nor were they willing to provide the necessary financing on a junior

secured basis.  During the course of negotiations, the Bridge Loan Lenders also informed the

Debtors that they would not consent to the priming of the liens securing their Bridge Loan by a

third party lender.  Moreover, in connection with negotiations regarding the terms of the Plan,

the DIP Lenders agreed to allow a portion of the DIP Obligations to be paid as new convertible

unsecured notes under the Plan to the extent the Debtors do not have adequate cash on the

effective date of the Plan.  Given the foregoing, and the expense, time and risks associated with

finding and obtaining court approval of alternative financing and the immediacy of the Debtors'

need to access Cash Collateral, the Debtors determined that it would not be productive to solicit

interest for junior or unsecured administrative expense financing from additional lenders prior to

the commencement of these chapter 11 cases.

> ii.    **Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is in the Best Interest of Creditors.**

34.    A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  See In re

Barbara K Enters., Inc., 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. Mar. 5, 2009) (explaining

that courts defer to debtor's business judgment); Ames Dep't Stores, 115 B.R. at 38 (noting that

financing decisions under section 364 of the Bankruptcy Code must reflect debtor's business

judgment).  Courts grant a debtor considerable deference in acting in accordance with its sound

business judgment.  See, e.g., Barbara K Enters., 2008 WL 2439649 at *14 (explaining that

courts defer to debtor's business judgment "so long as a request for financing does not 'leverage

the bankruptcy process' and unfairly cede control of the reorganization to any party in interest.").

35.    To determine whether the business judgment standard is met, a court is

"required to examine whether a reasonable business person would make a similar decision under

similar circumstances." In re Dura Auto. Sys., Inc., No. 06-11202 (KJC), 2007 Bankr. LEXIS

2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., 340 B.R. 222, 239

(Bankr. D. Del. 2006)).

        36.     Here, in the exercise of their business judgment, the Debtors have

determined that entry into the DIP Facility is necessary to preserve the assets of their estates in

order to pursue and consummate the Proposed Restructuring Transaction.  The Debtors' decision

to enter into their existing capital structure and the pricing and terms offered, as well as the DIP

Facility was informed by the DIP Lenders' commitments to the RSA and the Plan.  Ultimately,

the Debtors' decision to enter into the DIP Facility is clearly the best option available to the

Debtors and entry of the Orders is in the best interests of the Debtors, their estates, and their

stakeholders.  Without the use of Cash Collateral and financing provided by the DIP Facility, the

Debtors would lack the liquidity necessary to continue operating their business in the ordinary

course while they pursue the Proposed Restructuring Transaction in an orderly manner.

       **iii.**     **The Terms of the DIP Facility Are Fair and Reasonable Under the**
            **Circumstances.**

        37.     In determining whether the terms of postpetition financing are fair and

reasonable, courts consider the relative circumstances of both the debtor and the potential lender.

See In re Farmland, 294 B.R. at 886-89; see also Unsecured Creditors' Comm. Mobil Oil Corp.

v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.), 65 B.R. 358, 364-65 n.7

(W.D. Mich. 1986) (recognizing debtor may have to enter into "hard" bargains to acquire funds

for its reorganization).  The propriety of a proposed financing facility should also be considered

in light of current market conditions. See Tr. of Record at 740:4-6, In re Lyondell Chem. Co.,

No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market

conditions, as disappointing as the [DIP financing] pricing terms are, I find the provisions [of a

DIP financing facility that included a roll-up of prepetition secured debt] reasonable here and now.").

38.     Through the consensual use of Cash Collateral and the financing available under the DIP Facility, the Debtors will have the liquidity they need to operate their business during these chapter 11 cases.  The terms that have been agreed to are fair and customary, and permit the Debtors to effectively pursue the Proposed Restructuring Transaction.

39.     Moreover, the Debtors believe the various fees and charges associated with obtaining the DIP Facility are usual and customary and well within the range of reasonableness.[4]  Courts recognize that lender fees often are the only way to obtain financing, and routinely approve them.  See, e.g., Resolution Trust Corp. v. Official Unsecured Creditors' Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

40.     Further, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these chapter 11 cases.  Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve-Out for certain administrative and professional fees, including (a) administrative expenses incurred in accordance with the Budget, (b) fees required to be paid to the Court and to the U.S. Trustee, and (c) fees and disbursements incurred by professional persons employed by the Debtors or any statutory committee in the Debtors' chapter 11 cases.  Carve-outs for

---

[4]     The Debtors intend on filing a supporting declaration regarding the fees and pricing under the DIP Facility prior to the hearing to consider entry of the Final Order.

professional fees have been found to be reasonable and necessary to ensure that statutory

creditors' committees and debtors' estates are adequately assisted by counsel and other

professionals.  See In re Ames, 115 B.R. at 38.

41.    Accordingly, after thorough analysis by the Debtors and their advisors, the

Debtors have concluded that the terms of the DIP Facility are reasonable and appropriate under

the circumstances.

## B.    Financing Under Section 364(d) of the Bankruptcy Code.

42.    Section 364(d)(1) of the Bankruptcy Code provides that a court may

authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is

unable to obtain credit otherwise and (b) there is "adequate protection of the interest of the

holder of the lien on the property of the estate on which such senior or equal lien is proposed to

be granted."  See 11 U.S.C. § 364(d)(1); see also In re YL West 87th Holdings I LLC, 423 B.R.

421, 441 (Bankr. S.D.N.Y. 2010).

### i.    Priming Pursuant to Section 364(d)(1).

43.    Section 364(d) does not require an exhaustive search for alternative

financing.  See In re Snowshoe Co., 789 F.2d at 1088; see also In re 495 Central Park Ave.

Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the

debtor to seek alternate financing from every possible lender.  However, the debtor must make

an effort to obtain credit without priming a senior lien."); In re Reading Tube Indus., 72 B.R.

329, 332 (Bankr. E.D. Pa. 1987) ("Courts have found 20 attempts [to secure funding] and 2

attempts [to secure funding] to be sufficient under the particular circumstances of each case but .

. . one attempt is not sufficient.").

44.     Here, the DIP Lenders have insisted upon senior secured liens pursuant to section 364(d)(1).  Importantly, however, the Prepetition Secured Parties have consented to being primed and have agreed to the Debtors' entry into the DIP Facility.  See Anchor Savs. Bank v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) (consenting to imposition of priming lien "relieved the debtor of having to demonstrate that [the lienholders] were adequately protected").  Moreover, the priming liens do not prime the Prepetition Prior Liens (i.e., liens that were in existence on the Petition Date, either perfected as of the Petition Date or perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, and senior in priority to the liens associated with the Bridge Loan Credit Agreement and the  Novelion Intercompany Loan Credit Agreement).  Accordingly, the Debtors submit that the priming liens contained in the DIP Facility are appropriate under the circumstances here.

**ii.     The Debtors' Proposed Grant of Adequate Protection Is Appropriate.**

45.     The Debtors believe that the Prepetition Secured Parties' interests in the Prepetition Collateral are also adequately protected in compliance with section 364(d)(1) of the Bankruptcy Code.

46.     While the Bankruptcy Code does not define "adequate protection," section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  The "indubitable equivalent" alternative "is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party."  Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994).  Courts determine adequate protection for purposes of the Bankruptcy Code "on a case-by-case basis."  Id.; see also In re

Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate

protection is a fact-specific inquiry . . . left to the vagaries of each case."). The purpose of

adequate protection "is to ensure that the creditor receives the value for which he bargained

prebankruptcy." Id. (quoting MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d

1393, 1396 (10th Cir. 1987)); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr.

S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from

diminution in the value of its interest.").[5]

      47.     Here, the Debtors propose to grant the adequate protection provisions set

forth in the summary chart in paragraph 24 above to the extent of any diminution in value of the

Prepetition Collateral. See also Interim Order at ¶ 3 and Final Order at ¶ 3. The Debtors believe

that the adequate protection proposed herein is fair and reasonable under the circumstances of

these chapter 11 cases and is more than sufficient to satisfy the requirements of section 364(d) of

the Bankruptcy Code.

---

[5]    Because section 361 of the Bankruptcy Code defines "adequate protection" for purposes of sections 362, 363 and 364 of the Bankruptcy Code, even though the relief requested in this section of the Motion is based on section 364(d) of the Bankruptcy Code, cases discussing the concept of adequate protection for purposes of sections 362 or 363 are valid authority. See LNC Investments, Inc. v. First Fidelity Bank, 247 B.R. 38, 45 (S.D.N.Y. 2000) (stating that section 361 complements protective provisions sections 362, 363 and 364 by delineating manners in which adequate protection may be provided in all three of these circumstances); Midlantic National Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.), 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980) (noting that "section 363(e) is duplicative of the rights afforded to creditors under section 362(d)"). In applying each of these sections, the Court is directed by the Bankruptcy Code to section 361 to determine the measure of relief necessary to provide the creditor with adequate protection. Therefore, the adequate protection analysis which the Court has undertaken in considering the proper measure of relief under section 362(d) applies to the plaintiffs section 363(e) claim as well . . ."); Desert Fire Prot. v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC), 434 B.R. 716, 753 (S.D. Fla. 2010) (noting that "the principle of adequate protection applies equally" in cash collateral and priming contexts).

### iii.    Use of Cash Collateral.

48.    Although the Debtors do not require immediate access to the financing being made available under the DIP Facility, the Debtors do require and request immediate use of their Cash Collateral pending the hearing to consider entry of the Final Order. Section 63(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Use of cash collateral is authorized if the holders of interests in such cash collateral consent or are provided adequate protection for such interests.  See 11 U.S.C. § 363(e).

49.    The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  As discussed in detail above, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral, subject to the terms of the Orders. In addition, the Debtors believe that the adequate protection proposed herein and in the Orders is fair and reasonable and is sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

### D.    Modification of the Automatic Stay.

50.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Credit Agreement and the Orders contemplate the modification of the automatic stay to the extent necessary to permit the Debtors and the DIP Agent and DIP Lenders to take all actions necessary to implement the DIP Credit Agreement and the Orders.  Pursuant to Local Rule 4001-2(g)(10)(A), the DIP Lenders will provide seven (7) calendar days' prior notice to counsel for the Debtors, counsel for any Committee and the U.S. Trustee after an event of default before enforcing remedies under the DIP Loan Documents.

51.     Stay modification provisions of this type are customary components of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances, and will provide the Debtors and other parties reasonable time to cure or contest an event of default.  Accordingly, the Debtors request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

**E.     Interim Approval and Irreparable Harm.**

52.     Bankruptcy Rule 4001 provides that a final hearing on a motion to obtain postpetition financing and use of cash collateral may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary, expedited hearing on the motion and to authorize the use of cash collateral and proposed debtor-in-possession financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  See Fed. R. Bankr. P. 4001(c)(2).

53.     Here, the Debtors have an urgent and immediate need to use Cash Collateral in order to continue to operate.  Absent access to Cash Collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors and conduct the Proposed Restructuring Transaction.  The Debtors' use of Cash Collateral will ensure that the "going concern" value of their assets is preserved, a value substantially greater than the value which would be realized if the Debtors were forced to cease operations immediately due to a lack of liquidity.  Accordingly, the Debtors request that the Court conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to use Cash Collateral to avoid irreparable harm to their estates.

**F.**    **Establishing Notice Procedures and Scheduling the Final Hearing.**

54.    Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) the

Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c) counsel to those

certain lenders under the Debtors' proposed debtor-in-possession financing facility, the Debtors'

prepetition secured bridge loan credit agreement and the Debtors' 2% unsecured convertible

notes; (d) counsel to Novelion Therapeutics, Inc.; (e) counsel to the indenture trustee for the

Debtors' 2% unsecured convertible notes; (f) the United States Attorney's Office for the

Southern District of New York; (g) the Internal Revenue Service; (h) the United States Food and

Drug Administration; and (i) counsel to the Plan Investor ((a) through (i), collectively, the

"**Notice Parties**")). The Debtors submit that, under the circumstances, no other or further notice

is required.

55.    The Debtors request that the Court schedule the Final Hearing within

thirty-five (35) days of the filing date and authorize them to mail copies of the entered Interim

Order, which fixes the time, date and manner for the filing of objections to entry of the Final

Order.

56.    The Debtors request that the Court consider such notice of the Final

Hearing to be sufficient notice under Bankruptcy Rules 2002 and 4001.

57.    No previous request for the relief sought herein has been made to this or

any other Court.

*Remainder of Page Intentionally Left Blank*

## **CONCLUSION**

WHEREFORE the Debtors request that the Court (a) enter an order substantially

in the form of the proposed Interim Order annexed hereto as <u>Exhibit A</u>; (b) after the Final

Hearing, enter the Final Order substantially in the form annexed hereto as <u>Exhibit B</u>; and

(c) grant such other and further relief as the Court may deem just and proper.


Dated:  May 20, 2019
       New York, New York

                      WILLKIE FARR & GALLAGHER LLP
                      *Proposed Counsel for the Debtors and*
                      *Debtors in Possession*


                  By:  /s/ Paul V. Shalhoub
                      Paul V. Shalhoub
                      Andrew S. Mordkoff

                      787 Seventh Avenue
                      New York, New York 10019
                      Telephone:  (212) 728-8000
                      Facsimile:  (212) 728-8111

## <u>EXHIBIT A</u>

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Aegerion Pharmaceuticals, Inc., et al.,[1] | : | Case No. 19-_____ (      ) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------x

### INTERIM ORDER (I)  AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV)  MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING

Upon the motion, dated May 20, 2019 [Docket No. [___]] (the "Motion"), of the Borrower (as defined below) and the other debtors and debtors-in-possession (collectively, the "Debtors"), in the above-referenced chapter 11 cases (the "Cases"), seeking (among other things) entry of an interim order (this "Interim Order"), pursuant to sections 105, 361, 362, 363, 503, 507, and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), that, among other things:

(i)      authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which the Prepetition Secured Parties (as defined below) have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(ii)     vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order;

---

[1]      The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are: Aegerion Pharmaceuticals, Inc. (0116) and Aegerion Pharmaceuticals Holdings, Inc. (1331). The Debtors' executive headquarters are located at 245 First Street, Riverview II, 18th Floor, Cambridge, MA 02142.

(iii)    grants the Prepetition Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Secured Parties Adequate Protection (as defined below), which consists of, among other things, Adequate Protection Liens (as defined below), Adequate Protection Superiority Claims (as defined below), and current payment of accrued and unpaid prepetition and postpetition interest at the non-default rate, payment of certain specified postpetition payments due to the Prepetition Secured Parties, and reimbursable fees and expenses;

(iv)    schedules a final hearing on the Motion (the "Final Hearing") to be held no later than thirty-five calendar days after the Petition Date to consider entry of a final order that grants all of the relief requested in the Motion on a final basis (including approval on a final basis of the Debtors' request for an order approving postpetition debtor in possession financing (the "DIP Facility"), which relief also was sought by the Motion), which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or this Court) acceptable to the Prepetition Agent (the "Final Order");

(v)    waives, upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(vi)    provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the Motion, and the Declaration of John R. Castellano in Support of Chapter 11 Petitions and First Day Pleadings, (the "First Day Declaration"), and the evidence submitted or proffered at the hearing on this Interim Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), and 4001(d) and 9014 and all applicable Local Rules, notice of the Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); and an Interim Hearing having been held and concluded on _____, 2019; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued

operation of the Debtors' business and the preservation of the value of the Debtors' assets; and

after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

A. **Petition Date**. On May 20, 2019 (the "Petition Date"), each of the Debtors

filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Southern District of New York (this "Court"). The Debtors have

continued in the management and operation of their businesses and properties as debtors-in-

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No statutory committee

of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or

examiner has been appointed in the Cases.

B. **Jurisdiction and Venue**. This Court has core jurisdiction over the Cases,

the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409. The statutory and other predicates for the relief granted herein are

sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002,

4001, 6004, and 9014 and the Local Rules.

C. **Notice**. The Interim Hearing is being held pursuant to the authorization of

Bankruptcy Rule 4001. Notice of the Interim Hearing and the interim relief requested in the

Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier

or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee

for the Southern District of New York (the "United States Trustee"), (ii) those entities or

---

[2]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis, (iii) counsel to the Prepetition Agent (as defined below), (iv) the Prepetition Agent, (v) the Prepetition Bridge Lenders, (vi) counsel to the Prepetition Bridge Lenders, (vii) counsel to Novelion Therapeutics, Inc., (vii) Novelion Therapeutics, Inc., (ix) counsel to Amryt Pharma Plc, and (x) all other known lienholders.  Under the circumstances, such notice of the Motion, and the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules, and no other notice need be provided for entry of this Interim Order.

   D.  **<u>Debtors' Stipulations Regarding the Prepetition Facilities</u>**.  Subject only to the rights of parties in interest that are specifically set forth in Paragraph 5 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (Paragraphs D and E hereof shall be referred to herein collectively as the "<u>Debtors' Stipulations</u>") as follows:

   (i)  <u>Prepetition Bridge Loan Credit Facility</u>.  Pursuant to that certain Bridge Credit Agreement dated as of November 8, 2018 (as amended, restated or otherwise modified from time to time, the "<u>Prepetition Bridge Loan Credit Agreement</u>," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Bridge Loan Documents</u>"), among (a) Aegerion Pharmaceuticals, Inc. (the "<u>Borrower</u>"), as borrower, (b) the other financial institutions party thereto as "Lenders" (collectively, in their capacity as such, the "<u>Prepetition Bridge Lenders</u>"), and (c) Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, the "<u>Prepetition Agent</u>" and, together with the Prepetition Bridge Lenders and any other party to which Prepetition Bridge Loan Obligations (as defined below) are owed, the "<u>Prepetition Bridge Loan Secured Parties</u>"), the Prepetition Bridge Loan Secured Parties agreed to

extend loans and other financial accommodations to, the Borrower pursuant to the Prepetition Bridge Loan Documents.  All obligations of the Debtors arising under the Prepetition Bridge Loan Credit Agreement (including all "Roll Up Loans" (the "Roll Up Loans") and the other "Obligations", each as defined therein) or the other Prepetition Bridge Loan Documents shall collectively be referred to herein as the "Prepetition Bridge Loan Obligations."

        (ii)      Novelion Intercompany Loan Credit Agreement.  Pursuant to that certain Amended and Restated Loan and Security Agreement, dated as of March 15, 2018, between the Novelion Therapeutics Inc. ("Novelion" and, collectively with the Prepetition Bridge Loan Secured Parties, the "Prepetition Secured Parties") and the Borrower (as amended by Amendment No. 1 and Consent, dated as of November 8, 2018 and as further amended, modified, restated, replaced or supplemented from time to time, the "Novelion Intercompany Loan Agreement" and, together with the Bridge Loan Credit Agreement, the "Prepetition Credit Agreements"), and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Novelion Intercompany Loan Documents" and, collectively with the Prepetition Bridge Loan Documents, the "Prepetition Loan Documents"), Novelion agreed to extend loans and other financial accommodations to, the Borrower pursuant to the Novelion Intercompany Loan Documents.  All obligations of the Debtors arising under the Novelion Intercompany Loan Agreement (including the "Obligations", as defined therein, whether or not arising under the Novelion Loan Documents) or the other Novelion Intercompany Loan Documents, whether presently existing or arising in the future, shall collectively be referred to herein as the "Novelion Intercompany Loan Obligations" and, collectively with the Prepetition Bridge Loan Obligations, the "Prepetition Obligations".  Pursuant

to the Subordination Agreement (defined below), the Prepetition Bridge Loan Secured Parties agreed not to challenge, join, direct, support or encourage any other party in challenging or seeking to challenge, the Novelion Intercompany Loan Obligations in the original aggregate amount of $25 million (subject to reduction for certain repayments authorized under the Prepetition Loan Documents) (the "Non-Contested Novelion Intercompany Amount").

(iii)    Prepetition Liens and Prepetition Collateral.    Pursuant to the Collateral Documents (each as defined in the Prepetition Credit Agreements) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Collateral Documents"), by and among each of the Loan Parties party thereto (the "Grantors"), Novelion and the Prepetition Agent, each Grantor granted to (i) the Prepetition Agent, for the benefit of itself and the other Prepetition Bridge Loan Secured Parties, to secure the Prepetition Bridge Loan Obligations, a first priority security interest in and continuing Lien (the "Prepetition Bridge Loan Liens") on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, subject to the terms of the Subordination Agreement (as defined below) with respect to the Roll Up Loans and (ii) Novelion, to secure the Novelion Intercompany Loan Obligations, a first priority security interest in and continuing Lien (the "Novelion Intercompany Loan Liens" and, collectively with the Prepetition Bridge Loan Liens, the "Prepetition Liens") on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, subject to the terms of the Subordination Agreement.  All "Collateral" as defined in the Prepetition Credit Agreements granted or pledged

- 6 -

by such Grantors pursuant to any Prepetition Collateral Document or any other Prepetition Loan Document shall collectively be referred to herein as the "Prepetition Collateral."  As of the Petition Date, (I) the Prepetition Bridge Loan Liens and the Novelion Intercompany Loan Liens supporting the Non-Contested Novelion Intercompany Amount (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition Bridge Loan Secured Parties and Novelion (as applicable) for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the Carve-Out (as defined below) (B) the Permitted Liens (as defined in the Prepetition Bridge Loan Credit Agreement) and (C) solely with respect to the Roll Up Loans, as and to the extent set forth in the Subordination Agreement, the Novelion Intercompany Loan Obligations, and (II) (w) the Prepetition Bridge Loan Obligations and the Non-Contested Novelion Intercompany Amount constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Bridge Loan Obligations or the Non-Contested Novelion Intercompany Amount exist, (y) no portion of the Prepetition Bridge Loan Obligations or the Non-Contested Novelion Intercompany Amount or any payments made to any or all of the Prepetition Bridge Loan Secured Parties or Novelion on account of the Non-Contested Novelion Intercompany Amount are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) any guarantee under the Collateral Documents (as defined

in the Prepetition Bridge Loan Credit Agreement) shall continue in full force and effect to unconditionally guaranty the Prepetition Bridge Loan Obligations and the Non-Contested Novelion Intercompany Amount notwithstanding any use of Cash Collateral permitted hereunder.

(iv) <u>Amounts Owed under Prepetition Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition Bridge Loan Secured Parties, pursuant to the Prepetition Bridge Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Bridge Loan Secured Parties, an aggregate principal amount of not less than $72,976,717 with respect to the bridge loan facility, which amount includes a principal amount of not less than $22,500,000 with respect to the Roll-Up Loans, *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Bridge Loan Documents), and other amounts now or hereafter due under the Prepetition Bridge Loan Documents.  As of the Petition Date, the applicable Debtors owed Novelion an aggregate principal amount of not less than $36,340,173 pursuant to the Novelion Intercompany Loan Agreement of which amount, $19,393,700 is the outstanding Non-Contested Novelion Intercompany Amount, *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Novelion Intercompany Loan Documents), and other amounts now or hereafter due under the Novelion Intercompany Loan Documents.

(v)       <u>Release of Claims</u>.  Subject to the reservation of rights set forth in Paragraph 5 below, each Debtor and its estate shall be deemed to have forever waived, discharged,

and released each of (i) the Prepetition Bridge Loan Secured Parties, (ii) Novelion, and (iii) each

of their respective affiliates, assigns or successors and the respective members, managers, equity

holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees

and other representatives of the foregoing (all of the foregoing, collectively, in such capacity, the

"Prepetition Secured Party Releasees") from any and all "claims" (as defined in the Bankruptcy

Code), counterclaims, causes of action (including causes of action in the nature of "lender

liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or

recovery against any and all of the Prepetition Secured Party Releasees, whether arising at law or

in equity, relating to and/or otherwise in connection (as applicable) with the Prepetition Bridge

Loan Obligations, the Prepetition Bridge Loan Liens, the Non-Contested Novelion Intercompany

Amount or the debtor-creditor relationship between any of the Prepetition Bridge Loan Secured

Parties, on the one hand, and any of  the Debtors, on the other hand, including (I) any

recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant

to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of

applicable state law, federal law, or municipal law and (II) any right or basis to challenge or object

to the amount, validity, or enforceability of the Prepetition Bridge Loan Obligations, the Non-

Contested Novelion Intercompany Amount, or any payments or other transfers made on account

of the Prepetition Bridge Loan Obligations or the Non-Contested Novelion Intercompany Amount,

or the validity, enforceability, priority, or non-avoidability of the Prepetition Liens securing the

Prepetition Bridge Loan Obligations and the Non-Contested Novelion Intercompany Amount,

including any right or basis to seek any disgorgement or recovery of payments of cash or any other

distributions or transfers previously received by any of the Prepetition Secured Party Releasees.

      E.      **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit

accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

F.    **Subordination Agreement**.    The Subordination Agreement dated as of November 8, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Subordination Agreement") among the Prepetition Bridge Loan Secured Parties, Novelion and Novelion Services USA, Inc. ("Novelion Services") sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition Bridge Loan Secured Parties and the Prepetition Bridge Loan Obligations and Prepetition Bridge Loan Liens, on the one hand, and the indebtedness and obligations of the Debtors to Novelion and Novelion Services, on the other hand, including (a) the Novelion Intercompany Loan Obligations and the Novelion Intercompany Liens and (b) any other documentation providing for any payment obligation of the Debtors or any subsidiary of the Debtors to Novelion or Novelion Services, or any affiliate thereof, including, without limitation, under (x) that certain Master Service Agreement, dated as of December 1, 2016, between Novelion and the Borrower (as amended, modified or supplemented from time to time) and (y) that certain Master Service Agreement, dated as of December 1, 2016, between Novelion Services and the Buyer (as amended, modified or supplemented from time to time).  Pursuant to section 510 of the Bankruptcy Code, such Subordination Agreement and any other intercreditor agreement or subordination agreement between and/or among the Prepetition Agent, any Prepetition Bridge Loan Lender, Novelion, any Debtor or affiliate thereof, and any other applicable intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture or related document, (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights and remedies of the Prepetition Bridge Loan Secured Parties and Novelion (including the relative priorities, rights and remedies of such parties

with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (iii) shall not be amended, altered or modified by the terms of this Interim Order.  Pursuant to the Subordination Agreement and the Prepetition Credit Agreements, the Net Cash Proceeds (as defined in the Prepetition Bridge Loan Credit Agreement) received from the Permitted Licensing Transaction (as defined in the Prepetition Bridge Loan Credit Agreement) were to be remitted by the Borrower to repay (i) the Prepetition Bridge Loans (but not the Roll Up Loans) and (ii) the Non-Contested Novelion Intercompany Amount, on a 58% and 42% basis, respectively (such payments, the "Permitted Licensing Transaction Payments").

G.       **Adequate Protection for Prepetition Secured Parties**.  The Prepetition Bridge Loan Secured Parties have agreed, and Novelion is deemed to have agreed pursuant to the terms of the Subordination Agreement, to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, during the Interim Period (as defined below), subject to the terms and conditions set forth herein.  The Prepetition Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and the use of the Cash Collateral contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition Secured Parties.  Prepetition Bridge Loan Lenders holding 100% of the aggregate principal balance of the Loans (each as defined in the Prepetition Bridge Loan Credit Agreement) have expressly consented to the entry of this Interim Order and

the relief provided herein and pursuant to the terms of the Prepetition Bridge Loan Credit Agreement.

H.       **Section 552**.  In light of the subordination of their Liens and superpriority administrative claims to the Carve-Out, each of the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

I.       **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties and their ability to successfully reorganize or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed.  Authorization of the use of Cash Collateral in accordance with this Interim Order is therefor in the best interests of the Debtors' estates and consistent with their fiduciary duties. Based on all of the foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the Motion and the record before this Court with respect to the Motion, and with the consent of the Debtors, the Prepetition Agent, the Prepetition Bridge Loan Secured Parties, and the deemed consent of Novelion, to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.       **Motion Granted**.  The Motion is hereby granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the Motion with

- 12 -

respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.   **Protections**.

(a)   <u>Authorization to Use Cash Collateral</u>.  To enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, or (ii) the Termination Declaration (as defined below), in each case unless extended by written agreement of the Prepetition Agent at the direction of the requisite percentage of the Prepetition Bridge Lenders (the period from the entry of this Interim Order through and including such earliest date, the "<u>Interim Period</u>") the Debtors are hereby authorized to use Cash Collateral. Any use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order, including the Approved Budget and the Budget Covenants as defined and contained in Paragraph 2(c) below.  Following the entry of the Final Order, further Cash Collateral use will be governed by the terms of such Final Order.

(b)   <u>Budget</u>.  Attached hereto as <u>Exhibit A</u> is a rolling 13-week cash flow budget (the "<u>Initial Approved Budget</u>") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales) and (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, capital expenditures, and estimated fees and expenses of the Prepetition Agent (including counsel and financial advisors therefor).

(i)   The Debtors shall at the end of every four (4) week period commencing on Friday of the first full calendar week following the Petition Date propose (and provide a copy to Novelion) an update to the then-existing Approved

Budget (as defined below) adding thereto the forecast of cash receipts and cash disbursements (including any Permitted Affiliate Services Payments (as defined in the Prepetition Credit Agreement)) for the 13-week period commencing with the calendar week immediately following the date such proposed update is required to be delivered hereunder, which, once approved in writing by the Prepetition Agent at the direction of the requisite percentage of the Prepetition Bridge Lenders in their discretion (and following entry of the Final Order, the administrative agent for the DIP Facility (the "DIP Agent" and together with the Prepetition Agent, the "Agents")) at the direction of the requisite percentage of the lenders for the DIP Facility) (each, a "Proposed Supplemental Budget" and, once approved in writing by the applicable Agent(s) at the direction of the requisite percentage of lenders of the applicable facility (or deemed approved, as provided below), a "Supplemental Approved Budget"), shall supplement and replace the then existing Approved Budget then in effect (the Initial Approved Budget, as modified by any and all Supplemental Approved Budgets, shall constitute the "Approved Budget")  without further notice, motion, or application to, order of, or hearing before, this Court; provided that if the applicable Agent(s) at the direction of the requisite percentage of lenders of the applicable facility (have not objected to a proposed budget within seven (7) days after delivery thereof, such proposed budget shall be deemed acceptable to and approved by such Agent(s) and the respective lenders for all purposes hereunder; provided, however, that unless and until

such Supplemental Approved Budget has been approved (or deemed approved as provided above) by the applicable Agent(s), the Debtors shall still be subject to and be governed by the terms of the Approved Budget then in effect in accordance with this Interim Order, and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral other than with respect thereto.

(ii)    The Initial Approved Budget and each Proposed Supplemental Budget shall include a memo item reflecting cumulative transfers that may be required to each direct or indirect non-debtor subsidiary of the Debtors (the "Foreign Subsidiaries") irrespective of expense categories.    Each Proposed Supplemental Budget shall include a consolidating cash flow schedule illustrating budgeted cash flows for the Foreign Subsidiaries aggregated by geography and broken down by use of funds.

(iii)    By no later than 11:59 p.m. (New York, New York time) by the third Business Day of each calendar week, and commencing following the first full week following the Petition Date, the Debtors shall deliver to the Prepetition Agent and Prepetition Bridge Lenders variance reports (in substantially the same format as the Budget) showing actual cash receipts and disbursements for the immediately preceding week, noting therein all variances, on a line-item basis, from values set forth for such period(s) in the Initial Budget or the most current Supplemental Approved Budget, as applicable.    For the avoidance of doubt, such weekly variance reports shall

include actual cash flows to Foreign Subsidiaries by geography broken down by use of funds.

(iv)    Notwithstanding anything to the contrary in this Interim Order, the professional fees, costs and expenses of the Lender Professionals (as defined below) (the "Lender Professional Fees") shall be due, payable and paid in accordance with the terms of this Interim Order and the Professional Fees (as defined below) shall be due, payable and paid subject to this Interim Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court, in each case, notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants (as defined below) to the extent the actual amount of such fees, costs and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

(c)    Budget Covenants.  The Debtors shall only expend Cash Collateral and proceeds thereof in accordance with the purposes, and in the time periods, set forth in the Approved Budget (and in the case of the costs and expenses of the Prepetition Agent, in accordance with this Interim Order without being limited by the Approved Budget), subject to the following permitted variances (collectively, the "Permitted Variances"):

(i)    permitted variances with respect to the actual operating disbursements of the Debtors shall be tested weekly initially on the third Business Day of the second full week following the Petition Date (the "First Testing Date")

- 16 -

(testing the period from the Petition Date through and including such date (such initial testing period, the "<u>First Testing Period</u>")) and continuing on the third Business Day of each week thereafter (each, a "<u>Subsequent Testing Date</u>") (in the case of the first Subsequent Testing Date, testing the trailing three week period ending on the Friday before such Subsequent Testing Date (the "<u>Second Testing Period</u>"), and in the case of each Subsequent Testing Date that follows, testing the trailing four week period ending on the Friday before the applicable Subsequent Testing Date (each, a "<u>Four Week Testing Period</u>")) as follows: (A) for the First Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the First Testing Period shall not exceed 125% of the sum of the "Total Operating Disbursements" for such First Testing Period as set forth in the Approved Budget, (B) for the first Subsequent Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the Second Testing Period shall not exceed 120% of the sum of the "Total Operating Disbursements" for such Second Testing Period as set forth in the Approved Budget, and (C) for each Subsequent Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the immediately preceding Four Week Testing Period shall not exceed 115% of the sum of the "Total

- 17 -

Operating Disbursements" for such Four Week Testing Period as set forth in the Approved Budget; and

(ii)   permitted variances with respect to the actual cash receipts of the Debtors shall be tested weekly initially on the First Testing Date (testing the First Testing Period) and continuing on the Subsequent Testing Date of every week thereafter (testing the applicable Four Week Testing Period) as follows: (A) for the First Testing Date, the sum of actual receipts of the Debtors for the First Testing Period shall not be less than 75% of the sum of the "Total Receipts" for such First Testing Period as set forth in the Approved Budget, (B) for the First Subsequent Testing Date, the sum of actual receipts of the Debtors for the Second Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such Second Testing Period as set forth in the Approved Budget, and (C) for every other Subsequent Testing Date thereafter, the sum of actual receipts of the Debtors for the immediately preceding Four Week Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such Four Week Testing Period as set forth in the Approved Budget; provided, that for the purposes of determining compliance with this clause (c)(ii) with respect to an applicable testing period, (x) if a cash receipt that was scheduled in the Approved Budget, as then applicable, to be received during such applicable testing period is received within three (3) business days after such applicable testing period, such receipt may, at the Debtors' election, be applied as if it was received during such applicable testing period; and (y) if a cash receipt

that was scheduled in the Approved Budget, as then applicable, to be received in the next subsequent testing period is received during such applicable testing period, such receipt may, at the Debtors' election, be applied as if it was received during the next subsequent testing period and not such applicable testing period.

The budget-related covenants under this Paragraph 2(c) are collectively referred to herein as the "Budget Covenants."

(d)    Use of Proceeds of Collateral.  The Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except: (a) with respect to the Prepetition Obligations as set forth in this Interim Order and a Final Order; (b) as provided in any order in connection with the First Day Motions (as defined in the Restructuring Support Agreement (as defined below)) (the "First Day Orders"); and (c) as expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the Prepetition Agent, Prepetition Bridge Lenders and Novelion prior to such motion, order, or request for such relief being filed.

(e)    Conditions Precedent.  The Prepetition Secured Parties have no obligation to permit use of any Prepetition Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Interim Period unless and until (i) all conditions precedent to the use of Prepetition Collateral or proceeds thereof under this Interim Order have been satisfied in full or waived by the Prepetition Agent in accordance with Section 10.01 of the Prepetition Bridge Loan Credit Agreement, as applicable, and this Interim Order, or (ii) otherwise ordered to do so by this Court.

- 19 -

(f)    <u>Permitted Licensing Transaction Payments</u>.  (i) The Debtors may use proceeds of Permitted Licensing Transaction Payments due and payable to the Prepetition Bridge Loan Secured Parties in the proportion set forth in Schedule 1.01 of the Prepetition Bridge Loan Credit Agreement in accordance with the Budget and (ii) the Permitted Licensing Transaction Payments due and payable to Novelion in the proportion set forth in Schedule 1.01 of the Prepetition Bridge Loan Credit Agreement shall be placed into a segregated account held by the Debtors (the "<u>Novelion Segregated Licensing Account</u>").  At any time prior to an Event of Default under this Order or the Final Order, and upon written notice to the Debtors and the Prepetition Agent, Novelion may request a withdrawal from the Novelion Segregated Licensing Account, and any such draw request shall be honored by the Debtors within two (2) business days and be deemed to reduce the Non-Contested Novelion Intercompany Amount claim under the Plan in an amount equal to $1.75 for every dollar drawn, as set forth therein.

3.    **Adequate Protection**.

(a) In consideration for the use of the Prepetition Collateral (including Cash Collateral), the Prepetition Agent, for the benefit of the Prepetition Bridge Loan Secured Parties, shall receive the following adequate protection (collectively referred to as the "<u>Prepetition Bridge Loan Secured Parties Adequate Protection</u>"):

(i)    <u>Adequate Protection Liens</u>.  To the extent there is a diminution in value of the interests of the Prepetition Bridge Loan Secured Parties in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Bridge Loan Collateral (including Cash Collateral) and/or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("<u>Diminution in Prepetition Collateral Value</u>"), the Prepetition Agent, for the

benefit of all the Prepetition Bridge Loan Secured Parties, is hereby granted, subject to the Carve-Out and the terms and conditions set forth below, pursuant to sections 361 and 363 of the Bankruptcy Code, replacement Liens upon all of the "Adequate Protection Collateral", excluding all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law (collectively, "Avoidance Actions"), but including, subject to the entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Actions Proceeds") (such adequate protection replacement Liens, the "Prepetition Bridge Loan Secured Party Adequate Protection Liens").  "Adequate Protection Collateral" shall include, without limitation, any and all tangible and intangible pre- and post-petition property of the Debtors, whether existing before, on or after the Petition Date, together with any proceeds thereof, including, without limitation, any and all cash and any investment of such cash, inventory, goods, accounts, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, payment intangibles, documents, instruments, securities, chattel paper, interests in leaseholds (*provided, however*, that solely to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event there shall only be a lien on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code), real property, deposit accounts (except for any account created to hold an adequate assurance deposit for utility providers, pursuant to separate order of this Court), securities

accounts, investment property, letters of credit, letter-of-credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, commercial tort claims, capital stock of subsidiaries, wherever located, and the proceeds, products, rents, accession and profits of the foregoing.

        (ii)        <u>Adequate Protection Superpriority Claims</u>.  To the extent of Diminution in Prepetition Collateral Value, the Prepetition Bridge Loan Secured Parties are hereby further granted, subject to the Carve-Out, allowed superpriority administrative claims (such adequate protection superpriority claims, the "<u>Prepetition Bridge Loan Secured Party Adequate Protection Superpriority Claims</u>"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 7), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all Avoidance Actions Proceeds).  Subject to the relative priorities set forth above, the Prepetition Bridge Loan Secured Party Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  For purposes of this Interim Order, the terms "<u>Paid in Full</u>," "<u>Repaid in Full</u>," "<u>Repay in Full</u>," and "<u>Payment in Full</u>" shall mean, the indefeasible payment in full in cash of all Prepetition Obligations (other than contingent obligations, indemnities and expenses related thereto that, in each case, are not then payable or in existence or for which no claim has been asserted).

(iii)    Priority of Prepetition Bridge Loan Secured Party Adequate
Protection Liens and Prepetition Bridge Loan Secured Party Adequate Protection Superpriority
Claims. The Prepetition Bridge Loan Secured Party Adequate Protection Liens and the Prepetition
Bridge Loan Secured Party Adequate Protection Superpriority Claims, in each case subject to the
Carve-Out, (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or,
subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the
case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari
passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their
estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any
Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's
property,  (C) shall be valid, binding, perfected and enforceable against any trustee or any other
estate representative elected or appointed in the Cases or upon the conversion of any of the Cases
to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the
foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Cases, and (D)
notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Cases,
shall be senior to any administrative claims arising under any such "first day" orders.
Notwithstanding anything to the contrary herein, each of (x) the Roll Up Loans and (y) the
Prepetition Bridge Loan Secured Party Adequate Protection Liens and the Prepetition Bridge Loan
Secured Party Adequate Protection Superpriority Claims with respect to the Roll Up Loans, shall
be junior in priority to the Novelion Adequate Protection Liens and Novelion Adequate Protection
Claims (each as defined below).

(iv)    Interest, Professional Fees and Other Adequate Protection Payments.
Without limiting any rights of the Prepetition Agent and the other Prepetition Bridge Loan Secured

Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition Bridge Loan Secured Parties to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall, subject to the Carve-Out, (i) pay or reimburse in cash the Prepetition Agent for all fees, costs, expenses, and charges (including the reasonable fees, costs, and expenses of counsel and financial advisors for the Prepetition Agent and the other Prepetition Bridge Loan Secured Parties) (x) outstanding as of the Petition Date, to the extent, and at the times, payable under the Prepetition Loan Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date, and (y) to the extent arising and relating to the period after the Petition Date, as provided in Paragraph 18(a) below and (ii) cause any and all interest on the Prepetition Bridge Loan Obligations under the Prepetition Bridge Loan Credit Agreement to accrue at the non-default rate(s) set forth therein, which such interest shall be paid in kind by being capitalized and added to the outstanding principal balance of the Prepetition Bridge Loan Obligations (after which time such capitalized interest shall be treated as a portion of the outstanding principal balance of the Prepetition Bridge Loan Obligations for all purposes of the Credit Agreement, including without limitation the accrual of interest thereon at the interest rates specified therein), in the case of each of sub-clauses (i) and (ii) above, whether or not budgeted in the Approved Budget, and without further notice (except as provided in Paragraph 19(b) below with respect to postpetition professional fees, costs, and expenses), motion, or application to, order of, or hearing before, this Court.

(v)     <u>Right to Seek Additional Adequate Protection</u>.     Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection

provided herein is reasonable to protect the interests of the Prepetition Secured Parties.  However, the Prepetition Agent, at the direction of and on behalf of the Prepetition Bridge Loan Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the request for or grant of any additional or alternative adequate protection (except as provided in the Subordination Agreement).  The consent of the Prepetition Bridge Loan Secured Parties to the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Bridge Loan Secured Parties that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise.

(b) In consideration for the use of the Prepetition Collateral (including Cash Collateral), Novelion shall receive the following adequate protection (collectively referred to as the "Novelion Adequate Protection"):

(i)        Adequate Protection Liens.  To the extent there is a Diminution in Prepetition Collateral Value, Novelion is hereby granted, subject to the Carve-Out and the terms and conditions set forth below, pursuant to sections 361 and 363 of the Bankruptcy Code, replacement Liens upon all of the Adequate Protection Collateral, including, subject to the entry of the Final Order, Avoidance Actions Proceeds (such adequate protection replacement Liens, the "Novelion Adequate Protection Liens" and, together with the Prepetition Bridge Loan Secured Parties Adequate Protection Liens, the "Adequate Protection Liens").

(ii)       Adequate Protection Superpriority Claims.  To the extent of Diminution in Prepetition Collateral Value, Novelion is hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Novelion

Adequate Protection Superpriority Claims" and, together with the Prepetition Bridge Loan Secured Parties Adequate Protection Superpriority Claims the "Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority, subject to the Carve-Out, over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 7), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all Avoidance Action Proceeds).  Subject to the relative priorities set forth herein, the Novelion Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.

(iii)      Priority of Novelion Adequate Protection Liens and Novelion Adequate Protection Superpriority Claims.  The Novelion Adequate Protection Liens and the Novelion Adequate Protection Superpriority Claims, in each case subject to the Carve-Out, (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, or (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative

elected or appointed in the Cases or any Successor Case, and/or upon the dismissal of any of the Cases and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such "first day" orders. Notwithstanding anything to the contrary herein, the Novelion Adequate Protection Liens and Novelion Adequate Protection Superpriority Claims shall be subject to the Carve-Out and junior in priority to the Prepetition Obligations (other than any Prepetition Obligations consisting of Roll Up Loans), Prepetition Secured Party Adequate Protection Liens and the Prepetition Secured Party Adequate Protection Superpriority Claims.

(iv)     <u>Professional Fees and Other Adequate Protection Payments</u>.  Without limiting any rights of Novelion under section 506(b) of the Bankruptcy Code, the Novelion Intercompany Loan Agreement or the Subordination Agreement, but notwithstanding anything to the contrary contained therein, the Debtors shall not be obligated to pay or reimburse in cash Novelion for any fees, costs, expenses, or charges (including any fees, costs, and expenses of counsel and financial advisor for Novelion) unless and until such time as the Restructuring Support Agreement is terminated as to Novelion (through no fault of or breach by Novelion) prior to the consummation of the Plan.

(v)     <u>Right to Seek Additional Adequate Protection</u>.     Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection provided herein is reasonable to protect the interests of Novelion.  However, Novelion may request Court approval for additional or alternative adequate protection pursuant to the Subordination Agreement, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection.

4.      **Automatic Postpetition Lien Perfection.**  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any Adequate Protection Collateral or (c) taking any other action to validate or perfect the Adequate Protection Liens or to entitle the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, the Prepetition Agent (at the direction of the requisite percentage of Prepetition Bridge Lenders) and Novelion may, each in its sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date.  The applicable Debtors shall execute and deliver to the Prepetition Agent and Novelion all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, the Prepetition Agent (at the direction of the Prepetition Bridge Lenders) and Novelion may, each in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Interim Order.

5.     **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.

The Debtors' Stipulations shall be binding upon the Debtors and, subject to the remaining

provisions of this paragraph 5, their estates in all circumstances upon entry of this Interim Order.

The Debtors' Stipulations shall be binding upon their estates and each other party in interest,

including the Committee, except to the extent and only to the extent such Committee or, any other

party in interest with standing (including any chapter 11 trustee) other than the Debtors (or if the

Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as

defined below), the chapter 7 trustee in such Successor Case), *first*, commences, by the earlier of

(x) with respect to any Committee, sixty (60) calendar days after the formation of any Committee,

and (y) with respect to other parties in interest with requisite standing other than the Debtors or

any Committee, seventy-five (75) calendar days following the date of entry of the Interim Order

(such time period established by the earlier of clauses (x) and (y), as the same may be extended in

accordance with this Paragraph 5, shall be referred to as the "Challenge Period," and the date that

is the next calendar day after the termination of the Challenge Period in the event that either (i) no

Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect

only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated,

shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary

proceeding, challenging or otherwise objecting to the admissions, stipulations, findings, or releases

included in the Debtors' Stipulations, or (B) a contested matter, adversary proceeding against any

or all of (1) the Prepetition Bridge Loan Secured Parties in connection with or related to the

Prepetition Bridge Loan Obligations, or the actions or inactions of any of the Prepetition Bridge

Loan Secured Parties arising out of or related to the Prepetition Bridge Loan Obligations or the

Prepetition Bridge Loan Documents or (2) Novelion in connection with or related to the Non-

Contested Novelion Intercompany Amount, or the actions or inactions of Novelion arising out of

or related to the Non-Contested Novelion Intercompany Amount, including any claim against any

or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff,

counterclaim, or defense to the Prepetition Obligations (including those under sections 506, 544,

547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the

Prepetition Secured Parties) (clauses (i) and (ii) collectively, the "Challenges" and, each

individually, a "Challenge"), and *second*, obtains a final, non-appealable order in favor of such

party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary

proceeding, or other action (any such Challenge timely brought for which such a final and non-

appealable order is so obtained, a "Successful Challenge").  If a chapter 7 trustee or a chapter 11

trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination

Date, with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period

and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected.

Except as otherwise expressly provided herein, from and after the Challenge Period Termination

Date and for all purposes in these Cases and any Successor Cases (and after the dismissal of these

Cases or any Successor Cases), (i) all payments made to or for the benefit of the Prepetition

Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether

made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to

counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or

avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever

released, waived, and barred, (iii) all of the Prepetition Bridge Loan Obligations and the Non-

Contested Novelion Intercompany Amount shall be deemed to be fully allowed claims, and (iv)

the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties

in interest in these Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on the Debtors' estates, any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.  Except as may be ordered by the Court for cause shown, the Challenge Period may be extended only with the written consent of the Prepetition Agent (at the direction of the requisite percentage of Prepetition Bridge Lenders) in its sole discretion.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 5 or to require or permit an extension of the Challenge Period Termination Date.

6.    **Carve-Out**.  Subject to the terms and conditions contained in this Paragraph 6, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of this Interim Order:

(i)    <u>Carve-Out</u>.  For purposes of this Interim Order, "Carve-Out" means (a) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $50,000 (without regard to the Carve-Out Trigger Notice); (c) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, all unpaid fees, costs, and disbursements ("<u>Debtor Professionals Fees</u>") of professionals retained by the Debtors in these Cases (collectively, the "<u>Debtors' Professionals</u>") that are incurred prior to the delivery by the Prepetition Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice, that remain unpaid after application of any retainers being held by such professionals; (c) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, all unpaid fees, costs, and disbursements of professionals ("<u>Committee Professional Fees</u>," and together with the Debtor Professional Fees, the "<u>Professional Fees</u>") retained by the Committee in these Cases (collectively, the "<u>Committee's Professionals</u>") and all reasonable unpaid out-of-pocket expenses of the members of any Committee ("<u>Committee Members</u>"), in each case that are incurred prior to the delivery by the Prepetition Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice, and remain unpaid after application of any retainers being held by such professionals, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $500,000; (d) the unpaid fees, costs, and disbursements of the Debtors' Professionals that are incurred after the delivery of a Carve-Out Trigger Notice by the Prepetition Agent that are allowed by this Court under sections 327, 330 or 363 of the Bankruptcy Code, after application of any already un-applied retainers being held by such

professionals, in an aggregate amount not to exceed $1,000,000 (the "Debtors' Professionals Carve-Out Cap"); and (e) the reasonable unpaid fees, costs, and disbursements of the Committee Professionals and the reasonable unpaid expenses of Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice by the Prepetition Agent, that are allowed by this Court under sections 328, 330 or 1103 of the Bankruptcy Code after application of any retainers being held by such professionals, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $250,000 (the "Committee Carve-Out Cap" and, together with the Debtors' Professionals Carve-Out Cap, the "Post-Default Carve-Out Cap") (*provided* that any success, completion, or similar fees payable from the Post-Default Carve-Out Cap amount shall be subject and subordinate, and junior in right of payment, to all other Professional Fees payable from such amount). The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the Prepetition Agent to the Debtors' lead counsel, the United States Trustee, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event (as defined below), expressly stating that the Post-Default Carve-Out Cap is triggered. Immediately upon the delivery of a Carve-Out Trigger Notice or the closing of a sale of all or substantially all of the Debtors' assets, and prior to the payment of any Prepetition Secured Party on account of adequate protection or otherwise, the Debtors shall fund a segregated account established by the Debtors (the "Carve-Out Account"), without any reduction of the Prepetition Obligations, equal to the sum of (I) the Post-Default Carve-Out Cap plus (II) the unpaid fees and expenses that were incurred prior to the delivery of the Carve-Out Trigger Notice in accordance with clauses (b) and (c) above, that have not been disallowed by this Court and for which such Debtors' Professionals or Committee's Professionals have submitted a copy of an application to

this Court or monthly fee statement and that remain unpaid after application of any retainers being

held by such professionals.  All amounts deposited in the Carve-Out Account shall continue to be

subject to the Adequate Protection Liens and the Prepetition Liens such that, upon final payment

of all amounts due and owing under the Carve-Out, any funds remaining in the Carve-Out Account

shall be remitted to the Prepetition Agent for application in accordance with this Interim Order,

the Subordination Agreement or the other Prepetition Loan Documents, as applicable.  No amounts

set forth in this subparagraph 6(i) with respect to the Post-Default Carve-Out Cap may be modified

without the prior written consent of the Prepetition Agent (at the direction of the requisite

percentage of Prepetition Bridge Lenders.  Notwithstanding anything to the contrary, the failure

of the Carve-Out Account to satisfy in full the allowed fees and expenses of the Debtors'

Professionals and the Committee's Professionals shall not affect the priority of the Carve-Out, and

in no way shall the Carve-Out, the Post-Default Carve-Out Cap, the Carve-Out Account, or any of

the foregoing be construed as a cap or limitation on the amount of professional fees due and

payable by the Debtors.

(ii)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to

Object to Fees.  The Prepetition Secured Parties shall not be responsible for the direct payment or

reimbursement of any fees or disbursements of any of the Debtors' Professionals, Committee's

Professionals or Committee Members incurred in connection with the Cases or any Successor

Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall

be construed (i) to obligate any Prepetition Secured Party in any way to pay compensation to, or

to reimburse expenses of, any of the Debtors' Professionals, the Committee's Professionals or

Committee Members, or to guarantee that the Debtors or their estates have sufficient funds to pay

such compensation or reimbursement or (ii) to increase the Carve-Out if actual allowed fees and

expenses of any of the Debtors' Professionals, Committee's Professionals or Committee Members are higher in fact than the Post-Default Carve-Out Cap. Notwithstanding any provision in this Paragraph 6 to the contrary, no portion of the Carve-Out, Cash Collateral, or Prepetition Collateral shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 15 hereof. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases or any Successor Cases, any trustee or of any other person or entity, or shall affect the right of any Prepetition Secured Party or any other party to object to the allowance and payment of any such fees and expenses.

(iii) <u>Payment of Allowed Professional Fees and Expenses</u>. The Debtors shall be permitted to pay fees and expenses of the Debtors' Professionals, the Committee's Professionals and the Committee Members, subject to this Interim Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court. The amounts paid prior to the Carve-Out Trigger Notice shall not reduce the Post-Default Carve-Out Cap.

7.    **Waiver of 506(c) Claims**. Upon entry of the Final Order, and as a further condition of the Debtors' use of Cash Collateral pursuant to this Interim Order and a Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the Prepetition Secured Parties, the Prepetition Collateral, and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Prepetition Agent (at the direction of the requisite percentage of Prepetition Bridge Lenders, (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the Prepetition Secured Parties, and (c) the

exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy

Code or otherwise to charge any costs or expense of administration of the Cases or any Successor

Cases from or against the Prepetition Secured Parties or their Prepetition Liens on or other interests

in any or all of the Prepetition Collateral and the Cash Collateral shall not impair and shall be

subject to, and junior to, the Prepetition Collateral and the Cash Collateral.

8.      **After-Acquired Property**.  Except as otherwise expressly provided in this Interim

Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on

or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity

resulting from any security agreement entered into by the Debtors prior to the Petition Date, except

to the extent that such property constitutes proceeds of property of the Debtors that is subject to a

valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable

and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted

by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under

the Bankruptcy Code or other provisions or principles of applicable law.

9.      **Protection of Prepetition Secured Parties' Rights**.

(a)      Subject to entry of a Final Order, unless the Prepetition Agent (at the

direction of the requisite percentage of Prepetition Bridge Lenders) shall have provided its prior

written consent or all Prepetition Bridge Loan Obligations (excluding the Roll Up Loans) have

been Paid in Full, there shall not be entered in any of these Cases or any Successor Cases any order

(including any order confirming any plan of reorganization or liquidation) that authorizes any of

the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a

security, mortgage, or collateral interest or other Lien on all or any portion of the Prepetition

Collateral and/or that is entitled to administrative priority status, in each case that is superior to or

*pari passu* with the Prepetition Liens and the Adequate Protection Liens; (ii) the use of Cash Collateral for any purpose other than to Pay in Full the Prepetition Bridge Loan Obligations (excluding the Roll Up Loans) or as otherwise permitted in this Interim Order, (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553 of the Bankruptcy Code or otherwise, or (iv) any modification of any of the Prepetition Secured Parties' rights under this Interim Order or the Prepetition Bridge Loan Documents with respect any Prepetition Bridge Loan Obligations.

(b) The Debtors will, until the earlier of the consummation of the Plan or until the Prepetition Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the Prepetition Loan Documents, (ii) reasonably cooperate with, consult with, and provide to the Prepetition Secured Parties all such non-privileged information and documents that any or all of the Debtors are obligated (including upon request by any of the Prepetition Secured Parties) to provide under the Prepetition Loan Documents (in the absence of the pendency of these Cases) or the provisions of this Interim Order, (iii) permit consultants, advisors and other representatives (including third party representatives) of the Prepetition Agent, the Prepetition Bridge Lenders and Novelion to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide non-privileged advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Credit

Agreement, and (iv) permit the Prepetition Agent, the Prepetition Bridge Lenders and Novelion and each of their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and neither the Debtors nor their legal and financial advisors shall be required to provide the Prepetition Agent or other Prepetition Secured Parties, or Novelion, or their respective counsel and financial advisors, with any information subject to attorney-client privilege or consisting of attorney work product.

10.    **Proceeds of Subsequent Financing**. Subject to the entry of the Final Order, without limiting the provisions and protections of Paragraph 9 above, if at any time prior to the Payment in Full of all the Prepetition Bridge Loan Obligations (excluding the Roll Up Loans) (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the Prepetition Agent for application to the Prepetition Bridge Loan Obligations (other than the Roll Up Loans) subject to the Subordination Agreement.

11.    **Cash Collection**. Subject to the Carve-Out and any contrary provision in the Final Order, from and after the date of the entry of this Interim Order, all collections and proceeds of any Prepetition Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is

now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition Loan Documents (or in such other accounts as are designated by the Prepetition Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the sole dominion and control of the Prepetition Agent (and the funds in such accounts may be used by the Debtors to the extent provided in this Interim Order).  Subject to entry of a Final Order, until Payment in Full of the Prepetition Bridge Loan Obligations (other than the Roll Up Loans), upon the direction of the Prepetition Agent as directed by the requisite percentage of Prepetition Bridge Lenders, at any time after the occurrence of a Termination Event and subject to the provisions of Paragraphs 5, 6 and 14, all proceeds in the Cash Collection Accounts shall be remitted to the Prepetition Agent for application to the Prepetition Bridge Loan Obligations (other than the Roll Up Loans) until Payment in Full of the Prepetition Bridge Loan Obligations (other than the Roll Up Loans), and the Prepetition Agent shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing.  Unless otherwise agreed to in writing by the Prepetition Agent (at the direction of the requisite percentage of Prepetition Bridge Lenders), the Debtors shall maintain no accounts except those identified in the Debtors' cash management order [Docket No. [ ● ]] (the "Cash Management Order").  The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition Agent.   The Debtors are authorized to incur obligations and liabilities for treasury, depositary or cash management services, including overnight overdraft services, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and

interstate depository network services provided on a postpetition basis by any financial institution at which any Cash Collection Account is maintained; provided, however, that except to the extent otherwise required by this Court, nothing herein shall require any Prepetition Secured Party to incur any overdrafts or provide any such services or functions to the Debtors.

12.      **Restructuring Support Agreement**.  The Debtors, Novelion, the other Consenting Lenders (as defined in the Restructuring Support Agreement (as defined below)) and certain other parties have entered into that certain Restructuring Support Agreement dated as of May 20, 2019 (the "Restructuring Support Agreement"), pursuant to which the parties thereto agreed to support the Debtors' restructuring as more fully set forth therein.  Nothing in this Interim Order shall modify any parties' rights or obligations under the Restructuring Support Agreement.

13.      **Termination Events**.  The following shall constitute a termination event under this Interim Order unless waived in writing by the Prepetition Agent (each, a "Termination Event"):

(a)      The failure to obtain entry of the Final Order, in form and substance acceptable to the Prepetition Agent and the requisite percentage of Prepetition Bridge Lenders, on or before thirty-five calendar days after the Petition Date.

(b)      Any breach, default or other violation by any of the Debtors of the material terms and provisions of this Interim Order.

(c)      The termination of the Restructuring Support Agreement.

14.      **Rights and Remedies Upon Termination Event**.

(a)      Any automatic stay otherwise applicable to the Prepetition Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the Prepetition Secured Parties (subject to the Subordination Agreement) to exercise (i) immediately upon the occurrence and during the continuance of any

Termination Event, all rights and remedies under this Interim Order, the Prepetition Bridge Loan Credit Agreement (solely with respect to Bridge Loan Obligations other than Roll Up Loans) and/or applicable nonbankruptcy law (other than those rights and remedies against the Adequate Protection Collateral as provided in subparagraph 14(b) below), including the right to (i)(1) declare all Prepetition Bridge Loan Obligations (other than Roll Up Loans) to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (3) terminate the Prepetition Bridge Loan Credit Agreement as to any future liability or obligation of the Prepetition Secured Parties, but without affecting any of the Prepetition Obligations or the Prepetition Liens securing the Prepetition Obligations; and/or (ii) to declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration hereunder shall be made to the respective lead counsel to the Debtors, the Committee and the U.S. Trustee, and shall be referred to herein as a "Termination Declaration" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date").

(b)    Subject to entry of a Final Order, in addition to the rights and remedies described above, seven (7) business days following the Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the Prepetition Agent, the Prepetition Bridge Lenders and Novelion, subject to the Subordination Agreement, are hereby granted relief from the automatic stay, without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on, its Prepetition Liens on all or any portion of the Prepetition Collateral or Adequate Protection Collateral, including by collecting accounts receivable and applying the proceeds thereof to the Prepetition Obligations (other than the Roll Up Loans), and by occupying the

Debtors' premises to sell or otherwise dispose of the Prepetition Collateral.  Solely during the seven (7) Business Day period after a Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before this Court for the sole purpose of contesting whether a Termination Event has occurred, and section 105 of the Bankruptcy Code may not be invoked by the Debtors, the Committee, or any other party in interest in an effort to restrict or preclude any Prepetition Bridge Loan Secured Party from exercising any rights or remedies set forth in this Interim Order or the Prepetition Bridge Loan Credit Agreement.  During such seven (7) Business Day period, the Debtors may not use Cash Collateral except to pay payroll and other expenses critical to the business of the Debtors operating in accordance with the Approved Budget.

(c)      Subject to the entry of a Final Order and provisions of Paragraphs 5, 6 and 14 hereof, all proceeds realized in connection with the exercise of the rights and remedies of the Prepetition Bridge Loan Secured Parties shall be turned over to the Prepetition Agent for application to the Prepetition Bridge Loan Obligations (other than the Roll Up Loans) under, and in accordance with the provisions of, the Prepetition Bridge Loan Documents and this Interim Order until Payment in full of the Prepetition Bridge Loan Obligations (other than the Roll Up Loans).

(d)      Subject to entry of a Final Order, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the Prepetition Agent, Novelion or the other Prepetition Secured Parties contained in this Interim Order or the Prepetition Loan Documents, or otherwise available at law or in equity, upon five Business Days' written notice to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred and is

continuing, the Prepetition Agent, the Prepetition Bridge Lenders (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the Prepetition Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to any Prepetition Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors that are owned by or subject to a Lien of any third party and that are used by Debtors in their businesses, in the case of either subparagraph (i) or (ii) of this Paragraph 14(d) without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the Prepetition Agent, on behalf of the Prepetition Bridge Loan Secured Parties shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the Prepetition Agent and that accrue during the period of such occupancy or use by such Prepetition Agent calculated on a per diem basis. Nothing herein shall require the Debtors, the Prepetition Agent, Novelion, or the other Prepetition Secured Parties to assume any lease, license or other contract under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the Prepetition Agent and the other Prepetition Secured Parties in this Paragraph 14(d).

(e)    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and to incur all liabilities and obligations to the Prepetition Secured Parties under this Interim Order, (ii) authorize Novelion and the other Prepetition Secured Parties to retain and apply payments made in accordance with this Interim Order, (iii) permit each

- 43 -

of the Prepetition Agent, Novelion and the other Prepetition Secured Parties to perform any act authorized under this Interim Order, the Subordination Agreement and the Prepetition Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order.

15.    **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, no loans and/or proceeds from the Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity  (including any of the Debtors' Professionals, the Committee's Professionals or the Committee Members) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the Prepetition Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtors' Professionals, the Committee's Professionals or the Committee Members) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code unless upon consummation of any such loan all Prepetition Bridge Loan Obligations (other than the Roll Up Loans) are to be Paid in Full in Cash, or to seek any modification to this Interim Order not approved by the Prepetition Agent (at the direction of the requisite percentage of Prepetition Bridge Lenders); (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter

seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, any or all of the Prepetition Secured Parties, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof) in connection with the Prepetition Obligations, the Prepetition Liens, or the debtor-creditor relationship between any of the Prepetition Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the Prepetition Obligations, or the validity, extent, and priority of the Prepetition Liens or the Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Prepetition Liens, the Prepetition Secured Parties Adequate Protection Liens, or the other Prepetition Secured Parties Adequate Protection; and/or (D) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the Prepetition Secured Parties hereunder or any payments made hereunder; provided, however, up to $50,000 in the aggregate of the Carve-Out, Prepetition Collateral and any Cash Collateral may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or Liens of the Prepetition Agent, Novelion and the other Prepetition Secured Parties under the Prepetition Loan Documents so long as such investigation occurs within the Challenge Period; or (ii) pay any fees or similar amounts to any person (other than the Prepetition Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the Prepetition Agent.

16.    **Proofs of Claim**.  The Prepetition Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties in respect of all Prepetition Obligations.  In addition, the Prepetition Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Prepetition Obligations constituting administrative expenses.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, each of the Prepetition Agent (at the direction of the requisite percentage of Prepetition Bridge Lenders), for the benefit of itself and the other Prepetition Secured Parties, and Novelion, are hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in each of the Cases or Successor Cases (i) in the case of Prepetition Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition Bridge Loan Obligations, (ii) in the case of the Prepetition Agent, a request or aggregate requests for allowance and/or payment of any portion of the Prepetition Bridge Loan Obligations constituting administrative expenses, (iii) in the case of Novelion, a proof of claim in respect of any Novelion Intercompany Loan Obligations, and (iv) in the case of Novelion, a request or aggregate requests for allowance and/or payment of any portion of the Novelion Intercompany Loan Obligations constituting administrative expenses.

17.    **Preservation of Rights Granted Under the Interim Order**.

(a)    <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) all rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all

of the Prepetition Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all Prepetition Obligations have been Paid in Full, and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the Prepetition Secured Parties, respectively.

(b)    Survival of Interim Order.  The provisions of this Interim Order, any actions taken pursuant hereto, and the Prepetition Secured Parties Adequate Protection, and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the Prepetition Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including the Prepetition Secured Parties Adequate Protection and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the Prepetition Secured Parties, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such Prepetition Secured Parties Adequate Protection, and such other rights, remedies, Liens priorities, privileges, protections and benefits, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order.

18.  **Insurance Policies**.  Upon entry of this Interim Order, the Prepetition Agent, Novelion and the other Prepetition Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the Adequate Protection Collateral, and the Debtors shall take such actions as are reasonably requested by the Prepetition Agent (at the direction of the requisite percentage of Prepetition Bridge Lenders) and Novelion from time to time to evidence or effectuate the foregoing.

19.  **Other Rights and Obligations**.

(a)  Expenses.  The applicable Debtors will pay all reasonable expenses incurred by the Prepetition Agent (including the reasonable fees and disbursements of all counsel for the Prepetition Agent and the Prepetition Bridge Lenders and any internal or third-party appraisers, consultants, advisors and auditors engaged by or for the benefit of the Prepetition Agent, the Prepetition Bridge Lenders and/or their counsel) in connection with the preparation, execution, delivery, and administration of this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby are consummated.

(b)  Notice of Professional Fees.  Professionals for the Prepetition Bridge Loan Secured Parties (including professionals engaged by counsel to the Prepetition Agent or the other Prepetition Bridge Loan Secured Parties, as applicable) (collectively, the "Lender Professionals"; following entry of the Final Order, the "Lender Professionals" shall include the professionals for the DIP Agent or the lenders party to the DIP Facility (including professionals engaged by counsel thereto)) shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Committee or any other party in interest.  Copies

of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee, Novelion, counsel for any Committee, and such other parties as this Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; provided, however, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtors, United States Trustee or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices by the Debtors, then the Debtors, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.  All such unpaid fees, costs, expenses, and charges of the Prepetition Agent

that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute Prepetition Obligations and shall be secured by the Adequate Protection Collateral as specified in this Interim Order.   Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the Prepetition Agent or the other Prepetition Bridge Loan Secured Parties in connection with or with respect to the Prepetition Bridge Loan Credit Agreement or the other Prepetition Bridge Loan Documents are hereby approved in full and non-refundable and shall not otherwise be subject to any Challenge.

(c)     <u>Binding Effect</u>.   Subject only to Paragraph 5 above, the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases and any Successor Cases, including the Prepetition Secured Parties, any Committee, and the Debtors and their respective estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; <u>provided</u>, <u>however</u>, that except to the extent expressly provided in Paragraph 5, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)     <u>No Waiver</u>.   The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Loan Documents, or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver

of any of such parties' rights hereunder, thereunder, or otherwise. Nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition Secured Party, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion). Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law (subject to the Restructuring Support Agreement and the Subordination Agreement) to (i) request conversion of the Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Parties under the Prepetition Loan Documents, the Bankruptcy Code or otherwise.

(e)    <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary. In determining to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors

- 51 -

or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)     No Marshaling.  Subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, as applicable.

(g)     Inconsistency. In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in the nature of a "first day order", the provisions of this Interim Order shall govern and control.

(h)     Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(i)     Reservation of Rights.  Nothing in this Interim Order shall be deemed to constitute the consent of the Prepetition Secured Parties, and each of the foregoing expressly reserve the right to object, to entry of any Order of the Bankruptcy Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other

disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the Prepetition Obligations, and the Prepetition Secured Parties Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(j)    <u>Headings</u>.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

20.    **<u>Final Hearing</u>**

(a)    The Final Hearing to consider entry of the Final Order is scheduled for _____, 2019, at _____ (prevailing Eastern time) at the United States Bankruptcy Court for the Southern District of New York.  The proposed Final Order shall be substantially in the form of <u>Exhibit B</u> to the Motion.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)    <u>Final Hearing Notice</u>.  On or before _____, 2019, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (ii) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than _____, 2019, which objections shall be served so that

the same are received on or before such date by: (a) Aegerion Pharmaceuticals, Inc., 245 First Street, Riverview II, 18th Floor, Cambridge, MA 02142 (Attn: John R. Castellano); (b) proposed counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Paul V. Shalhoub, Esq. and Andrew S. Mordkoff, Esq.); (c) counsel to those certain lenders under the Debtors' proposed debtor-in-possession financing facility, the Debtors' Prepetition Bridge Loan Credit Agreement and the Debtors' 2% unsecured convertible notes, Latham & Watkins, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611 (Attn: Richard A. Levy, Esq.) and King & Spalding LLP, 444 West Lake Street, Suite 1650, Chicago, IL 60606 (Attn: Matthew L. Warren, Esq.); (d) counsel to any official committee of unsecured creditors; (e) counsel to the U.S. Trustee for Region 2, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Benjamin J. Higgins, Esq. and Brian S. Masumoto, Esq.); (f) counsel to Novelion Therapeutics Inc., Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018 (Attn: Gregory Fox, Esq. and Jacqueline Mercier, Esq.); and (g) counsel to Amryt Pharma Plc, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn: Matthew J. Williams, Esq. and Jason Zachary Goldstein, Esq.), and such objections shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case to allow actual receipt of the foregoing no later than _____, 2019, at 4:00 p.m. (prevailing Eastern time).

21.    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: _____, 2019
            New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT A**

## **Initial Approved Budget**

(see attached)



# Aegerion Pharmaceuticals, Inc.

DIP Cash Collateral Exhibits

As of: May 20, 2019

# Aegerion Pharmaceuticals, Inc.

## DIP Cash Collateral: Aegerion Consolidated
In US $'000 unless otherwise indicated

| Aegerion Consolidated | Week 1 Forecast 05/21/19 05/25/19 | Week 2 Forecast 05/26/19 06/01/19 | Week 3 Forecast 06/02/19 06/08/19 | Week 4 Forecast 06/09/19 06/15/19 | Week 5 Forecast 06/16/19 06/22/19 | Week 6 Forecast 06/23/19 06/29/19 | Week 7 Forecast 06/30/19 07/06/19 | Week 8 Forecast 07/07/19 07/13/19 | Week 9 Forecast 07/14/19 07/20/19 | Week 10 Forecast 07/21/19 07/27/19 | Week 11 Forecast 07/28/19 08/03/19 | Week 12 Forecast 08/04/19 08/10/19 | Week 13 Forecast 08/11/19 08/17/19 | Total 13-weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| 1   Lomitapide | $ 22 | $ 1,387 | $ 1,200 | $ 988 | $ 843 | $ 1,868 | $ 861 | $ 759 | $ 789 | $ 994 | $ 1,981 | $ 626 | $ 1,078 | $ 13,395 |
| 2   Metreleptin | 475 | 3,027 | 3,694 | 1,514 | 979 | 2,632 | 2,457 | 1,919 | 1,342 | 1,538 | 1,879 | 2,096 | 1,812 | 25,365 |
| 3   Third Parties Royalties | - | - | - | - | - | - | - | - | - | - | - | - | 1,031 | 1,031 |
| 4   Other | - | - | - | - | 256 | 5,000 | - | - | - | - | - | - | 10 | 5,266 |
| **Total Cash Receipts** | **497** | **4,413** | **4,894** | **2,502** | **2,078** | **9,500** | **3,318** | **2,679** | **2,131** | **2,532** | **3,860** | **2,722** | **3,930** | **45,056** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| 5   Payroll and Benefits | (87) | (921) | (132) | (618) | (368) | (533) | (96) | (800) | - | (877) | (50) | (594) | (75) | (5,151) |
| 6   Payroll and Benefits (Rejuvenate) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7   Discounts and Rebates | (11) | (151) | (46) | (108) | (955) | (1,016) | (982) | (1,054) | (952) | (952) | (1,035) | (186) | (183) | (7,631) |
| 8   Royalty Payments | - | - | - | - | - | - | - | - | - | - | - | - | (2,292) | (2,292) |
| 9   Product Manufacturing | (326) | (996) | (172) | (462) | (436) | (3,614) | (537) | (1,251) | (439) | (436) | (435) | (1,041) | (651) | (10,797) |
| 10   Clinical / Medical Affairs | (7) | (82) | (82) | (183) | (139) | (139) | (139) | (845) | (165) | (115) | (115) | (115) | (243) | (2,370) |
| 11   Facilities (incl. Leases) | (69) | (41) | (8) | (48) | (13) | (41) | (73) | (2) | (54) | (54) | (20) | (2) | (54) | (479) |
| 12   Insurance | (1) | - | - | (1) | (100) | - | - | (0) | - | (0) | - | (0) | - | (104) |
| 13   Legal Fees | (28) | (50) | (140) | (33) | - | (241) | - | - | - | (144) | - | - | - | (635) |
| 14   Other Professionals | (175) | (102) | (261) | (413) | (315) | (274) | (231) | (161) | (472) | (333) | (301) | (182) | (312) | (3,531) |
| 15   Other Operating Disbursements | (148) | (465) | (746) | (478) | (1,146) | (704) | (1,098) | (1,359) | (497) | (587) | (539) | (549) | (869) | (9,185) |
| **Total Operating Disbursements** | **(852)** | **(2,807)** | **(1,586)** | **(2,345)** | **(3,473)** | **(6,563)** | **(3,156)** | **(5,471)** | **(2,579)** | **(3,498)** | **(2,496)** | **(2,671)** | **(4,678)** | **(42,176)** |
| **Net Operating Cash Flow** | **(355)** | **1,606** | **3,308** | **156** | **(1,395)** | **2,937** | **162** | **(2,793)** | **(448)** | **(966)** | **1,364** | **51** | **(747)** | **2,881** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 16   Permitted Affiliate Services Payments | - | - | - | - | - | (146) | - | - | - | - | (192) | - | - | (338) |
| 17   Debt Service and Related Fees | - | - | - | - | (600) | - | (93) | - | - | - | (69) | - | - | (762) |
| 18   Professional Fees - Restructuring | - | - | - | (446) | - | (803) | (125) | (425) | - | - | (1,865) | (125) | (575) | (4,364) |
| 19   Professional Fees - Litigation and DOJ | - | - | - | - | - | - | - | - | - | - | - | (2,690) | - | (2,690) |
| 20   Other Non-operating Disb. | - | - | - | (130) | (130) | (1,300) | - | - | - | (50) | (250) | - | - | (1,859) |
| **Total Non-operating Disbursements** | **-** | **-** | **-** | **(576)** | **(730)** | **(2,249)** | **(218)** | **(425)** | **-** | **(50)** | **(2,376)** | **(2,815)** | **(575)** | **(10,013)** |
| **Net Cash Flow** | **$ (355)** | **$ 1,606** | **$ 3,308** | **$ (419)** | **$ (2,124)** | **$ 688** | **$ (57)** | **$ (3,218)** | **$ (448)** | **$ (1,016)** | **$ (1,011)** | **$ (2,764)** | **$ (1,322)** | **$ (7,133)** |
| **Unrestricted Book Cash Position** | | | | | | | | | | | | | | |
| 21   Beginning Book Cash Balance | $ 16,767 | $ 28,412 | $ 30,018 | $ 33,326 | $ 32,906 | $ 30,782 | $ 29,685 | $ 29,699 | $ 26,481 | $ 26,033 | $ 25,017 | $ 24,005 | $ 21,242 | $ 16,767 |
| 22   Net Cash Flow (See Above) | (355) | 1,606 | 3,308 | (419) | (2,124) | 688 | (57) | (3,218) | (448) | (1,016) | (1,011) | (2,764) | (1,322) | (7,133) |
| 23   Intercompany Funding | (0) | - | - | - | - | - | - | - | - | - | - | - | - | (0) |
| 24   FX gains/(losses) | 0 | - | - | 0 | - | - | - | - | - | - | - | - | - | 0 |
| 25   Adjustments | 12,000 | - | - | - | - | (1,785) | 70 | - | - | - | - | - | - | 10,285 |
| **Ending Unrestricted Book Cash Balance** | **$ 28,412** | **$ 30,018** | **$ 33,326** | **$ 32,906** | **$ 30,782** | **$ 29,685** | **$ 29,699** | **$ 26,481** | **$ 26,033** | **$ 25,017** | **$ 24,005** | **$ 21,242** | **$ 19,919** | **$ 19,919** |
| 26   Plus: Restricted Cash | 260 | 260 | 260 | 260 | 260 | 2,045 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 |
| **Total EndingBook cash** | **28,672** | **30,278** | **33,586** | **33,166** | **31,042** | **31,730** | **31,674** | **28,456** | **28,008** | **26,992** | **25,981** | **23,217** | **21,895** | **21,895** |
| 27   Addback: Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Cash Balance** | **$ 28,672** | **$ 30,278** | **$ 33,586** | **$ 33,166** | **$ 31,042** | **$ 31,730** | **$ 31,674** | **$ 28,456** | **$ 28,008** | **$ 26,992** | **$ 25,981** | **$ 23,217** | **$ 21,895** | **$ 21,895** |

# Aegerion Pharmaceuticals, Inc.

## DIP Cash Collateral: Aegerion – U.S. Entities (Debtors)

In US $'000 unless otherwise indicated

| Aegerion – U.S. Entity | Week 1 Forecast 05/21/19 05/25/19 | Week 2 Forecast 05/26/19 06/01/19 | Week 3 Forecast 06/02/19 06/08/19 | Week 4 Forecast 06/09/19 06/15/19 | Week 5 Forecast 06/16/19 06/22/19 | Week 6 Forecast 06/23/19 06/29/19 | Week 7 Forecast 06/30/19 07/06/19 | Week 8 Forecast 07/07/19 07/13/19 | Week 9 Forecast 07/14/19 07/20/19 | Week 10 Forecast 07/21/19 07/27/19 | Week 11 Forecast 07/28/19 08/03/19 | Week 12 Forecast 08/04/19 08/10/19 | Week 13 Forecast 08/11/19 08/17/19 | Total 13-weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| 1  Lomitapide | $  - | $  402 | $  1,113 | $  988 | $  843 | $  1,070 | $  813 | $  713 | $  743 | $  948 | $  1,165 | $  576 | $  1,028 | $  10,402 |
| 2  Metreleptin | - | 2,208 | 1,961 | 1,380 | 872 | 2,202 | 1,458 | 1,069 | 1,342 | 1,412 | 1,653 | 1,053 | 954 | 17,565 |
| 3  Third Parties Royalties | - | - | - | - | - | - | - | - | - | - | - | - | 1,031 | 1,031 |
| 4  Other | - | - | - | - | - | 5,000 | - | - | - | - | - | - | - | 5,000 |
| **Total Cash Receipts** | **-** | **2,610** | **3,075** | **2,368** | **1,715** | **8,271** | **2,271** | **1,782** | **2,085** | **2,360** | **2,818** | **1,629** | **3,013** | **33,998** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| 5  Payroll and Benefits | (25) | (515) | - | (513) | - | (512) | - | (667) | - | (509) | - | (508) | - | (3,249) |
| 6  Payroll and Benefits (Rejuvenate) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7  Discounts and Rebates | - | - | (30) | - | (945) | (965) | (952) | (952) | (952) | (952) | (952) | (183) | (183) | (7,066) |
| 8  Royalty Payments | - | - | - | - | - | - | - | - | - | - | - | - | (2,292) | (2,292) |
| 9  Product Manufacturing | - | (150) | (150) | (313) | (14) | (14) | (71) | (371) | (11) | (11) | (11) | (611) | (159) | (1,886) |
| 10 Clinical / Medical Affairs | - | (75) | (75) | (176) | (127) | (127) | (127) | (226) | (138) | (88) | (88) | (88) | (117) | (1,453) |
| 11 Facilities (incl. Leases) | - | (35) | - | (35) | - | - | (8) | - | (40) | - | (8) | - | (40) | (166) |
| 12 Insurance | - | - | - | - | (100) | - | - | - | - | - | - | - | - | (100) |
| 13 Legal Fees | - | (50) | (100) | - | - | (179) | - | - | - | (79) | - | - | - | (407) |
| 14 Other Professionals | - | (50) | (50) | (140) | (104) | (104) | (104) | (104) | (178) | (178) | (178) | (128) | (97) | (1,414) |
| 15 Other Operating Disbursements | (51) | (61) | (76) | (347) | (1,094) | (344) | (395) | (344) | (449) | (449) | (499) | (400) | (399) | (4,909) |
| **Total Operating Disbursements** | **(76)** | **(936)** | **(481)** | **(1,524)** | **(2,384)** | **(2,245)** | **(1,657)** | **(2,664)** | **(1,768)** | **(2,266)** | **(1,736)** | **(1,918)** | **(3,287)** | **(22,942)** |
| **Net Operating Cash Flow** | **(76)** | **1,674** | **2,594** | **844** | **(669)** | **6,026** | **615** | **(882)** | **317** | **94** | **1,082** | **(289)** | **(274)** | **11,056** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 16 Permitted Affiliate Services Payments | - | - | - | - | - | (146) | - | - | - | - | - | (192) | - | (338) |
| 17 Debt Service and Related Fees | - | - | - | - | (600) | - | (93) | - | - | - | (69) | - | - | (762) |
| 18 Professional Fees - Restructuring | - | - | - | (446) | - | (803) | (125) | (425) | - | - | (1,865) | (125) | (575) | (4,364) |
| 19 Professional Fees - Litigation and DOJ | - | - | - | - | - | - | - | - | - | - | - | (2,690) | - | (2,690) |
| 20 Other Non-operating Disb. | - | - | - | (130) | (130) | (1,300) | - | - | - | (50) | (250) | - | - | (1,859) |
| **Total Non-operating Disbursements** | **-** | **-** | **-** | **(576)** | **(730)** | **(2,249)** | **(218)** | **(425)** | **-** | **(50)** | **(2,376)** | **(2,815)** | **(575)** | **(10,013)** |
| **Net Cash Flow** | **$  (76)** | **$  1,674** | **$  2,594** | **$  268** | **$  (1,398)** | **$  3,778** | **$  396** | **$  (1,307)** | **$  317** | **$  44** | **$  (1,294)** | **$  (3,104)** | **$  (849)** | **$  1,042** |
| **Unrestricted Book Cash Position** | | | | | | | | | | | | | | |
| 21 Beginning Book Cash Balance | $  6,161 | $  19,345 | $  21,018 | $  23,612 | $  23,880 | $  22,482 | $  25,566 | $  26,032 | $  24,726 | $  24,542 | $  24,587 | $  23,293 | $  20,188 | $  6,161 |
| 22 Net Cash Flow (See Above) | (76) | 1,674 | 2,594 | 268 | (1,398) | 3,778 | 396 | (1,307) | 317 | 44 | (1,294) | (3,104) | (849) | 1,042 |
| 23 Intercompany Funding | 1,260 | - | - | - | - | 1,091 | - | - | (500) | - | - | - | - | 1,851 |
| 24 FX gains/(losses) | - | - | - | - | - | - | 70 | - | - | - | - | - | - | 70 |
| 25 Adjustments | 12,000 | - | - | - | - | (1,785) | - | - | - | - | - | - | - | 10,285 |
| **Ending Unrestricted Book Cash Balance** | **$  19,345** | **$  21,018** | **$  23,612** | **$  23,880** | **$  22,482** | **$  25,566** | **$  26,032** | **$  24,726** | **$  24,542** | **$  24,587** | **$  23,293** | **$  20,188** | **$  19,339** | **$  19,339** |
| 26 Plus: Restricted Cash | 220 | 220 | 220 | 220 | 220 | 2,005 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 |
| **Total EndingBook cash** | **19,564** | **21,238** | **23,832** | **24,100** | **22,702** | **27,571** | **27,967** | **26,661** | **26,477** | **26,522** | **25,228** | **22,123** | **21,274** | **21,274** |
| 27 Addback: Outstanding Checks | | | | | | | | | | | | | | |
| **Ending Bank Cash Balance** | **$  19,564** | **$  21,238** | **$  23,832** | **$  24,100** | **$  22,702** | **$  27,571** | **$  27,967** | **$  26,661** | **$  26,477** | **$  26,522** | **$  25,228** | **$  22,123** | **$  21,274** | **$  21,274** |

**Aegerion Pharmaceuticals, Inc.**

## DIP Cash Collateral: Aegerion – non-U.S. Entities (Non-Debtors)

In US $'000 unless otherwise indicated

| Aegerion – non-U.S. Entities | Week 1 Forecast 05/21/19 05/25/19 | Week 2 Forecast 05/26/19 06/01/19 | Week 3 Forecast 06/02/19 06/08/19 | Week 4 Forecast 06/09/19 06/15/19 | Week 5 Forecast 06/16/19 06/22/19 | Week 6 Forecast 06/23/19 06/29/19 | Week 7 Forecast 06/30/19 07/06/19 | Week 8 Forecast 07/07/19 07/13/19 | Week 9 Forecast 07/14/19 07/20/19 | Week 10 Forecast 07/21/19 07/27/19 | Week 11 Forecast 07/28/19 08/03/19 | Week 12 Forecast 08/04/19 08/10/19 | Week 13 Forecast 08/11/19 08/17/19 | Total 13-weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| 1  Lomitapide | $ 22 | $ 985 | $ 87 | $ - | $ - | $ 798 | $ 47 | $ 46 | $ 46 | $ 46 | $ 817 | $ 50 | $ 50 | $ 2,993 |
| 2  Metreleptin | 475 | 819 | 1,733 | 134 | 107 | 430 | 999 | 850 | - | 126 | 225 | 1,044 | 858 | 7,799 |
| 3  Third Parties Royalties | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4  Other | - | - | - | - | 256 | - | - | - | - | - | - | - | 10 | 266 |
| **Total Cash Receipts** | 497 | 1,804 | 1,819 | 134 | 363 | 1,228 | 1,046 | 897 | 46 | 172 | 1,042 | 1,093 | 917 | 11,058 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| 5  Payroll and Benefits | (62) | (406) | (132) | (105) | (368) | (21) | (96) | (133) | - | (368) | (50) | (87) | (75) | (1,902) |
| 6  Payroll and Benefits (Rejuvenate) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7  Discounts and Rebates | (11) | (151) | (16) | (108) | (10) | (50) | (30) | (102) | - | - | (83) | (3) | - | (566) |
| 8  Royalty Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9  Product Manufacturing | (326) | (846) | (22) | (150) | (422) | (3,600) | (466) | (880) | (428) | (425) | (425) | (431) | (492) | (8,911) |
| 10  Clinical / Medical Affairs | (7) | (7) | (7) | (7) | (12) | (12) | (12) | (618) | (27) | (27) | (27) | (27) | (125) | (916) |
| 11  Facilities (incl. Leases) | (69) | (6) | (8) | (14) | (13) | (41) | (65) | (2) | (14) | (54) | (12) | (2) | (14) | (313) |
| 12  Insurance | (1) | - | (0) | (1) | (0) | - | - | (0) | - | (0) | - | (0) | - | (4) |
| 13  Legal Fees | (28) | - | (40) | (33) | - | (63) | - | - | - | (65) | - | - | - | (228) |
| 14  Other Professionals | (175) | (52) | (211) | (272) | (211) | (171) | (127) | (57) | (294) | (154) | (123) | (54) | (215) | (2,117) |
| 15  Other Operating Disbursements | (96) | (404) | (670) | (131) | (52) | (360) | (703) | (1,015) | (48) | (138) | (40) | (149) | (470) | (4,277) |
| **Total Operating Disbursements** | (776) | (1,872) | (1,105) | (822) | (1,089) | (4,318) | (1,499) | (2,807) | (811) | (1,232) | (760) | (753) | (1,390) | (19,233) |
| **Net Operating Cash Flow** | (279) | (68) | 714 | (688) | (726) | (3,089) | (453) | (1,911) | (765) | (1,060) | 282 | 341 | (473) | (8,175) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 16  Permitted Affiliate Services Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17  Debt Service and Related Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 18  Professional Fees - Restructuring | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 19  Professional Fees - Litigation and DOJ | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 20  Other Non-operating Disb. | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-operating Disbursements** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | $ (279) | $ (68) | $ 714 | $ (688) | $ (726) | $ (3,089) | $ (453) | $ (1,911) | $ (765) | $ (1,060) | $ 282 | $ 341 | $ (473) | $ (8,175) |
| **Unrestricted Book Cash Position** | | | | | | | | | | | | | | |
| 21  Beginning Book Cash Balance | $ 10,606 | $ 9,067 | $ 8,999 | $ 9,714 | $ 9,026 | $ 8,300 | $ 4,119 | $ 3,666 | $ 1,755 | $ 1,491 | $ 430 | $ 713 | $ 1,053 | $ 10,606 |
| 22  Net Cash Flow (See Above) | (279) | (68) | 714 | (688) | (726) | (3,089) | (453) | (1,911) | (765) | (1,060) | 282 | 341 | (473) | (8,175) |
| 23  Intercompany Funding | (1,260) | - | - | - | - | (1,091) | - | - | 500 | - | - | - | - | (1,851) |
| 24  FX gains/(losses) | 0 | - | - | - | 0 | - | - | - | - | - | - | - | - | 0 |
| 25  Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Unrestricted Book Cash Balance** | $ 9,067 | $ 8,999 | $ 9,714 | $ 9,026 | $ 8,300 | $ 4,119 | $ 3,666 | $ 1,755 | $ 1,491 | $ 430 | $ 713 | $ 1,053 | $ 580 | $ 580 |
| 26  Plus: Restricted Cash | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| **Total EndingBook cash** | 9,107 | 9,039 | 9,754 | 9,066 | 8,340 | 4,159 | 3,706 | 1,796 | 1,531 | 470 | 753 | 1,093 | 620 | 620 |
| 27  Addback: Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Cash Balance** | $ 9,107 | $ 9,039 | $ 9,754 | $ 9,066 | $ 8,340 | $ 4,159 | $ 3,706 | $ 1,796 | $ 1,531 | $ 470 | $ 753 | $ 1,093 | $ 620 | $ 620 |

## **EXHIBIT B**

**Proposed Final Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Aegerion Pharmaceuticals, Inc., <u>et al.</u>,[1] | : | Case No. 19-_____ (      ) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------x

### FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, AND (V) MODIFYING THE AUTOMATIC STAY

Upon the motion, dated May 20, 2019 (the "<u>Motion</u>"), of the Borrower (as defined below), and the other debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), in the above-referenced chapter 11 cases (the "<u>Cases</u>"), seeking (among other things) entry of a final order (this "<u>Final Order</u>") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l), 364(e), 503, 507, and 552 of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "<u>Local Rules</u>"), that, among other things:

(i)    authorizes the Debtor designated as "Borrower" under, and as defined in, the DIP Credit Agreement (as defined below) (the "<u>Borrower</u>") to obtain, and the guarantors (the "<u>DIP Guarantors</u>") under the DIP Loan Documents (as defined below) to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of, a senior secured priming and superpriority postpetition term loan facility in a principal amount of up to

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are:  Aegerion Pharmaceuticals, Inc. (0116); and Aegerion Pharmaceuticals Holdings, Inc. (1331). The Debtors' executive headquarters are located at 245 First Street, Riverview II, 18th Floor, Cambridge, MA 02142.

$20,000,000 (the "DIP Facility" and the loans extended under the DIP Facility, the "DIP Loans"), pursuant to the terms of (x) this Final Order, (y) that certain Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "DIP Credit Agreement"),[2] by and among the Borrower, the DIP Guarantors, Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, collectively, the "DIP Agent"), and the other financial institutions party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (collectively, the "DIP Lenders," and together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "DIP Secured Parties"), in substantially the form attached hereto, and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "DIP Loan Documents"), to fund, among other things, ongoing working capital, general corporate expenditures and other financing needs of the Debtors;

(ii)    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Final Order;

(iii)    grants (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens on all of the Adequate Protection Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens (1) shall be senior to the Primed Liens (as defined below) and (2) shall be junior solely to any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date (as defined below), (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition Liens (as defined below) (all such Liens described in clause (iii)(x)(2), collectively, the "Prepetition Prior Liens") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including,[3] upon entry of this Final Order, any Avoidance Actions Proceeds (as defined below);

(iv)    authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which the Prepetition Secured Parties (as defined below) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Final Order or otherwise;

---

[2]    Unless otherwise specified herein, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement. A copy of the DIP Credit Agreement is attached hereto as Exhibit A.

[3]    As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

(v)      vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Final Order;

(vi)      grants the Prepetition Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Secured Party Adequate Protection (as defined below), which consists of, among other things, Adequate Protection Liens (as defined below),  Adequate Protection Superiority Claims (as defined below), and current payment of accrued and unpaid prepetition and postpetition interest at the non-default rate, payment of certain specified postpetition payments due to the Prepetition Secured Parties, and reimbursable fees and expenses;

(vii)      waives certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(viii)      provides for the immediate effectiveness of this Final Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the Motion, the DIP Credit Agreement, the Declaration of John R. Castellano, (the "First Day Declaration"), the evidence submitted or proffered at the hearing on the Motion, and the evidence submitted or proffered at the May 20, 2019 interim hearing on this Final Order (the "Final Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), and 4001(d) and 9014 and all applicable Local Rules, notice of the  Motion and the Final Hearing having been provided; a Final Hearing having been held and concluded on _____, 2019; and it appearing that approval of the relief requested is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

    A.      **Petition Date**. On May 20, 2019 (the "<u>Petition Date</u>"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (this "<u>Court</u>"). The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No statutory committee of unsecured creditors (to the extent such committee is appointed, the "<u>Committee</u>"), trustee, or examiner has been appointed in the Cases.

    B.      **Jurisdiction and Venue**. This Court has core jurisdiction over the Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and other predicates for the relief granted herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

    C.      **Notice**. Notice of the Final Hearing and the Motion, and the relief requested therein, complies with Bankruptcy Rules and the Local Rules, and no other notice need be provided for entry of this Final Order.

    D.      **Debtors' Stipulations Regarding the Prepetition Facilities**. Subject only to the rights of parties in interest that are specifically set forth in Paragraph 5 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (Paragraphs D and E hereof shall be referred to herein collectively as the "<u>Debtors' Stipulations</u>") as follows:

---

[4]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

(i)        Prepetition Bridge Loan Credit Facility.  Pursuant to that certain Bridge Credit Agreement dated as of November 8, 2018 (as amended, restated or otherwise modified from time to time, the "Prepetition Bridge Loan Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Bridge Loan Documents") , among (a) Aegerion Pharmaceuticals, Inc. (the "Borrower"), as borrower, (b) the other financial institutions party thereto as "Lenders" (collectively, in their capacity as such, the "Prepetition Bridge Lenders"), and (c) Cantor Fitzgerald Securities, as administrative agent and collateral agent ( in such capacities, the "Prepetition Agent" and, together with the Prepetition Bridge Lenders and any other party to which Prepetition Bridge Loan Obligations (as defined below) are owed, the "Prepetition Bridge Loan Secured Parties"), the Prepetition Bridge Loan Secured Parties agreed to extend loans and other financial accommodations to, the Borrower pursuant to the Prepetition Bridge Loan Documents.  All obligations of the Debtors arising under the Prepetition Bridge Loan Credit Agreement (including all "Roll Up Loans" (the "Roll Up Loans") and the other "Obligations", each as defined therein) or the other Prepetition Bridge Loan Documents shall collectively be referred to herein as the "Prepetition Bridge Loan Obligations."

(ii)       Novelion Intercompany Loan Credit Agreement.  Pursuant to that certain Amended and Restated Loan and Security Agreement, dated as of March 15, 2018, between the Novelion Therapeutics Inc. ("Novelion" and, collectively with the Prepetition Bridge Loan Secured Parties, the "Prepetition Secured Parties") and the Borrower (as amended by Amendment No. 1 and Consent, dated as of November 8, 2018 and as further amended, modified, restated, replaced or supplemented from time to time, the "Novelion Intercompany Loan Agreement" and,

5

together with the Bridge Loan Credit Agreement, the "Prepetition Credit Agreements"), and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Novelion Intercompany Loan Documents" and, collectively with the Prepetition Bridge Loan Documents, the "Prepetition Loan Documents"), Novelion agreed to extend loans and other financial accommodations to, the Borrower pursuant to the Novelion Intercompany Loan Documents.  All obligations of the Debtors arising under the Novelion Intercompany Loan Agreement (including the "Obligations", as defined therein, whether or not arising under the Novelion Loan Documents) or the other Novelion Intercompany Loan Documents, whether presently existing or arising in the future, shall collectively be referred to herein as the "Novelion Intercompany Loan Obligations" and, collectively with the Prepetition Bridge Loan Obligations, the "Prepetition Obligations".  Pursuant to the Subordination Agreement (defined below), the Prepetition Bridge Loan Secured Parties agreed not to challenge, join, direct, support or encourage any other party in challenging or seeking to challenge, the Novelion Intercompany Loan Obligations in the original aggregate amount of $25 million (subject to reduction for certain repayments authorized under the Prepetition Loan Documents) (the "Non-Contested Novelion Intercompany Amount").

(iii)    Prepetition Liens and Prepetition Collateral.    Pursuant to the Collateral Documents (each as defined in the Prepetition Credit Agreements) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Collateral Documents"), by and among each of the Loan Parties party thereto (the "Grantors"), Novelion and the Prepetition Agent, each Grantor granted to (i) the Prepetition Agent, for the benefit of itself and the other Prepetition Bridge Loan Secured Parties, to secure the Prepetition

Bridge Loan Obligations, a first priority security interest in and continuing Lien (the "Prepetition Bridge Loan Liens") on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, subject to the terms of the Subordination Agreement (as defined below) with respect to the Roll Up Loans and (ii) Novelion, to secure the Novelion Intercompany Loan Obligations, a first priority security interest in and continuing Lien (the "Novelion Intercompany Loan Liens" and, collectively with the Prepetition Bridge Loan Liens, the "Prepetition Liens") on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, subject to the terms of the Subordination Agreement.  All "Collateral" as defined in the Prepetition Credit Agreements granted or pledged by such Grantors pursuant to any Prepetition Collateral Document or any other Prepetition Loan Document shall collectively be referred to herein as the "Prepetition Collateral."  As of the Petition Date, (I) the Prepetition Bridge Loan Liens and the Novelion Intercompany Loan Liens supporting the Non-Contested Novelion Intercompany Amount (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition Bridge Loan Secured Parties and Novelion (as applicable) for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below), (C) the Permitted Liens (as defined in the Prepetition Bridge Loan Credit Agreement) and (D) solely with respect to the Roll Up Loans, as and to the extent set forth in the Subordination

Agreement, the Novelion Intercompany Loan Obligations, and (II) (w) the Prepetition Bridge Loan

Obligations and the Non-Contested Novelion Intercompany Amount constitute legal, valid, and

binding obligations of the applicable Debtors, enforceable in accordance with the terms of the

applicable Prepetition Loan Documents (other than in respect of the stay of enforcement arising

from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or

counterclaims to any of the Prepetition Bridge Loan Obligations or the Non-Contested Novelion

Intercompany Amount exist, (y) no portion of the Prepetition Bridge Loan Obligations or the Non-

Contested Novelion Intercompany Amount or any payments made to any or all of the Prepetition

Bridge Loan Secured Parties or Novelion on account of the Non-Contested Novelion

Intercompany Amount are subject to avoidance, disallowance, disgorgement, recharacterization,

recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the

Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

and (z) any guarantee under the Collateral Documents (as defined in the Prepetition Bridge Loan

Credit Agreement) shall continue in full force and effect to unconditionally guaranty the

Prepetition Bridge Loan Obligations and the Non-Contested Novelion Intercompany Amount

notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial

accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this

Final Order or the DIP Loan Documents.

(iv)     Amounts Owed under Prepetition Loan Documents.    As of the

Petition Date, the applicable Debtors owed the Prepetition Bridge Loan Secured Parties, pursuant

to the Prepetition Bridge Loan Documents, without defense, counterclaim, reduction or offset of

any kind, in respect of loans made and other financial accommodations made by the Prepetition

Bridge Loan Secured Parties, an aggregate principal amount of not less than $72,976,717 with

respect to the bridge loan facility, which amount includes a principal amount of not less than $22,500,000 with respect to the Roll-Up Loans, *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Bridge Loan Documents), and other amounts now or hereafter due under the Prepetition Bridge Loan Documents.  As of the Petition Date, the applicable Debtors owed Novelion an aggregate principal amount of not less than $36,340,173  pursuant to the Novelion Intercompany Loan Agreement of which amount, $19,393,700 is the outstanding Non-Contested Novelion Intercompany Amount, *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Novelion Intercompany Loan Documents), and other amounts now or hereafter due under the Novelion Intercompany Loan Documents.

(v)      Release of Claims.  Subject to the reservation of rights set forth in Paragraph 5 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of (i) the Prepetition Bridge Loan Secured Parties, (ii) Novelion, and (iii) each of their respective affiliates, assigns or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (all of the foregoing, collectively, in such capacity, the "Prepetition Secured Party Releasees") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition Secured Party Releasees, whether arising at law or

9

in equity, relating to and/or otherwise in connection (as applicable) with the Prepetition Bridge Loan Obligations, the Prepetition Bridge Loan Liens, the Non-Contested Novelion Intercompany Amount or the debtor-creditor relationship between any of the Prepetition Bridge Loan Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Bridge Loan Obligations, the Non-Contested Novelion Intercompany Amount, or any payments or other transfers made on account of the Prepetition Bridge Loan Obligations or the Non-Contested Novelion Intercompany Amount, or the validity, enforceability, priority, or non-avoidability of the Prepetition Liens securing the Prepetition Bridge Loan Obligations and the Non-Contested Novelion Intercompany Amount, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Secured Party Releasees.

E.        Cash Collateral.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition  Secured Parties.

F.        Subordination Agreement.  The Subordination Agreement dated as of November 8, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Subordination Agreement") among the Prepetition Bridge Loan Secured Parties, Novelion  and Novelion Services USA, Inc. ("Novelion Services") sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition Bridge Loan Secured Parties and the Prepetition Bridge Loan Obligations and Prepetition Bridge Loan Liens, on the one

10

hand, and the indebtedness and obligations of the Debtors to Novelion and Novelion Services, on the other hand, including (a) the Novelion Intercompany Loan Obligations and the Novelion Intercompany Liens and (b) any other documentation providing for any payment obligation of the Debtors or any subsidiary of the Debtors to Novelion or Novelion Services, or any affiliate thereof, including, without limitation, under (x) that certain Master Service Agreement, dated as of December 1, 2016, between Novelion and the Borrower (as amended, modified or supplemented from time to time) and (y) that certain Master Service Agreement, dated as of December 1, 2016, between Novelion Services and the Buyer (as amended, modified or supplemented from time to time). Pursuant to section 510 of the Bankruptcy Code, such Subordination Agreement and any other intercreditor agreement or subordination agreement between and/or among the Prepetition Agent, any Prepetition Bridge Loan Lender, Novelion, any Debtor or affiliate thereof, and any other applicable intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture or related document, (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights and remedies of the Prepetition Bridge Loan Secured Parties and Novelion (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (iii) shall not be amended, altered or modified by the terms of this Interim Order. Pursuant to the Subordination Agreement and the Prepetition Credit Agreements, the Net Cash Proceeds (as defined in the Prepetition Bridge Loan Credit Agreement) received from the Permitted Licensing Transaction (as defined in the Prepetition Bridge Loan Credit Agreement) were to be remitted by the Borrower to repay (i) the Prepetition Bridge Loans (but not the Roll Up Loans) and (ii) the Non-Contested Novelion

Intercompany Amount, on a 58% and 42% basis, respectively (such payments, the "Permitted Licensing Transaction Payments").

### G.        Findings Regarding the DIP Facility.

(i)        Need for Postpetition Financing. The Debtors need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to otherwise preserve the value of the Debtors' estate. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and the borrowings under the DIP Facility is vital to a successful reorganization and/or to otherwise preserve the enterprise value of the Debtors' estates. Immediate and irreparable harm will be caused to the Debtors and their estates if financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Final Order and the DIP Loan Documents.

(ii)        No Credit Available on More Favorable Terms. The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Final Order. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claims (as defined below), (b)

allowing the DIP Secured Parties to provide the loans and other financial accommodations under the DIP Facility on the terms set forth herein and in the DIP Loan Documents, and (c) granting to the Prepetition Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Prepetition Secured Party Adequate Protection (all of the foregoing described in clauses (a), (b), and (c) above, collectively, the "DIP Protections").

H.    **Adequate Protection for the Prepetition Secured Parties**.    The Prepetition Bridge Loan Secured Parties have agreed, and Novelion is deemed to have agreed pursuant to the terms of the Subordination Agreement, to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for a priming of the Prepetition Liens pursuant to section 364(d) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to this Court at the Final Hearing, the terms of the proposed adequate protection arrangements, the use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition Secured Parties.  Prepetition Bridge Loan Lenders holding 100% of the aggregate principal balance of the Loans (each as defined in the Prepetition Bridge Loan Credit Agreement) have expressly consented to the entry of this Final Order and the relief provided herein and pursuant to the terms of the Prepetition Bridge Loan Credit Agreement.  Notwithstanding anything to the contrary

13

herein, the Prepetition Secured Parties' consent to the DIP Facility and to the priming of the Prepetition Liens by the DIP Liens is expressly limited to the present DIP Facility and the DIP Liens securing the same and shall not be applicable to any other debtor-in-possession credit facility, even if it contains substantially the same economic terms as this DIP Facility.

I.        **Section 552**.  In light of the subordination of their Liens and superpriority administrative claims to the Carve-Out and the DIP Liens, each of the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

J.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)        The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Final Order.

(ii)        The terms and conditions of the DIP Facility as set forth in the DIP Loan Documents and this Final Order, and the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(iii)        The DIP Secured Parties, the Prepetition Secured Parties, and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arms' length in, as applicable, negotiating, consenting to, and/or agreeing to, the DIP Facility, the Debtors' use of the Adequate Protection Collateral and the Prepetition Collateral (including

Cash Collateral), the DIP Loan Documents and the DIP Protections (including the Prepetition Secured Party Adequate Protection).  The DIP Obligations (including all advances that are made at any time to the Debtors under the DIP Loan Documents and the Debtors' use of the Adequate Protection Collateral and the Prepetition Collateral (including Cash Collateral) shall be deemed to have been extended and/or consented to by the DIP Secured Parties and the Prepetition Secured Parties for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Final Order, and, accordingly, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Party Adequate Protection and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Final Order in the event this Final Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

K.    **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Final Order, the Debtors' estates, their businesses and properties and their ability to successfully reorganize or otherwise preserve the enterprise value of the Debtors' estates will be irreparably harmed. Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Final Order and the DIP Loan Documents is therefor in the best interests of the Debtors' estates and consistent with their fiduciary duties.  Based on all of the foregoing, sufficient cause exists for entry of the Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the  Motion and the record before this Court with respect to  Motion, and with the consent of the Debtors, the Prepetition Agent, the Prepetition Bridge

Loan Secured Parties, and the DIP Agent (on behalf of all of the DIP Secured Parties), and the deemed consent of Novelion, to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1. **Motion Granted**. The Motion is hereby granted in accordance with the terms and conditions set forth in this Final Order and the DIP Loan Documents. Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2. **DIP Loan Documents and Other Protections**.

(a)  Approval of DIP Loan Documents. The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Final Order, to incur the DIP Obligations (as defined below), in accordance with, and subject to, the terms of this Final Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Final Order and the DIP Loan Documents. The Debtors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Final Order, including all closing fees, administrative fees, commitment fees, and reasonable attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Final Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect;

16

provided, however, that the payment of the fees and expenses of the Lender Professionals (as defined below) shall be subject to the provisions of Paragraph 20(b). Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms. Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)      DIP Obligations.  For purposes of this Final Order, the term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Loan Documents (including all "Obligations" as defined in the DIP Credit Agreement) and shall include the principal of, interest on, and fees, costs, expenses, and other charges owing in respect of, such amounts (including any reasonable attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Final Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.

(c)      Authorization to Incur DIP Obligations and Use Cash Collateral.  To enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Final Order through and including a Termination Declaration (as defined below), in each case unless extended by written agreement of the DIP Agent and the Prepetition Agent (both at the direction of the requisite percentage of lenders) (the period from the entry of this Final Order through and including such date, the "Final Period"), the Debtors and the Borrower, as applicable, are hereby authorized to (x) use Cash Collateral and (y) to borrow under the DIP Facility; and (ii) any proposed use of the proceeds of DIP Loans or use

of Cash Collateral shall be consistent with the terms and conditions of this Final Order and the DIP

Loan Documents, including the Approved Budget and the Budget Covenants as defined and

contained in Paragraph 2(e) below.  All DIP Obligations shall be unconditionally guaranteed, on

a joint and several basis, by the DIP Guarantors, as further provided in the DIP Loan Documents.

(d)    Budget.  Attached hereto as Exhibit B is a rolling 13-week cash flow budget (the

"Initial Approved Budget") that reflects on a line-item basis the Debtors' (i) weekly projected cash

receipts (including from non-ordinary course assets sales) and (ii) weekly projected disbursements

(including ordinary course operating expenses, bankruptcy-related expenses under the Cases,

capital expenditures, and estimated fees and expenses of the DIP Agent (including counsel and

financial advisors therefor), the other DIP Secured Parties (including counsel and financial

advisors therefor), the Prepetition Agent (including counsel and financial advisors therefor), and

any other fees and expenses relating to the DIP Facility.

(i)    The Debtors shall at the end of every four (4) week period

commencing on Friday of the first full calendar week following the

Petition Date propose (and provide a copy to Novelion) an update to

the then-existing Approved Budget (as defined below) adding

thereto the forecast of cash receipts and cash disbursements

(including any Permitted Affiliate Services Payments (as defined in

the Prepetition Credit Agreement)) for the 13-week period

commencing with the calendar week immediately following the date

such proposed update is required to be delivered hereunder, which,

once approved in writing by the Prepetition Agent and the

administrative agent for the DIP Facility (the DIP Agent and

together with the Prepetition Agent, the "Agents")) (each, a "Proposed Supplemental Budget" and, once approved in writing by the applicable Agent(s) at the direction of the requisite percentage of lenders of the applicable facility (or deemed approved, as provided below), a "Supplemental Approved Budget"), shall supplement and replace the then existing Approved Budget then in effect (the Initial Approved Budget, as modified by any and all Supplemental Approved Budgets, shall constitute the "Approved Budget") without further notice, motion, or application to, order of, or hearing before, this Court; provided that if the applicable Agent(s) at the direction of the requisite percentage of lenders of the applicable facility have not objected to a proposed budget within seven (7) days after delivery thereof, such proposed budget shall be deemed acceptable to and approved by such Agent(s) and the respective lenders for all purposes hereunder; provided, however, that unless and until such Supplemental Approved Budget has been approved (or deemed approved as provided above) by the applicable Agent(s), the Debtors shall still be subject to and be governed by the terms of the Approved Budget then in effect in accordance with this Interim Order, and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral other than with respect thereto.

19

(ii)    The Initial Approved Budget and each Proposed Supplemental Budget shall include a memo item reflecting cumulative transfers that may be required to each direct or indirect non-debtor subsidiary of the Debtors (the "Foreign Subsidiaries") irrespective of expense categories.  Each Proposed Supplemental Budget shall include a consolidating cash flow schedule illustrating budgeted cash flows for the Foreign Subsidiaries aggregated by geography and broken down by use of funds.

(iii)    By no later than 11:59 p.m. (New York, New York time) by the third Business Day of each calendar week, and commencing following the first full week following the Petition Date, the Debtors shall deliver to the Prepetition Agent, Prepetition Bridge Lenders, DIP Agent and DIP Lenders variance reports (in substantially the same format as the Budget) showing actual cash receipts and disbursements for the immediately preceding week, noting therein all variances, on a line-item basis, from values set forth for such period(s) in the Initial Budget or the most current Supplemental Approved Budget, as applicable.  For the avoidance of doubt, such weekly variance reports shall include actual cash flows to Foreign Subsidiaries by geography broken down by use of funds.

(iv)    Notwithstanding anything to the contrary in this Final Order, the professional fees, costs and expenses of the Lender Professionals (as defined below) (the "Lender Professional Fees") shall be due,

payable and paid in accordance with the terms of this Final Order and the Professional Fees (as defined below) shall be due, payable and paid subject to this Final Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court, in each case, notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants (as defined below) to the extent the actual amount of such fees, costs and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

(e)    <u>Budget Covenants</u>.  The Debtors shall only incur DIP Obligations and expend Cash Collateral and other Adequate Protection Collateral proceeds thereof in accordance with the purposes, and in the time periods, set forth in the Approved Budget (and in the case of the costs and expenses of the DIP Agent, the other DIP Secured Parties, and the Prepetition Agent, in accordance with the DIP Loan Documents and this Final Order without being limited by the Approved Budget), subject to the following permitted variances (collectively, the "<u>Permitted Variances</u>"):

(i)    permitted variances with respect to the actual operating disbursements of the Debtors shall be tested weekly initially on the third Business Day of the second full week following the Petition Date (the "<u>First Testing Date</u>") (testing the period from the Petition Date through and including such date (such initial testing period, the "<u>First Testing Period</u>")) and continuing on

21

the third Business Day of each week thereafter (each, a "Subsequent Testing Date") (in the case of the first Subsequent Testing Date, testing the trailing three week period ending on the Friday before such Subsequent Testing Date (the "Second Testing Period"), and in the case of each Subsequent Testing Date that follows, testing the trailing four week period ending on the Friday before the applicable Subsequent Testing Date (each, a "Four Week Testing Period")) as follows: (A) for the First Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the First Testing Period shall not exceed 125% of the sum of the "Total Operating Disbursements" for such First Testing Period as set forth in the Approved Budget, (B) for the first Subsequent Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the Second Testing Period shall not exceed 120% of the sum of the "Total Operating Disbursements" for such Second Testing Period as set forth in the Approved Budget, and (C) for each Subsequent Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the immediately preceding Four Week Testing Period shall not exceed 115% of the sum of the "Total Operating Disbursements" for such Four Week Testing Period as set forth in the Approved Budget; and

(ii)      permitted variances with respect to the actual cash receipts of the Debtors shall be tested weekly initially on the First Testing Date (testing the First Testing Period) and continuing on the Subsequent Testing Date of every week thereafter (testing the applicable Four Week Testing Period) as follows: (A) for the First Testing Date, the sum of actual receipts of the Debtors for the First Testing Period shall not be less than 75% of the sum of the "Total Receipts" for such First Testing Period as set forth in the Approved Budget, (B) for the first Subsequent Testing Date, the sum of actual receipts of the Debtors for the Second Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such Second Testing Period as set forth in the Approved Budget, and (C) for every other Subsequent Testing Date thereafter, the sum of actual receipts of the Debtors for the immediately preceding Four Week Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such Four Week Testing Period as set forth in the Approved Budget; provided, that for the purposes of determining compliance with this clause (c)(ii) with respect to an applicable testing period, (x) if a cash receipt that was scheduled in the Approved Budget, as then applicable, to be received during such applicable testing period is received within three (3) business days after such applicable testing period, such receipt may, at the Debtors' election, be applied as if it was received during such applicable testing period; and (y) if a cash receipt that was scheduled in the Approved Budget, as then applicable, to be received in the next subsequent testing period is received during such

applicable testing period, such receipt may, at the Debtors' election, be

applied as if it was received during the next subsequent testing period and

not such applicable testing period.

The budget-related covenants under this Paragraph 2(e) are collectively referred to herein as the

"Budget Covenants."

(f)     Interest, Fees, Costs, Indemnities and Expenses.  The DIP Obligations shall bear

interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the

terms and conditions of, this Final Order and the DIP Loan Documents, in each case without

further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall

pay on demand all fees, costs, indemnities, expenses (including reasonable out-of-pocket legal

and other professional fees and expenses of the DIP Agent and the other DIP Secured Parties) and

other charges payable under the terms of the DIP Loan Documents.  All such fees, costs,

indemnities, expenses and disbursements, whether incurred, paid or required to be paid

prepetition or post-petition and whether or not budgeted in the Approved Budget, are hereby

affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its

professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and

disbursements may be applied for payment) as contemplated in this Final Order and the DIP Loan

Documents, and, subject to the provisions of Paragraph 20(b) with respect to the fees and

expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any

respect.

(g)     Use of DIP Facility and Proceeds of Adequate Protection Collateral.  The Borrower

shall apply the proceeds of all Adequate Protection Collateral solely in accordance with this Final

Order and the DIP Loan Documents.  Without limiting the foregoing, the Debtors shall not be

permitted to make any payments (from the Adequate Protection Collateral, the proceeds of DIP Loans or otherwise) on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except:  (a) with respect to the Prepetition Obligations as set forth in this Final Order; (b) as provided in any order in connection with the First Day Motions (as defined in the Restructuring Support Agreement (as defined below)) (the "First Day Orders"); (c) as expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Bridge Lenders and Novelion prior to such motion, order, or request for such relief being filed; or (d) as otherwise expressly provided in the DIP Credit Agreement, without giving effect to any amendment or waiver thereof to which the DIP Agent has not consented in writing.

(h)    Conditions Precedent.  The DIP Secured Parties and Prepetition Secured Parties each have no obligation to extend credit under the DIP Facility or permit use of any Adequate Protection Collateral or Prepetition Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Final Period unless and until (i) all conditions precedent to the extension of credit and/or use of Adequate Protection Collateral, Prepetition Collateral or proceeds thereof under the DIP Loan Documents and this Final Order have been satisfied in full or waived by the DIP Agent and the Prepetition Agent in accordance with the DIP Loan Documents or  Section 10.01 of the Prepetition Bridge Loan Credit Agreement, as applicable, and this Final Order, or (ii) otherwise ordered to do so by this Court.

(i)    Permitted Licensing Transaction Payments.  (i) The Debtors may use proceeds of Permitted Licensing Transaction Payments due and payable to the Prepetition Bridge Loan Secured Parties in the proportion set forth in Schedule 1.01 of the Prepetition Bridge Loan Credit

Agreement in accordance with the Budget and (ii) the Permitted Licensing Transaction Payments due and payable to Novelion in the proportion set forth in Schedule 1.01 of the Prepetition Bridge Loan Credit Agreement shall be placed into a segregated account held by the Debtors (the "Novelion Segregated Licensing Account").  At any time prior to an Event of Default under this Final Order, and upon written notice to the Debtors and the Prepetition Agent, Novelion may request a withdrawal from the Novelion Segregated Licensing Account, and any such draw request shall be honored by the Debtors within two (2) business days and be deemed to reduce the Non-Contested Novelion Intercompany Amount claim under the Plan in an amount equal to $1.75 for every dollar drawn, as set forth therein.

(j)      DIP Liens.  As security for the DIP Obligations, effective as of the Petition Date, the following security interests and Liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Final Order, are hereby granted by the Debtors to the DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens granted to the DIP Agent for the benefit of all the DIP Secured Parties pursuant to this Final Order and the DIP Loan Documents, the "DIP Liens"), on all Adequate Protection Collateral, in each case subject to the Carve-Out:

> (I)      pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all Adequate Protection Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to the Prepetition Prior Liens and the Carve-Out; and
>
> (III)      pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming Lien on all other Adequate Protection Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the Adequate Protection Liens and senior and priming to (A) the Prepetition Liens and (B) any Liens that are junior to the Prepetition Liens or the Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively,

the "Primed Liens") and shall be junior only to the Prepetition Prior Liens and the Carve-Out.

(k)      DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Final Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Agent for the benefit of the DIP Secured Parties shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Prior Liens, and, to the extent provided in this Final Order and the DIP Loan Documents, shall also be subject to the Carve-Out, and (ii) except as provided in the immediately preceding sub-clause (i), are senior to all prepetition and postpetition Liens or other interests of any kind of any other person or entity (including the Primed Liens and the Adequate Protection Liens), whether created voluntarily or involuntarily (including by order of a court).

(l)      Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto (including any trustee or other estate representative in any Successor Case (as defined below)), and their creditors and other parties-in-interest, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Final Order shall be stayed, restrained, voidable, avoidable, disallowable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

27

(m)     <u>Superpriority Administrative Claim Status</u>.  In addition to the DIP Liens granted

herein, effective immediately upon entry of this Final Order, all of the DIP Obligations shall

constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the

Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out in

accordance with this Final Order, over all administrative expense claims, adequate protection and

other diminution claims (including the Adequate Protection Superpriority Claims (as defined

below)), priority and other unsecured claims, and all other claims against the Debtors or their

estates, now existing or hereafter arising, of any kind or nature whatsoever, including

administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections

105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any

other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may

become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "<u>DIP</u>

<u>Superpriority Claims</u>").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A)

of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of

the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable

from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds

thereof, excluding Avoidance Actions (as defined below) but including Avoidance Actions

Proceeds.  Other than as expressly provided in the DIP Credit Agreement and/or this Final Order

with respect to the Carve-Out, no costs or expenses of administration, including professional fees

allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that

have been or may be incurred in these proceedings, or in any Successor Cases, and no priority

claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the

DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents and/or this Final Order.

(n)   <u>Priority of DIP Liens and DIP Superpriority Claims</u>.   The DIP Liens and the DIP Superpriority Claims: (A) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), and/or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such "first day" orders.

3.   **Adequate Protection**.  (a) In consideration for the use of the Prepetition Collateral (including Cash Collateral) and the priming of the Prepetition Liens, the Prepetition Agent, for the benefit of the Prepetition Bridge Loan Secured Parties, shall receive the following adequate protection (collectively referred to as the "<u>Prepetition Bridge Loan Secured Parties Adequate Protection</u>"):

(i)   <u>Prepetition Bridge Loan Secured Party Adequate Protection Liens</u>. To the extent there is a diminution in value of the interests of the Prepetition Bridge Loan Secured Parties in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition

Bridge Loan Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("Diminution in Prepetition Collateral Value"), the Prepetition Agent, for the benefit of all the Prepetition Bridge Loan Secured Parties, is hereby granted, subject to the Carve-Out and the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the "Adequate Protection Collateral", excluding all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law (collectively, "Avoidance Actions"), but including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Actions Proceeds") (such adequate protection replacement Liens, the "Prepetition Bridge Loan Secured Party Adequate Protection Liens").  "Adequate Protection Collateral" shall include, without limitation, any and all tangible and intangible pre- and post-petition property of the Debtors, whether existing before, on or after the Petition Date, together with any proceeds thereof, including, without limitation, any and all cash and any investment of such cash, inventory, goods, accounts, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, payment intangibles, documents, instruments, securities, chattel paper, interests in leaseholds (*provided, however*, that solely to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event there shall only be a lien on the economic value of, proceeds of sale or other disposition

30

of, and any other proceeds and products of such leasehold interests unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code), real property, deposit accounts (except for any account created to hold an adequate assurance deposit for utility providers, pursuant to separate order of this Court), securities accounts, investment property, letters of credit, letter-of-credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, commercial tort claims, capital stock of subsidiaries, wherever located, and the proceeds, products, rents, accession and profits of the foregoing.

(ii)     <u>Adequate Protection Superpriority Claims</u>.    To the extent of Diminution in Prepetition Collateral Value, the Prepetition Bridge Loan Secured Parties are hereby further granted, subject to the Carve-Out, allowed superpriority administrative claims (such adequate protection superpriority claims, the "<u>Prepetition Bridge Loan Secured Party Adequate Protection Superpriority Claims</u>"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Carve-Out to the extent provided herein and in the DIP Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions but including all Avoidance Actions Proceeds); <u>provided</u>, <u>however</u>, that the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Adequate Protection Superpriority Claims unless and until all

31

DIP Obligations have been Paid in Full (as defined below).  Subject to the relative priorities set forth above, the Prepetition Bridge Loan Secured Party Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  For purposes of this Final Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations and/or Prepetition Obligations, the indefeasible payment in full in cash of all DIP Obligations or Prepetition Obligations, respectively (other than contingent obligations, indemnities and expenses related thereto that, in each case, are not then payable or in existence or for which no claim has been asserted).

(iii)    Priority of Prepetition Bridge Loan Secured Party Adequate Protection Liens and Prepetition Bridge Loan Secured Party Adequate Protection Superpriority Claims.  The Prepetition Bridge Loan Secured Party Adequate Protection Liens and the Prepetition Bridge Loan Secured Party Adequate Protection Superpriority Claims, in each case subject to the Carve-Out, (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such "first day" orders.

Notwithstanding anything to the contrary herein, each of (x) the Roll Up Loans and (y) the Prepetition Bridge Loan Secured Party Adequate Protection Liens and the Prepetition Bridge Loan Secured Party Adequate Protection Superpriority Claims with respect to the Roll Up Loans, shall be junior in priority to the Novelion Adequate Protection Liens and Novelion Adequate Protection Claims (each as defined below).

           (iv)       <u>Interest, Professional Fees and Other Adequate Protection Payments</u>. Without limiting any rights of the Prepetition Agent and the other Prepetition Bridge Loan Secured Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition Bridge Loan Secured Parties to the entry of this Final Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall, subject to the Carve-Out, (i) pay or reimburse in cash the Prepetition Agent for all fees, costs, expenses, and charges (including the reasonable fees, costs, and expenses of counsel and financial advisors for the Prepetition Agent and the other Prepetition Bridge Loan Secured Parties) (x) outstanding as of the Petition Date, to the extent, and at the times, payable under the Prepetition Loan Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date, and (y) to the extent arising and relating to the period after the Petition Date, as provided in Paragraph 20(b) below and (ii) cause any and all interest on the Prepetition Bridge Loan Obligations under the Prepetition Bridge Loan Credit Agreement to accrue at the non-default rate(s) set forth therein, which such interest shall be paid in kind by being capitalized and added to the outstanding principal balance of the Prepetition Bridge Loan Obligations (after which time such capitalized interest shall be treated as a portion of the outstanding principal balance of the Prepetition Bridge Loan Obligations for all purposes of the Credit Agreement, including without limitation the accrual of interest thereon at the interest rates

33

specified therein), in the case of each of sub-clauses (i) and (ii) above, whether or not budgeted in the Approved Budget, and without further notice (except as provided in Paragraph 20(b) below with respect to postpetition professional fees, costs, and expenses), motion, or application to, order of, or hearing before, this Court.

(v)    The Debtors shall deliver to the Prepetition Secured Parties all information, reports, documents and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(vi)    Survival.  Unless otherwise expressly set forth herein, any consent or approval rights or similar rights granted or referenced in this Final Order in favor of any or all of the DIP Agent, the other DIP Secured Parties, the Prepetition Agent and the other Prepetition Secured Parties may be exercised (or not exercised) in the sole discretion of such party.

(vii)    Consent to Priming and Adequate Protection.  The Prepetition Agent, on behalf of the Prepetition Secured Parties, and Novelion pursuant to the Subordination Agreement, consents to the Prepetition Secured Party Adequate Protection and the priming provided for herein; provided, however, that such consent of the Prepetition Agent and Novelion to the priming of the Prepetition Liens and the use of Cash Collateral is expressly conditioned upon the entry of this Final Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; and provided, further, that such consent shall be of no force and effect in the event this Final Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

34

(viii)       Right to Seek Additional Adequate Protection.    Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition Secured Parties.  However, the Prepetition Agent, at the direction of and on behalf of the Prepetition Bridge Loan Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the request for or grant of any additional or alternative adequate protection (except as provided in the Subordination Agreement); provided that any such additional or alternative adequate protection shall at all times be subordinate and junior to the claims and Liens of the DIP Secured Parties granted under this Final Order and the DIP Loan Documents.  The consent of the Prepetition Bridge Loan Secured Parties to the priming of the Prepetition Liens by the DIP Liens and the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Bridge Loan Secured Parties that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Final Order or otherwise.

(b) In consideration for the use of the Prepetition Collateral (including Cash Collateral), Novelion shall receive the following adequate protection (collectively referred to as the "Novelion Adequate Protection" and together with Prepetition Bridge Loan Secured Parties Adequate Protection, the "Prepetition Secured Party Adequate Protection"):

(i)       Adequate Protection Liens.  To the extent there is a Diminution in Prepetition Collateral Value, Novelion is hereby granted, subject to the Carve-Out and the terms and conditions set forth below, pursuant to sections 361 and 363 of the Bankruptcy Code,

35

replacement Liens upon all of the Adequate Protection Collateral, including Avoidance Actions Proceeds (such adequate protection replacement Liens, the "Novelion Adequate Protection Liens" and, together with the Prepetition Bridge Loan Secured Parties Adequate Protection Liens, the "Adequate Protection Liens").

(ii)    Adequate Protection Superpriority Claims.    To the extent of Diminution in Prepetition Collateral Value, Novelion is hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Novelion Adequate Protection Superpriority Claims" and, together with the Prepetition Bridge Loan Secured Parties Adequate Protection Superpriority Claims the "Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority, subject to the Carve-Out, over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions but including all Avoidance Actions Proceeds).    Subject to the relative priorities set forth herein, the Novelion Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.

(iii)    Priority of Novelion Adequate Protection Liens and Novelion Adequate Protection Superpriority Claims.    The Novelion Adequate Protection Liens and the Novelion Adequate Protection Superpriority Claims, in each case subject to the Carve-Out, (A) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code or the

"equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Case, and/or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such "first day" orders. Notwithstanding anything to the contrary herein, the Novelion Adequate Protection Liens and Novelion Adequate Protection Superpriority Claims shall be subject to the Carve-Out and junior in priority to the Prepetition Obligations (other than any Prepetition Obligations consisting of Roll Up Loans), Adequate Protection Liens and the Adequate Protection Superpriority Claims.

(iv)     Professional Fees and Other Adequate Protection Payments. Without limiting any rights of Novelion under section 506(b) of the Bankruptcy Code, the Novelion Intercompany Loan Agreement or the Subordination Agreement, but notwithstanding anything to the contrary contained therein, the Debtors shall not be obligated to pay or reimburse in cash Novelion for any fees, costs, expenses, or charges (including any fees, costs, and expenses of counsel and financial advisor for Novelion) unless and until such time as the Restructuring Support Agreement is terminated as to Novelion (through no fault of or breach by Novelion) prior to the consummation of the Plan.

(v)     Right to Seek Additional Adequate Protection. Under the circumstances and given that the above-described adequate protection is consistent with the

37

Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection

provided herein is reasonable to protect the interests of Novelion.  However, Novelion may request

Court approval for additional or alternative adequate protection pursuant to the Subordination

Agreement, without prejudice to any objection of the Debtors or any other party in interest to the

grant of any additional or alternative adequate protection.

4.        **Automatic Postpetition Lien Perfection.**  This Final Order shall be sufficient and

conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and

the Adequate Protection Liens without the necessity of (a) filing or recording any financing

statement, deed of trust, mortgage, or other instrument or document that may otherwise be required

under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform

Commercial Code or other law) over any Adequate Protection Collateral (and the DIP Agent and,

after Payment in Full of the DIP Facility, the Prepetition Agent shall be deemed, without any

further action, to have control over all the Debtors' deposit accounts, securities accounts and

commodities accounts within the meaning of such Uniform Commercial Code and other law) or

(c) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Liens

or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.

Notwithstanding the foregoing, each of the DIP Agent (at the direction of the requisite lenders

under the DIP Facility), the Prepetition Agent (at the direction of the requisite percentage of

Prepetition Bridge Lenders) and Novelion may, each in its sole discretion, enter into and file, as

applicable, financing statements, mortgages, security agreements, notices of Liens, and other

similar documents, and is hereby granted relief from the automatic stay of section 362 of the

Bankruptcy Code in order to do so, and all such financing statements, mortgages, security

agreements, notices, and other agreements or documents shall be deemed to have been entered

into, filed or recorded as of the Petition Date. The applicable Debtors shall execute and deliver to the DIP Agent, the Prepetition Agent and Novelion, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the DIP Liens and the Adequate Protection Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, the DIP Agent and the Prepetition Agent (each at the direction of the applicable percentage of required lenders) and Novelion may, each in its discretion, file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Final Order. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other Adequate Protection Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable Adequate Protection Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Final Order or in favor of the Prepetition Secured Parties in accordance with this Final Order. To the extent that the Prepetition Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional

39

insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the secured party under each such Prepetition Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition Secured Parties.  The Prepetition Agent shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all Adequate Protection Collateral that, without giving effect to the Bankruptcy Code and this Final Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

5.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtors' Stipulations shall be binding upon the Debtors and, subject to the remaining provisions of this paragraph 5, their estates in all circumstances upon entry of the Interim Order. The Debtors' Stipulations shall be binding upon their estates and each other party in interest, including the Committee, except to the extent and only to the extent such Committee or any other party in interest with standing (including any chapter 11 trustee) other than the Debtors (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), *first*, commences, by the earlier of (x) with respect to any Committee, sixty (60) calendar days after the formation of any Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or any Committee, seventy-five (75) calendar days following the date of entry of the Interim Order

(such time period established by the earlier of clauses (x) and (y), as the same may be extended in accordance with this Paragraph 5, shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B) a contested matter, adversary proceeding against any or all of (1) the Prepetition Bridge Loan Secured Parties in connection with or related to the Prepetition Bridge Loan Obligations, or the actions or inactions of any of the Prepetition Bridge Loan Secured Parties arising out of or related to the Prepetition Bridge Loan Obligations or the Prepetition Bridge Loan Documents or (2) Novelion in connection with or related to the Non-Contested Novelion Intercompany Amount, or the actions or inactions of Novelion arising out of or related to the Non-Contested Novelion Intercompany Amount, including any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Secured Parties) (clauses (i) and (ii) collectively, the "Challenges" and, each individually, a "Challenge"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").  If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination

Date, with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period

and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected.

Except as otherwise expressly provided herein, from and after the Challenge Period Termination

Date and for all purposes in these Cases and any Successor Cases (and after the dismissal of these

Cases or any Successor Cases), (i) all payments made to or for the benefit of the Prepetition

Secured Parties pursuant to, or otherwise authorized by, the Interim Order, this Final Order or

otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be

subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery

or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever

released, waived, and barred, (iii) all of the Prepetition Bridge Loan Obligations and the Non-

Contested Novelion Intercompany Amount shall be deemed to be fully allowed  claims, and (iv)

the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties

in interest in these Cases or any Successor Cases, including any Committee or chapter 11 or chapter

7 trustee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the

Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately

preceding sentence shall nonetheless remain binding and preclusive on the Debtors' estates, any

Committee and on any other party in interest from and after the Challenge Period Termination

Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i)

through (iv) of the immediately preceding sentence were expressly challenged in such Challenge

and such Challenge becomes a Successful Challenge.  Except as may be ordered by the Court for

cause shown, the Challenge Period may be extended only with the written consent of the DIP

Agent and Prepetition Agent in their sole discretion (at the direction of the requisite applicable

lenders).  Notwithstanding any provision to the contrary herein, nothing in this Final Order shall

be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 5 or to require or permit an extension of the Challenge Period Termination Date.

6.    **Carve-Out**.  Subject to the terms and conditions contained in this Paragraph 6, each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of this Final Order:

(i)    Carve-Out.  For purposes of this Final Order, "Carve-Out" means (a) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $50,000 (without regard to the Carve-Out Trigger Notice); (c) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, all unpaid fees, costs, and disbursements ("Debtor Professionals Fees") of professionals retained by the Debtors in these Cases (collectively, the "Debtors' Professionals") that are incurred  prior to the delivery by the DIP Agent or Prepetition Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice, that remain unpaid after application of any retainers being held by such professionals; (c) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, all unpaid fees, costs,

and disbursements of professionals ("Committee Professional Fees," and together with the Debtor Professional Fees, the "Professional Fees") retained by the Committee in these Cases (collectively, the "Committee's Professionals") and all reasonable unpaid out-of-pocket expenses of the members of any Committee ("Committee Members"), in each case that are incurred prior to the delivery by the DIP Agent or the Prepetition Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice, and remain unpaid after application of any retainers being held by such professionals, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $500,000; (d) the unpaid fees, costs, and disbursements of the Debtors' Professionals that are incurred after the delivery of a Carve-Out Trigger Notice by the DIP Agent or the Prepetition Agent, that are allowed by this Court under sections 327, 330 or 363 of the Bankruptcy Code, after application of any already un-applied retainers being held by such professionals, in an aggregate amount not to exceed $1,000,000 (the "Debtors' Professionals Carve-Out Cap"); and (e) the reasonable unpaid fees, costs, and disbursements of the Committee Professionals and the reasonable unpaid expenses of Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice by the DIP Agent or Prepetition Agent, that are allowed by this Court under sections 328, 330 or 1103 of the Bankruptcy Code after application of any retainers being held by such professionals, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $250,000 (the "Committee Carve-Out Cap" and, together with the Debtors' Professionals Carve-Out Cap, the "Post-Default Carve-Out Cap") (*provided* that any success, completion, or similar fees payable from the Post-Default Carve-Out Cap amount shall be subject and subordinate, and junior in right of payment, to all other Professional Fees payable from such amount). The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent or the

Prepetition Agent to the Debtors' lead counsel, the United States Trustee, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event (as defined below), expressly stating that the Post-Default Carve-Out Cap is triggered.  Immediately upon the delivery of a Carve-Out Trigger Notice or the closing of a sale of all or substantially all of the Debtors' assets, and prior to the payment of any DIP Secured Party or Prepetition Secured Party on account of adequate protection or otherwise, the Debtors shall fund a segregated account established by the Debtors (the "Carve-Out Account"),  without any reduction of the DIP Obligations or the Prepetition Obligations, equal to the sum of (I) the Post-Default Carve-Out Cap plus (II) the unpaid fees and expenses that were incurred prior to the delivery of the Carve-Out Trigger Notice in accordance with clauses (b) and (c) above, that have not been disallowed by this Court and for which such Debtors' Professionals or Committee's Professionals have submitted a copy of an application to this Court or monthly fee statement and that remain unpaid after application of any retainers being held by such professionals.  All amounts deposited in the Carve-Out Account shall continue to be subject to the DIP Liens, the Adequate Protection Liens and the Prepetition Liens such that, upon final payment of all amounts due and owing under the Carve-Out, any funds remaining in the Carve-Out Account shall be remitted to the DIP Agent or the Prepetition Agent, as applicable, for application in accordance with this Final Order, the Subordination Agreement, the DIP Loan Documents and Prepetition Loan Documents, as applicable.  No amounts set forth in this subparagraph 6(i) with respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the DIP Agent and the Prepetition Agent (at the direction of the requisite applicable lenders).  Notwithstanding anything to the contrary, the failure of the Carve-Out Account to satisfy in full the allowed fees and expenses of the Debtors' Professionals and the

Committee's Professionals shall not affect the priority of the Carve-Out, and in no way shall the Carve-Out, the Post-Default Carve-Out Cap, the Carve-Out Account, or any of the foregoing be construed as a cap or limitation on the amount of professional fees due and payable by the Debtors.

(ii)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  The Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtors' Professionals, Committee's Professionals or Committee Members incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed (i) to obligate any DIP Secured Party or any Prepetition Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Debtors' Professionals, the Committee's Professionals or Committee Members, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement or (ii) to increase the Carve-Out if actual allowed fees and expenses of any of the Debtors' Professionals, Committee's Professionals or Committee Members are higher in fact than the Post-Default Carve-Out Cap. Notwithstanding any provision in this Paragraph 6 to the contrary, no portion of the Carve-Out, Cash Collateral, Prepetition Collateral, Adequate Protection Collateral or proceeds of the DIP Facility shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 16 hereof.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases or any Successor Cases, any trustee or of any other person or entity, or shall affect the right of any DIP Secured Party or any Prepetition Secured Party or any other party to object to the allowance and payment of any such fees and expenses.

(iii) <u>Payment of Allowed Professional Fees and Expenses</u>.  The Debtors shall be permitted to pay fees and expenses of the Debtors' Professionals, the Committee's Professionals and the Committee Members, subject to this Final Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court.  The amounts paid prior to the Carve-Out Trigger Notice shall not reduce the Post-Default Carve-Out Cap.

7.    **<u>Waiver of 506(c) Claims</u>**.  As a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties and the Prepetition Secured Parties to the payment of the Carve-Out to the extent provided herein) and (ii) the Debtors' use of Cash Collateral pursuant to the Interim Order and this Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition Secured Parties, the Prepetition Collateral, the Adequate Protection Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition Agent (at the direction of the requisite applicable lenders), (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties and the Prepetition Secured Parties, and (c) the exercise prior to the entry of this Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Cases or any Successor Cases from or against the Prepetition Secured Parties or their Prepetition Liens on or other interests in any or all of the Adequate Protection Collateral, the Prepetition Collateral and the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Secured Parties' other interests

47

in the Adequate Protection Collateral, the Prepetition Collateral and the Cash Collateral and the other DIP Protections accorded the DIP Secured Parties.

8.      **After-Acquired Property**.  Except as otherwise expressly provided in this Final Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

9.      **Protection of DIP Secured Parties' and Prepetition Secured Parties' Rights**.

(a)      Unless the DIP Agent and the Prepetition Agent  (at the direction of the applicable requisite percentage of lenders) shall have provided their prior written consent or all DIP Obligations and Prepetition Bridge Loan Obligations (excluding the Roll Up Loans) have been Paid in Full (subject to the Subordination Agreement), there shall not be entered in any of these Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Adequate Protection Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens,  the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and/or the other DIP Protections ; (ii) the use of

Cash Collateral for any purpose other than to Pay in Full the DIP Obligations and the Prepetition Bridge Loan Obligations (excluding the Roll Up Loans) or as otherwise permitted in the DIP Loan Documents and this Final Order, (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553 of the Bankruptcy Code or otherwise, or (iv) any modification of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights under this Final Order, the DIP Loan Documents or the Prepetition Bridge Loan Documents with respect any DIP Obligations or Prepetition Bridge Loan Obligations.

(b)　　The Debtors will, until the earlier of the consummation of the Plan or until the DIP Obligations and the Prepetition Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate with, consult with, and provide to the DIP Secured Parties and the Prepetition Secured Parties all such non-privileged information and documents that any or all of the Debtors are obligated (including upon request by any of the DIP Secured Parties or the Prepetition Secured Parties) to provide under the DIP Loan Documents, the Prepetition Loan Documents (in the absence of the pendency of these Cases) or the provisions of this Final Order, (iii) permit consultants, advisors and other representatives (including third party representatives) of each of the DIP Agent, the Prepetition Agent, the DIP Lenders, the Prepetition Bridge Lenders and Novelion to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide non-privileged advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective

49

officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Loan Documents, and (iv) permit the DIP Agent, the Prepetition Agent, the Prepetition Bridge Lenders, the DIP Lenders, Novelion and each of their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and neither the Debtors nor their legal and financial advisors shall  be required to provide the DIP Agent, the Prepetition Agent or other Prepetition Secured Parties, or Novelion, or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.  For avoidance of doubt, the Prepetition Agent and Novelion shall have the same access and cooperation rights as the DIP Agent for purposes of this subparagraph (b).

10.    **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of Paragraph 9 above, if at any time prior to the Payment in Full of all the DIP Obligations and the Prepetition Bridge Loan Obligations (excluding the Roll Up Loans) (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Final Order or the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent for application to  the DIP Obligations until Paid in Full and then to the Prepetition Bridge Loan Obligations (other than the Roll Up Loans) subject to the Subordination Agreement.

11.    **Cash Collection**.  Subject to the Carve-Out, from and after the date of the entry of this Final Order, all collections and proceeds of any Adequate Protection Collateral or Prepetition Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition Loan Documents (or in such other accounts as are designated by the DIP Agent or the Prepetition Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the sole dominion and control of the DIP Agent and the Prepetition Agent (and the funds in such accounts may be used by the Debtors to the extent provided in this Final Order and the DIP Loan Documents).  Upon the direction of the DIP Agent or, following Payment in Full of the DIP Obligations and until Payment in Full of the Prepetition Bridge Loan Obligations (other than the Roll Up Loans), the Prepetition Agent (at the direction of the applicable requisite percentage of lenders), at any time after the occurrence of a Termination Event and subject to the provisions of Paragraph 5, 6 and 15, (a) all proceeds in the Cash Collection Accounts shall be remitted to the DIP Agent for application to the DIP Obligations until Payment in Full and then to the Prepetition Agent for application to the Prepetition Bridge Loan Obligations (other than the Roll Up Loans) until Payment in Full of the Prepetition Bridge Loan Obligations, and, (b) the DIP Agent and the Prepetition Agent shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing, and (c) the Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order (as defined below)), are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect

from the DIP Agent.  Unless otherwise agreed to in writing by the DIP Agent and the Prepetition

Agent (at the direction of the applicable requisite percentage of lenders), the Debtors shall maintain

no accounts except those identified in the Debtors' cash management order [Docket No. [ ● ]]

(the "Cash Management Order").  The Debtors are authorized to incur obligations and liabilities

for treasury, depositary or cash management services, including overnight overdraft services,

controlled disbursement, automated clearinghouse transactions, return items, overdrafts and

interstate depository network services provided on a postpetition basis by any financial institution

at which any Cash Collection Account is maintained; provided, however, that except to the extent

otherwise required by this Court, nothing herein shall require any DIP Secured Party or Prepetition

Secured Party to incur any overdrafts or provide any such services or functions to the Debtors.

12.    **Disposition of Adequate Protection Collateral; Credit Bid**.

(a) Unless the DIP Obligations and the Prepetition Bridge Loan Obligations (other than the

Roll Up Loans) are Paid in Full upon the closing of a sale or other disposition of the Adequate

Protection Collateral or Prepetition Collateral, the Debtors shall not sell, transfer, lease, encumber,

or otherwise dispose of any portion of the Adequate Protection Collateral or any Prepetition

Collateral (or enter into any binding agreement to do so), outside the ordinary course of business,

without the prior written consent of the DIP Agent and the Prepetition Agent (and no such consent

shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or

Prepetition Bridge Loan Secured Party or any order of this Court), except as permitted in the DIP

Loan Documents and/or the Prepetition Loan Documents, as applicable, and this Final Order. Except

to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale,

transfer, lease, encumbrance or other disposition of any Adequate Protection Collateral outside the

ordinary course of business shall be remitted to the DIP Agent for application to the DIP Obligations,

in accordance with the terms of this Final Order and the DIP Loan Documents.  In addition, to the extent provided in the DIP Loan Documents, the Debtors are authorized and directed to enter into such blocked account agreements (with cash dominion, if the DIP Agent so elects) with the DIP Agent and such financial institutions as the DIP Agent may require pursuant to the DIP Loan Documents, and, if it so elects, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Prepetition Agent is a party without the need to enter into new blocked account agreements.

(b)  Subject to the funding of the Carve-Out and the provisions of Paragraph 6 of this Final Order, (x) the Prepetition Agent (or one or more of its designees, affiliates or assignees) and (y) subject to paragraphs 1.9 and 1.10 of the Subordination Agreement, Novelion (or on or more of its designees, affiliates or assignees), shall each have the unqualified right to credit bid up to the full allowed amount of any of their respective Prepetition Obligations in any non-ordinary course sale of the Prepetition Collateral (or any Adequate Protection Collateral subject to any Secured Party Adequate Protection Liens) under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent any sale contemplated thereunder does not result in Payment in in Full of all of the DIP Obligations on the effective date of such plan, or (iii) section 725 of the Bankruptcy Code.  The Debtors, on behalf of themselves and their estates, stipulate and agree that any non-ordinary course sale of all or part of the Prepetition Collateral (or any Adequate Protection Collateral subject to any Prepetition Secured Party Adequate Protection Liens) that does not include an unqualified right to credit bid up to the full allowed amount of the Prepetition Secured Parties' respective Prepetition Obligations would mean that the Prepetition Agent and the other Prepetition Secured Parties will not receive the indubitable equivalent of their claims and interests.  The DIP Agent (or one or more of its designees,

affiliates or assignees) shall have the unqualified right to credit bid any or all of the DIP Obligations under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code. If the DIP Agent, the Prepetition Agent, Novelion or their respective designees, affiliates or assignees make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any Adequate Protection Collateral or Prepetition Collateral, then for purposes of such auction or sale process or any applicable order of this Court, the DIP Agent, Prepetition Agent, and/or Novelion shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.

13. **Restructuring Support Agreement**. The Debtors, Novelion, the other Consenting Lenders (as defined in the Restructuring Support Agreement (as defined below)) and certain other parties have entered into that certain Restructuring Support Agreement dated as of May 20, 2019 (the "Restructuring Support Agreement"), pursuant to which the parties thereto agreed to support the Debtors' restructuring as more fully set forth therein. Nothing in this Final Order shall modify any parties' rights or obligations under the Restructuring Support Agreement.

14. **Termination Events**. The following shall constitute a termination event under this Final Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent and the Prepetition Agent and the requisite percentage of applicable lenders (each, a "Termination Event"):

(a)    The occurrence and continuation of an uncured and unwaived "Event of Default" under the DIP Credit Agreement, as set forth therein.

(b)      Any uncured and unwaived breach, default or other violation by any of the Debtors of the material terms and provisions of this Final Order.

(c)      The termination of the Restructuring Support Agreement.

15.      **Rights and Remedies Upon Termination Event**.

(a)      Any automatic stay otherwise applicable to the DIP Secured Parties and the Prepetition Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Secured Parties and the Prepetition Secured Parties (subject to the Subordination Agreement) to exercise (i)  immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Final Order, the Prepetition Bridge Loan Credit Agreement (solely with respect to Bridge Loan Obligation other than Roll Up Loans), the DIP Loan Documents and/or applicable non-bankruptcy law (other than those rights and remedies against the Adequate Protection Collateral as provided in subparagraph 15(b) below), including the right to (i)(1) declare all Prepetition Bridge Loan Obligations (other than Roll Up Loans) and/or DIP Obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (3) terminate the Prepetition Bridge Loan Credit Agreement, DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent, Prepetition Agent, and the other DIP Secured Parties and Prepetition Secured Parties, but without affecting any of the DIP Obligations or Prepetition Obligations or the DIP Liens or Prepetition Liens securing such obligations; and/or (ii) to declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration hereunder shall be made to the respective lead counsel to the Debtors, the Committee and the U.S. Trustee, and shall be referred to herein as a "Termination Declaration"

and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date").

(b)    In addition to the rights and remedies described above, seven (7) business days following the Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the DIP Agent, DIP Lenders, and Prepetition Agent  are hereby granted relief from the automatic stay, without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on, its DIP Liens or Prepetition Liens on all or any portion of the Prepetition Collateral or Adequate Protection Collateral, including by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations or Prepetition Obligations (other than the Roll Up Loans), and by occupying the Debtors' premises to sell or otherwise dispose of the Adequate Protection Collateral or Prepetition Collateral.  Solely during the seven (7) Business Day period after a Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before this Court for the sole purpose of contesting whether a Termination Event has occurred, and section 105 of the Bankruptcy Code may not be invoked by the Debtors, the Committee, or any other party in interest in an effort to restrict or preclude any DIP Secured Party or Prepetition Bridge Loan Secured Party from exercising any rights or remedies set forth in this Final Order or the Prepetition Bridge Loan Credit Agreement or DIP Loan Documents.  During such seven (7) Business Day period, the Debtors may not use Cash Collateral  except to pay payroll and other expenses critical to the business of the Debtors operating in accordance with the Approved Budget.

(c)    Subject to the provisions of Paragraph 5, 6, and 15 hereof, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the Prepetition Bridge Loan Secured Parties shall be turned over to the DIP Agent for application

to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents

and this Final Order until Payment in Full of all of the DIP Obligations and <u>then</u> to the Prepetition

Agent for application to the Prepetition Bridge Loan Obligations (other than the Roll Up Loans)

under, and in accordance with the provisions of, the Prepetition Bridge Loan Documents and this

Final Order until Payment in full of the Prepetition Bridge Loan Obligations (other than the Roll

Up Loans).

        (d)      Notwithstanding anything contained herein to the contrary, and without

limiting any other rights or remedies of the DIP Agent or the Prepetition Agent contained in this

Final Order or the DIP Loan Documents or Prepetition Loan Documents, or otherwise available at

law or in equity, and subject to the terms of the DIP Loan Documents, upon five Business Days'

written notice to the Debtors and any landlord, lienholder, licensor, or other third party owner of

any leased or licensed premises or intellectual property that a Termination Event has occurred and

is continuing, the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Bridge Lenders (i)

may, unless otherwise provided in any separate agreement by and between the applicable landlord

or licensor and the Prepetition Agent or DIP Agent (the terms of which shall be reasonably

acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the

purpose of exercising any remedy with respect to any Prepetition Collateral or Adequate Protection

Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as

lessee or licensee under the applicable license and to use any and all trademarks, trade names,

copyrights, licenses, patents, or any other similar assets of the Debtors that are owned by or subject

to a Lien of any third party and that are used by Debtors in their businesses, in the case of either

subparagraph (i) or (ii) of this Paragraph 15(d) without interference from lienholders or licensors

thereunder, subject to such lienholders' or licensors' rights under applicable law; <u>provided,</u>

however, that the Prepetition Agent or DIP Agent, on behalf of the Prepetition Bridge Loan Secured Parties and DIP Secured Parties shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent or Prepetition Agent and that accrue during the period of such occupancy or use by such DIP Agent or Prepetition Agent calculated on a *per diem* basis.  Nothing herein shall require the Debtors, the DIP Agent, Prepetition Agent, Novelion, or the other Prepetition Secured Parties or DIP Secured Parties to assume any lease, license or other contract under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the Prepetition Agent, the DIP Agent, and the other DIP Secured Parties or Prepetition Bridge Loan Secured Parties in this Paragraph 15(d).

(e)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Final Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Loan Documents, the DIP Facility, and this Final Order, (ii) authorize Novelion, the DIP Secured Parties and the other Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition Loan Documents and/or this Final Order, (iii) to permit each of the DIP Agent, the other DIP Secured Parties, the Prepetition Agent, Novelion and the other Prepetition Secured Parties to perform any act authorized under this Final Order, the DIP Loan Documents, Subordination Agreement and the Prepetition Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Final Order and the DIP Loan Documents.

(f)     Subject to Payment in Full of the DIP Obligations, notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the Prepetition Agent or the other Prepetition Secured Parties contained in this Final Order or the Prepetition Loan Documents, or otherwise available at law or in equity, the Prepetition Agent shall succeed to, and be entitled to, all of the rights, remedies, benefits and protections accorded to the DIP Agent pursuant to Paragraph 15(e), as if all references therein to the "DIP Agent" and the "DIP Parties" are references to the "Prepetition Agent" and the "Prepetition Bridge Loan Secured Parties" until the Payment in Full of the Prepetition Bridge Loan Obligations (other than Roll Up Loans).

16.     **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility, Adequate Protection Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity  (including any of the Debtors' Professionals, the Committee's Professionals or the Committee Members) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the Prepetition Collateral or the Adequate Protection Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtors' Professionals, the Committee's Professionals or the Committee Members) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section

59

364(c) or (d) of the Bankruptcy Code, unless upon consummation of any such loan all DIP

Obligations are to be Paid in Full in Cash, or to seek any modification to this Interim Order not

approved by the DIP Agent and Prepetition Agent; (ii) investigate (except as set forth below),

assert, join, commence, support, or prosecute any action for any claim, counter-claim, action,

proceeding, application, motion, objection, defense, or other contested matter seeking any order,

judgment, determination, or similar relief against, or adverse to the interests of, any or all of the

DIP Secured Parties, the Prepetition Secured Parties, their respective affiliates, assigns or

successors and the respective officers, directors, employees, agents, attorneys, representatives and

other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or

other matter (including formal or informal discovery proceedings in anticipation thereof) in

connection with the Prepetition Obligations, the Prepetition Liens, or the debtor-creditor

relationship between any of the Prepetition Secured Parties, on the one hand, and any of the

Debtors, on the other hand, including (A) any Challenges and any Avoidance Actions or other

actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity,

enforceability, priority, and extent of the DIP Obligations and/or the Prepetition Obligations, or

the validity, extent, and priority of the DIP Liens, the Prepetition Liens, or the Adequate Protection

Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the

DIP Liens, the Prepetition Liens, the Prepetition Secured Party Adequate Protection Liens, or the

other Prepetition Secured Party Adequate Protection; and/or (D) any action seeking to modify any

of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the

DIP Secured Parties and the Prepetition Secured Parties hereunder or under the DIP Loan

Documents or the Prepetition Loan Documents, as applicable, or any payments made thereunder

or in respect thereof; provided, however, up to $50,000 in the aggregate of the Carve-Out, any

60

Adequate Protection Collateral, any Prepetition Collateral, any Cash Collateral and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or Liens of the Prepetition Agent, Novelion and the other Prepetition Secured Parties under the Prepetition Loan Documents  so long as such investigation occurs within the Challenge Period; or (ii) pay any fees or similar amounts to any person (other than the Prepetition Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the Prepetition Agent.

17.    **Proofs of Claim**.  The Prepetition Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties in respect of all Prepetition Obligations.  In addition, the Prepetition Secured Parties and the DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Prepetition Obligations constituting administrative expenses or any DIP Obligations, as applicable.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, each of the Agents (at the direction of the applicable requisite percentage of lenders), for the benefit of itself and the other DIP Secured Parties and Prepetition Secured Parties, and Novelion, are hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in each of the Cases or Successor Cases (i) in the case of Prepetition Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition Bridge Loan Obligations, and (ii) in the case of each of the Prepetition Agent and the DIP Agent, a request or aggregate requests for allowance and/or payment of any portion of the DIP Obligations or

Prepetition Bridge Loan Obligations constituting administrative expenses, (iii) in the case of Novelion, a proof of claim in respect of any Novelion Intercompany Loan Obligations, and (iv) in the case of Novelion, a request or aggregate requests for allowance and/or payment of any portion of the Novelion Intercompany Loan Obligations constituting administrative expenses.

18.     **Preservation of Rights Granted Under the Final Order**.

(a)     <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) all rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Final Order (and shall maintain their respective priorities as provided by this Final Order) until all DIP Obligations and all Prepetition Obligations have been Paid in Full, and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively.

(d)     <u>Survival of Final Order</u>.  The provisions of this Final Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Prepetition Secured Party Adequate Protection), and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for

62

abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Final Order, including all of the DIP Protections (including the Prepetition Secured Party Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections (including the Prepetition Secured Party Adequate Protection), and such other rights, remedies, Liens priorities, privileges, protections and benefits, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Final Order.  The DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.    **Insurance Policies**.  Upon entry of this Final Order, the DIP Agent, the other DIP Secured Parties, the Prepetition Agent, Novelion and the other Prepetition Secured Parties  shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the Adequate Protection Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Agent, the Prepetition Agent (each at the direction of the applicable requisite percentage of lenders) and Novelion from time to time to evidence or effectuate the foregoing.

20.    **Other Rights and Obligations**.

(a)    <u>Expenses</u>.  The applicable Debtors will pay all reasonable expenses incurred by the Agents (including the reasonable fees and disbursements of all counsel for the Agents and DIP Lenders and any internal or third-party appraisers, consultants, advisors and auditors engaged by or for the benefit of the Agents and/or their counsel) in connection with the preparation, execution, delivery, and administration of the DIP Loan Documents, the Interim Order, this Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(b)    <u>Notice of Professional Fees</u>.  Professionals for the DIP Agent and the Prepetition Bridge Loan Secured Parties (including professionals engaged by counsel to the DIP Agent, Prepetition Agent or the other Prepetition Bridge Loan Secured Parties, as applicable) (collectively, the "<u>Lender Professionals</u>"; the "Lender Professionals" shall include the professionals for the DIP Agent or the lenders party to the DIP Facility (including professionals engaged by counsel thereto)) shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Committee or any other party in interest.  Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee, Novelion, counsel for any Committee, and such other parties as this Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; <u>provided</u>, <u>however</u>, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary

64

invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtors, United States Trustee or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices by the Debtors, then the Debtors, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Final Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.   All such unpaid fees, costs, expenses, and charges of the DIP Agent and the Prepetition Agent that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the Adequate Protection Collateral as specified in this Final Order.  Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the Agents, the other DIP Secured Parties or Prepetition Bridge Loan Secured Parties in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP

Loan Documents or Prepetition Bridge Loan Documents are hereby approved in full and non-refundable and shall not otherwise be subject to any Challenge.

(c)    Binding Effect.  Subject only to Paragraph 5 above, the provisions of this Final Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases and any Successor Cases, including the DIP Secured Parties, the Prepetition Secured Parties, any Committee, and the Debtors and their respective estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; provided, however, that except to the extent expressly provided in Paragraph 5, the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)    No Waiver.  The failure of the Prepetition Secured Parties or the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the Prepetition Loan Documents, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Final Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition Secured Party or any DIP Secured Party, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase

66

agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted

by law (or the right of a Debtor to contest such assertion).  Except as prohibited by this Final Order,

the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly

or implicitly, or otherwise impair, any right or ability of the Prepetition Secured Parties or the DIP

Secured Parties under the Bankruptcy Code or under non-bankruptcy law (subject to the

Restructuring Support Agreement and the Subordination Agreement) to (i) request conversion of

the Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor

Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to

oppose the use of Cash Collateral in any Successor Case, (ii) propose, subject to the provisions of

section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the

Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the

Bankruptcy Code, or (iii) except as expressly provided herein, exercise any of the rights, claims,

or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition

Secured Parties, respectively, under the DIP Loan Documents or the Prepetition Loan Documents,

the Bankruptcy Code or otherwise.

(e)    <u>No Third Party Rights</u>.  Except as explicitly provided for herein or in any

DIP Loan Document, this Final Order does not create any rights for the benefit of any third party,

creditor, equity holder, or direct, indirect, or incidental beneficiary.  In determining to make any

loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral

or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the

DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be

deemed to be in control of the operations of the Debtors or to be acting as a "responsible person"

or "owner or operator" with respect to the operation or management of the Debtors (as such terms,

or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)    No Marshaling.    The DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Adequate Protection Collateral or the Prepetition Collateral, as applicable.

(g)    Inconsistency.    In the event of any inconsistency between the terms or conditions of this Final Order and the terms or conditions of any other order entered by this Court in the nature of a "first day order", the provisions of this Final Order shall govern and control.

(i)    Enforceability.    This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

(j)    Reservation of Rights.    Nothing in this Final Order shall be deemed to constitute the consent of the DIP Secured Parties or the Prepetition Secured Parties, and each of the foregoing expressly reserve the right to object, to entry of any Order of the Bankruptcy Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course

of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition Obligations, and the Prepetition Secured Party Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(k)     Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Final Order.

21.     **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: _____, 2019
          New York, New York

_____

UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

## **DIP Credit Agreement**

(attached as Exhibit C to the Motion)

# **EXHIBIT B**

## **Initial Approved Budget**

(see attached)



# Aegerion Pharmaceuticals, Inc.

DIP Cash Collateral Exhibits

As of: May 20, 2019

# Aegerion Pharmaceuticals, Inc.

## DIP Cash Collateral: Aegerion Consolidated

In US $'000 unless otherwise indicated

| Aegerion Consolidated | Week 1 Forecast 05/21/19 05/25/19 | Week 2 Forecast 05/26/19 06/01/19 | Week 3 Forecast 06/02/19 06/08/19 | Week 4 Forecast 06/09/19 06/15/19 | Week 5 Forecast 06/16/19 06/22/19 | Week 6 Forecast 06/23/19 06/29/19 | Week 7 Forecast 06/30/19 07/06/19 | Week 8 Forecast 07/07/19 07/13/19 | Week 9 Forecast 07/14/19 07/20/19 | Week 10 Forecast 07/21/19 07/27/19 | Week 11 Forecast 07/28/19 08/03/19 | Week 12 Forecast 08/04/19 08/10/19 | Week 13 Forecast 08/11/19 08/17/19 | Total 13-weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| 1   Lomitapide | $ 22 | $ 1,387 | $ 1,200 | $ 988 | $ 843 | $ 1,868 | $ 861 | $ 759 | $ 789 | $ 994 | $ 1,981 | $ 626 | $ 1,078 | $ 13,395 |
| 2   Metreleptin | 475 | 3,027 | 3,694 | 1,514 | 979 | 2,632 | 2,457 | 1,919 | 1,342 | 1,538 | 1,879 | 2,096 | 1,812 | 25,365 |
| 3   Third Parties Royalties | - | - | - | - | - | - | - | - | - | - | - | - | 1,031 | 1,031 |
| 4   Other | - | - | - | - | 256 | 5,000 | - | - | - | - | - | - | 10 | 5,266 |
| **Total Cash Receipts** | 497 | 4,413 | 4,894 | 2,502 | 2,078 | 9,500 | 3,318 | 2,679 | 2,131 | 2,532 | 3,860 | 2,722 | 3,930 | 45,056 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| 5   Payroll and Benefits | (87) | (921) | (132) | (618) | (368) | (533) | (96) | (800) | - | (877) | (50) | (594) | (75) | (5,151) |
| 6   Payroll and Benefits (Rejuvenate) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7   Discounts and Rebates | (11) | (151) | (46) | (108) | (955) | (1,016) | (982) | (1,054) | (952) | (952) | (1,035) | (186) | (183) | (7,631) |
| 8   Royalty Payments | - | - | - | - | - | - | - | - | - | - | - | - | (2,292) | (2,292) |
| 9   Product Manufacturing | (326) | (996) | (172) | (462) | (436) | (3,614) | (537) | (1,251) | (439) | (436) | (435) | (1,041) | (651) | (10,797) |
| 10   Clinical / Medical Affairs | (7) | (82) | (82) | (183) | (139) | (139) | (139) | (845) | (165) | (115) | (115) | (115) | (243) | (2,370) |
| 11   Facilities (incl. Leases) | (69) | (41) | (8) | (48) | (13) | (41) | (73) | (2) | (54) | (54) | (20) | (2) | (54) | (479) |
| 12   Insurance | (1) | - | - | (1) | (100) | - | - | (0) | - | (0) | - | (0) | - | (104) |
| 13   Legal Fees | (28) | (50) | (140) | (33) | - | (241) | - | - | - | (144) | - | - | - | (635) |
| 14   Other Professionals | (175) | (102) | (261) | (413) | (315) | (274) | (231) | (161) | (472) | (333) | (301) | (182) | (312) | (3,531) |
| 15   Other Operating Disbursements | (148) | (465) | (746) | (478) | (1,146) | (704) | (1,098) | (1,359) | (497) | (587) | (539) | (549) | (869) | (9,185) |
| **Total Operating Disbursements** | (852) | (2,807) | (1,586) | (2,345) | (3,473) | (6,563) | (3,156) | (5,471) | (2,579) | (3,498) | (2,496) | (2,671) | (4,678) | (42,176) |
| **Net Operating Cash Flow** | (355) | 1,606 | 3,308 | 156 | (1,395) | 2,937 | 162 | (2,793) | (448) | (966) | 1,364 | 51 | (747) | 2,881 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 16   Permitted Affiliate Services Payments | - | - | - | - | (146) | - | - | - | - | - | (192) | - | - | (338) |
| 17   Debt Service and Related Fees | - | - | - | - | (600) | - | (93) | - | - | - | (69) | - | - | (762) |
| 18   Professional Fees - Restructuring | - | - | - | (446) | - | (803) | (125) | (425) | - | - | (1,865) | (125) | (575) | (4,364) |
| 19   Professional Fees - Litigation and DOJ | - | - | - | - | - | - | - | - | - | - | - | (2,690) | - | (2,690) |
| 20   Other Non-operating Disb. | - | - | - | (130) | (130) | (1,300) | - | - | - | (50) | (250) | - | - | (1,859) |
| **Total Non-operating Disbursements** | - | - | - | (576) | (730) | (2,249) | (218) | (425) | - | (50) | (2,376) | (2,815) | (575) | (10,013) |
| **Net Cash Flow** | $ (355) | $ 1,606 | $ 3,308 | $ (419) | $ (2,124) | $ 688 | $ (57) | $ (3,218) | $ (448) | $ (1,016) | $ (1,011) | $ (2,764) | $ (1,322) | $ (7,133) |
| **Unrestricted Book Cash Position** | | | | | | | | | | | | | | |
| 21   Beginning Book Cash Balance | $ 16,767 | $ 28,412 | $ 30,018 | $ 33,326 | $ 32,906 | $ 30,782 | $ 29,685 | $ 29,699 | $ 26,481 | $ 26,033 | $ 25,017 | $ 24,005 | $ 21,242 | $ 16,767 |
| 22   Net Cash Flow (See Above) | (355) | 1,606 | 3,308 | (419) | (2,124) | 688 | (57) | (3,218) | (448) | (1,016) | (1,011) | (2,764) | (1,322) | (7,133) |
| 23   Intercompany Funding | (0) | - | - | - | - | - | - | - | - | - | - | - | - | (0) |
| 24   FX gains/(losses) | 0 | - | - | 0 | - | - | - | - | - | - | - | - | - | 0 |
| 25   Adjustments | 12,000 | - | - | - | - | (1,785) | 70 | - | - | - | - | - | - | 10,285 |
| **Ending Unrestricted Book Cash Balance** | $ 28,412 | $ 30,018 | $ 33,326 | $ 32,906 | $ 30,782 | $ 29,685 | $ 29,699 | $ 26,481 | $ 26,033 | $ 25,017 | $ 24,005 | $ 21,242 | $ 19,919 | $ 19,919 |
| 26   Plus: Restricted Cash | 260 | 260 | 260 | 260 | 260 | 2,045 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 |
| **Total EndingBook cash** | 28,672 | 30,278 | 33,586 | 33,166 | 31,042 | 31,730 | 31,674 | 28,456 | 28,008 | 26,992 | 25,981 | 23,217 | 21,895 | 21,895 |
| 27   Addback: Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Cash Balance** | $ 28,672 | $ 30,278 | $ 33,586 | $ 33,166 | $ 31,042 | $ 31,730 | $ 31,674 | $ 28,456 | $ 28,008 | $ 26,992 | $ 25,981 | $ 23,217 | $ 21,895 | $ 21,895 |

**Aegerion Pharmaceuticals, Inc.**

## DIP Cash Collateral: Aegerion – U.S. Entities (Debtors)

In US $'000 unless otherwise indicated

| Aegerion - U.S. Entity | Week 1 Forecast 05/21/19 05/25/19 | Week 2 Forecast 05/26/19 06/01/19 | Week 3 Forecast 06/02/19 06/08/19 | Week 4 Forecast 06/09/19 06/15/19 | Week 5 Forecast 06/16/19 06/22/19 | Week 6 Forecast 06/23/19 06/29/19 | Week 7 Forecast 06/30/19 07/06/19 | Week 8 Forecast 07/07/19 07/13/19 | Week 9 Forecast 07/14/19 07/20/19 | Week 10 Forecast 07/21/19 07/27/19 | Week 11 Forecast 07/28/19 08/03/19 | Week 12 Forecast 08/04/19 08/10/19 | Week 13 Forecast 08/11/19 08/17/19 | Total 13-weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| 1  Lomitapide | $    - | $   402 | $ 1,113 | $   988 | $   843 | $ 1,070 | $   813 | $   713 | $   743 | $   948 | $ 1,165 | $   576 | $ 1,028 | $  10,402 |
| 2  Metreleptin | - | 2,208 | 1,961 | 1,380 | 872 | 2,202 | 1,458 | 1,069 | 1,342 | 1,412 | 1,653 | 1,053 | 954 | 17,565 |
| 3  Third Parties Royalties | - | - | - | - | - | - | - | - | - | - | - | - | 1,031 | 1,031 |
| 4  Other | - | - | - | - | - | 5,000 | - | - | - | - | - | - | - | 5,000 |
| **Total Cash Receipts** | **-** | **2,610** | **3,075** | **2,368** | **1,715** | **8,271** | **2,271** | **1,782** | **2,085** | **2,360** | **2,818** | **1,629** | **3,013** | **33,998** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| 5  Payroll and Benefits | (25) | (515) | - | (513) | - | (512) | - | (667) | - | (509) | - | (508) | - | (3,249) |
| 6  Payroll and Benefits (Rejuvenate) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7  Discounts and Rebates | - | - | (30) | - | (945) | (965) | (952) | (952) | (952) | (952) | (952) | (183) | (183) | (7,066) |
| 8  Royalty Payments | - | - | - | - | - | - | - | - | - | - | - | - | (2,292) | (2,292) |
| 9  Product Manufacturing | - | (150) | (150) | (313) | (14) | (14) | (71) | (371) | (11) | (11) | (11) | (611) | (159) | (1,886) |
| 10  Clinical / Medical Affairs | - | (75) | (75) | (176) | (127) | (127) | (127) | (226) | (138) | (88) | (88) | (88) | (117) | (1,453) |
| 11  Facilities (incl. Leases) | - | (35) | - | (35) | - | - | (8) | - | (40) | - | (8) | - | (40) | (166) |
| 12  Insurance | - | - | - | - | (100) | - | - | - | - | - | - | - | - | (100) |
| 13  Legal Fees | - | (50) | (100) | - | - | (179) | - | - | - | (79) | - | - | - | (407) |
| 14  Other Professionals | - | (50) | (50) | (140) | (104) | (104) | (104) | (104) | (178) | (178) | (178) | (128) | (97) | (1,414) |
| 15  Other Operating Disbursements | (51) | (61) | (76) | (347) | (1,094) | (344) | (395) | (344) | (449) | (449) | (499) | (400) | (399) | (4,909) |
| **Total Operating Disbursements** | **(76)** | **(936)** | **(481)** | **(1,524)** | **(2,384)** | **(2,245)** | **(1,657)** | **(2,664)** | **(1,768)** | **(2,266)** | **(1,736)** | **(1,918)** | **(3,287)** | **(22,942)** |
| **Net Operating Cash Flow** | **(76)** | **1,674** | **2,594** | **844** | **(669)** | **6,026** | **615** | **(882)** | **317** | **94** | **1,082** | **(289)** | **(274)** | **11,056** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 16  Permitted Affiliate Services Payments | - | - | - | - | - | (146) | - | - | - | - | - | (192) | - | (338) |
| 17  Debt Service and Related Fees | - | - | - | - | (600) | - | (93) | - | - | - | (69) | - | - | (762) |
| 18  Professional Fees - Restructuring | - | - | - | (446) | - | (803) | (125) | (425) | - | - | (1,865) | (125) | (575) | (4,364) |
| 19  Professional Fees - Litigation and DOJ | - | - | - | - | - | - | - | - | - | - | - | (2,690) | - | (2,690) |
| 20  Other Non-operating Disb. | - | - | - | (130) | (130) | (1,300) | - | - | - | (50) | (250) | - | - | (1,859) |
| **Total Non-operating Disbursements** | **-** | **-** | **-** | **(576)** | **(730)** | **(2,249)** | **(218)** | **(425)** | **-** | **(50)** | **(2,376)** | **(2,815)** | **(575)** | **(10,013)** |
| **Net Cash Flow** | **$    (76)** | **$ 1,674** | **$ 2,594** | **$   268** | **$ (1,398)** | **$ 3,778** | **$   396** | **$ (1,307)** | **$   317** | **$    44** | **$ (1,294)** | **$ (3,104)** | **$   (849)** | **$   1,042** |
| **Unrestricted Book Cash Position** | | | | | | | | | | | | | | |
| 21  Beginning Book Cash Balance | $ 6,161 | $ 19,345 | $ 21,018 | $ 23,612 | $ 23,880 | $ 22,482 | $ 25,566 | $ 26,032 | $ 24,726 | $ 24,542 | $ 24,587 | $ 23,293 | $ 20,188 | $  6,161 |
| 22  Net Cash Flow (See Above) | (76) | 1,674 | 2,594 | 268 | (1,398) | 3,778 | 396 | (1,307) | 317 | 44 | (1,294) | (3,104) | (849) | 1,042 |
| 23  Intercompany Funding | 1,260 | - | - | - | - | 1,091 | - | - | (500) | - | - | - | - | 1,851 |
| 24  FX gains/(losses) | - | - | - | - | - | - | 70 | - | - | - | - | - | - | 70 |
| 25  Adjustments | 12,000 | - | - | - | - | (1,785) | - | - | - | - | - | - | - | 10,285 |
| **Ending Unrestricted Book Cash Balance** | **$ 19,345** | **$ 21,018** | **$ 23,612** | **$ 23,880** | **$ 22,482** | **$ 25,566** | **$ 26,032** | **$ 24,726** | **$ 24,542** | **$ 24,587** | **$ 23,293** | **$ 20,188** | **$ 19,339** | **$ 19,339** |
| 26  Plus: Restricted Cash | 220 | 220 | 220 | 220 | 220 | 2,005 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 | 1,935 |
| **Total EndingBook cash** | **19,564** | **21,238** | **23,832** | **24,100** | **22,702** | **27,571** | **27,967** | **26,661** | **26,477** | **26,522** | **25,228** | **22,123** | **21,274** | **21,274** |
| 27  Addback: Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Cash Balance** | **$ 19,564** | **$ 21,238** | **$ 23,832** | **$ 24,100** | **$ 22,702** | **$ 27,571** | **$ 27,967** | **$ 26,661** | **$ 26,477** | **$ 26,522** | **$ 25,228** | **$ 22,123** | **$ 21,274** | **$ 21,274** |

**Aegerion Pharmaceuticals, Inc.**

## DIP Cash Collateral: Aegerion – non-U.S. Entities (Non-Debtors)
In US $'000 unless otherwise indicated

| Aegerion – non-U.S. Entities | Week 1 Forecast 05/21/19 05/25/19 | Week 2 Forecast 05/26/19 06/01/19 | Week 3 Forecast 06/02/19 06/08/19 | Week 4 Forecast 06/09/19 06/15/19 | Week 5 Forecast 06/16/19 06/22/19 | Week 6 Forecast 06/23/19 06/29/19 | Week 7 Forecast 06/30/19 07/06/19 | Week 8 Forecast 07/07/19 07/13/19 | Week 9 Forecast 07/14/19 07/20/19 | Week 10 Forecast 07/21/19 07/27/19 | Week 11 Forecast 07/28/19 08/03/19 | Week 12 Forecast 08/04/19 08/10/19 | Week 13 Forecast 08/11/19 08/17/19 | Total 13-weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| 1  Lomitapide | $ 22 | $ 985 | $ 87 | $ - | $ - | $ 798 | $ 47 | $ 46 | $ 46 | $ 46 | $ 817 | $ 50 | $ 50 | $ 2,993 |
| 2  Metreleptin | 475 | 819 | 1,733 | 134 | 107 | 430 | 999 | 850 | - | 126 | 225 | 1,044 | 858 | 7,799 |
| 3  Third Parties Royalties | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4  Other | - | - | - | - | 256 | - | - | - | - | - | - | - | 10 | 266 |
| **Total Cash Receipts** | 497 | 1,804 | 1,819 | 134 | 363 | 1,228 | 1,046 | 897 | 46 | 172 | 1,042 | 1,093 | 917 | 11,058 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| 5  Payroll and Benefits | (62) | (406) | (132) | (105) | (368) | (21) | (96) | (133) | - | (368) | (50) | (87) | (75) | (1,902) |
| 6  Payroll and Benefits (Rejuvenate) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7  Discounts and Rebates | (11) | (151) | (16) | (108) | (10) | (50) | (30) | (102) | - | - | (83) | (3) | - | (566) |
| 8  Royalty Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9  Product Manufacturing | (326) | (846) | (22) | (150) | (422) | (3,600) | (466) | (880) | (428) | (425) | (425) | (431) | (492) | (8,911) |
| 10  Clinical / Medical Affairs | (7) | (7) | (7) | (7) | (12) | (12) | (12) | (618) | (27) | (27) | (27) | (27) | (125) | (916) |
| 11  Facilities (incl. Leases) | (69) | (6) | (8) | (14) | (13) | (41) | (65) | (2) | (14) | (54) | (12) | (2) | (14) | (313) |
| 12  Insurance | (1) | - | (0) | (1) | (0) | - | - | (0) | - | (0) | - | (0) | - | (4) |
| 13  Legal Fees | (28) | - | (40) | (33) | - | (63) | - | - | - | (65) | - | - | - | (228) |
| 14  Other Professionals | (175) | (52) | (211) | (272) | (211) | (171) | (127) | (57) | (294) | (154) | (123) | (54) | (215) | (2,117) |
| 15  Other Operating Disbursements | (96) | (404) | (670) | (131) | (52) | (360) | (703) | (1,015) | (48) | (138) | (40) | (149) | (470) | (4,277) |
| **Total Operating Disbursements** | (776) | (1,872) | (1,105) | (822) | (1,089) | (4,318) | (1,499) | (2,807) | (811) | (1,232) | (760) | (753) | (1,390) | (19,233) |
| **Net Operating Cash Flow** | (279) | (68) | 714 | (688) | (726) | (3,089) | (453) | (1,911) | (765) | (1,060) | 282 | 341 | (473) | (8,175) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 16  Permitted Affiliate Services Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17  Debt Service and Related Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 18  Professional Fees - Restructuring | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 19  Professional Fees - Litigation and DOJ | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 20  Other Non-operating Disb. | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-operating Disbursements** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | $ (279) | $ (68) | $ 714 | $ (688) | $ (726) | $ (3,089) | $ (453) | $ (1,911) | $ (765) | $ (1,060) | $ 282 | $ 341 | $ (473) | $ (8,175) |
| **Unrestricted Book Cash Position** | | | | | | | | | | | | | | |
| 21  Beginning Book Cash Balance | $ 10,606 | $ 9,067 | $ 8,999 | $ 9,714 | $ 9,026 | $ 8,300 | $ 4,119 | $ 3,666 | $ 1,755 | $ 1,491 | $ 430 | $ 713 | $ 1,053 | $ 10,606 |
| 22  Net Cash Flow (See Above) | (279) | (68) | 714 | (688) | (726) | (3,089) | (453) | (1,911) | (765) | (1,060) | 282 | 341 | (473) | (8,175) |
| 23  Intercompany Funding | (1,260) | - | - | - | - | (1,091) | - | - | 500 | - | - | - | - | (1,851) |
| 24  FX gains/(losses) | 0 | - | - | 0 | - | - | - | - | - | - | - | - | - | 0 |
| 25  Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Unrestricted Book Cash Balance** | $ 9,067 | $ 8,999 | $ 9,714 | $ 9,026 | $ 8,300 | $ 4,119 | $ 3,666 | $ 1,755 | $ 1,491 | $ 430 | $ 713 | $ 1,053 | $ 580 | $ 580 |
| 26  Plus: Restricted Cash | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| **Total EndingBook cash** | 9,107 | 9,039 | 9,754 | 9,066 | 8,340 | 4,159 | 3,706 | 1,796 | 1,531 | 470 | 753 | 1,093 | 620 | 620 |
| 27  Addback: Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Cash Balance** | $ 9,107 | $ 9,039 | $ 9,754 | $ 9,066 | $ 8,340 | $ 4,159 | $ 3,706 | $ 1,796 | $ 1,531 | $ 470 | $ 753 | $ 1,093 | $ 620 | $ 620 |

# EXHIBIT C

**DIP Credit Agreement (without exhibits)**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of [_____], 2019

Among

AEGERION PHARMACEUTICALS, INC.,
as Borrower and as Debtor and Debtor-in-Possession,

THE LENDERS PARTY HERETO

and

CANTOR FITZGERALD SECURITIES,
as Administrative Agent

# TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms ...................................................................................... 1
Section 1.02    Other Interpretive Provisions................................................................ 24
Section 1.03    Accounting Terms.................................................................................. 24
Section 1.04    References to Agreements, Laws, Etc. ................................................... 25
Section 1.05    Times of Day......................................................................................... 25
Section 1.06    Timing of Payment or Performance........................................................ 25

ARTICLE II

THE COMMITMENTS AND THE LOANS

Section 2.01    The Commitments and the Loans ........................................................... 25
Section 2.02    Borrowings of Loans.............................................................................. 25
Section 2.03    Prepayments.......................................................................................... 26
Section 2.04    Repayment of Loans ............................................................................. 28
Section 2.05    Interest.................................................................................................. 28
Section 2.06    Fees ...................................................................................................... 28
Section 2.07    Computation of Interest and Fees .......................................................... 29
Section 2.08    Evidence of Indebtedness ...................................................................... 29
Section 2.09    Payments Generally .............................................................................. 30
Section 2.10    Sharing of Payments ............................................................................. 31

ARTICLE III

TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes..................................................................................................... 32
Section 3.02    [Reserved ............................................................................................. 36
Section 3.03    [Reserved ............................................................................................. 36
Section 3.04    Increased Cost and Reduced Return; Capital and Liquidity
                Requirements. ....................................................................................... 36
Section 3.05    [Reserved]............................................................................................. 37
Section 3.06    Matters Applicable to All Requests for Compensation ............................ 37
Section 3.07    Mitigation Obligations; Replacement of Lenders under Certain
                Circumstances....................................................................................... 37
Section 3.08    Survival ................................................................................................ 38

i

## ARTICLE IV

### CONDITIONS PRECEDENT TO LOANS

Section 4.01  Conditions to Initial Loans..........................**Error! Bookmark not defined.**
Section 4.02  Conditions to all Loans. ........................................................................... 41

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES

Section 5.01  Existence, Qualification and Power; Compliance with Laws................... 42
Section 5.02  Authorization; No Contravention ............................................................ 42
Section 5.03  Governmental Authorization; Other Consents......................................... 42
Section 5.04  Binding Effect ......................................................................................... 43
Section 5.05  No Material Adverse Effect..................................................................... 43
Section 5.06  Litigation................................................................................................. 43
Section 5.07  Ownership of Property; Liens.................................................................. 43
Section 5.08  Secured, Super-Priority Obligations ....................................................... 43
Section 5.09  Environmental Compliance ..................................................................... 44
Section 5.10  Taxes ....................................................................................................... 45
Section 5.11  Compliance with ERISA......................................................................... 46
Section 5.12  Labor Matters.......................................................................................... 46
Section 5.13  Insurance ................................................................................................. 46
Section 5.14  Subsidiaries; Equity Interests.................................................................. 46
Section 5.15  Margin Regulations; Investment Company Act; Anti-Terrorism
              Laws; Sanctions and Other Regulations ................................................. 46
Section 5.16  Disclosure ............................................................................................... 47
Section 5.17  Intellectual Property................................................................................ 48
Section 5.18  Initial Approved Budget .......................................................................... 48
Section 5.19  EEA Financial Institution ....................................................................... 48
Section 5.20  Contractual Obligations .......................................................................... 48
Section 5.21  Final Order............................................................................................... 48

## ARTICLE VI

### AFFIRMATIVE COVENANTS

Section 6.01  Financial Statements ............................................................................... 49
Section 6.02  Certificates; Reports; Other Information ................................................. 50
Section 6.03  Notice Requirements; Other Information ................................................. 51
Section 6.04  Environmental Matters ............................................................................ 52
Section 6.05  Maintenance of Existence ........................................................................ 54
Section 6.06  Maintenance of Properties ....................................................................... 54
Section 6.07  Maintenance of Insurance ....................................................................... 54
Section 6.08  Compliance with Laws ............................................................................ 55

ii

Section 6.09    Books and Records ..................................................... 55
Section 6.10    Inspection Rights; Lender Calls................................... 55
Section 6.11    Additional Guarantors................................................ 55
Section 6.12    Use of Proceeds ........................................................ 56
Section 6.13    Anti-Corruption and Sanctions Laws.......................... 57
Section 6.14    Taxes ........................................................................ 57
Section 6.15    End of Fiscal Years; Fiscal Quarters ......................... 57
Section 6.16    ERISA ...................................................................... 57
Section 6.17    Further Assurances.................................................... 58
Section 6.18    Business .................................................................... 58
Section 6.19    Post-Closing Matters................................................. 58
Section 6.20    Compliance with Final Order..................................... 58

## ARTICLE VII

## NEGATIVE COVENANTS

Section 7.01    Liens......................................................................... 59
Section 7.02    Investments ............................................................... 61
Section 7.03    Indebtedness.............................................................. 62
Section 7.04    Fundamental Changes ................................................ 63
Section 7.05    Dispositions............................................................... 63
Section 7.06    Restricted Payments .................................................. 64
Section 7.07    Change in Nature of Business..................................... 65
Section 7.08    Transactions with Affiliates ....................................... 65
Section 7.09    Prepayments and Modifications of Certain Agreements ......................... 65
Section 7.10    Negative Pledge ........................................................ 66
Section 7.11    Amendments to Organization Documents ................... 66
Section 7.12    Use of Proceeds ........................................................ 66
Section 7.13    Accounting Changes .................................................. 66
Section 7.14    OFAC........................................................................ 67
Section 7.15    Ownership of Subsidiaries ......................................... 67
Section 7.16    Compliance with Financing Orders and Approved Budget..................... 67
Section 7.17    Compliance With Certain Laws.................................. 67
Section 7.18    Chapter 11 Claims...................................................... 67
Section 7.19    Revision of Orders; Applications to Bankruptcy Court.......................... 67
Section 7.20    Adequate Protection................................................... 68

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default ...................................................... 68
Section 8.02    Remedies Upon Event of Default ............................... 72
Section 8.03    Application of Funds.................................................. 74

# ARTICLE IX

## ADMINISTRATIVE AGENT AND OTHER AGENTS

| | | |
|---|---|---|
| Section 9.01 | Appointment and Authorization | 75 |
| Section 9.02 | Delegation of Duties | 76 |
| Section 9.03 | Liability of the Administrative Agent | 77 |
| Section 9.04 | Reliance by the Administrative Agent | 77 |
| Section 9.05 | Notice of Default | 78 |
| Section 9.06 | Credit Decision; Disclosure of Information by the Administrative Agent | 78 |
| Section 9.07 | Indemnification of the Administrative Agent | 79 |
| Section 9.08 | The Administrative Agent in its Individual Capacity | 79 |
| Section 9.09 | Successor Agents | 80 |
| Section 9.10 | Administrative Agent May File Proofs of Claim | 80 |
| Section 9.11 | Release of Collateral and Guarantee | 81 |
| Section 9.12 | Other Agents; Arrangers and Managers | 82 |
| Section 9.13 | Appointment of Supplemental Administrative Agent | 82 |
| Section 9.14 | Certain Bankruptcy Matters | 83 |

# ARTICLE X

## MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.01 | Amendments, Etc. | 84 |
| Section 10.02 | Notices and Other Communications; Facsimile and Electronic Copies | 86 |
| Section 10.03 | No Waiver; Cumulative Remedies | 90 |
| Section 10.04 | Costs and Expenses | 90 |
| Section 10.05 | Indemnification by the Borrower | 91 |
| Section 10.06 | Payments Set Aside | 92 |
| Section 10.07 | Successors and Assigns | 93 |
| Section 10.08 | Confidentiality | 97 |
| Section 10.09 | Setoff | 97 |
| Section 10.10 | Counterparts | 98 |
| Section 10.11 | Integration | 98 |
| Section 10.12 | Survival of Representations and Warranties | 98 |
| Section 10.13 | Severability | 99 |
| Section 10.14 | GOVERNING LAW | 99 |
| Section 10.15 | WAIVER OF RIGHT TO TRIAL BY JURY | 99 |
| Section 10.16 | Binding Effect | 100 |
| Section 10.17 | Lender Action | 100 |
| Section 10.18 | PATRIOT Act | 100 |
| Section 10.19 | No Advisory or Fiduciary Responsibility | 100 |
| Section 10.20 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 101 |

Section 10.21  Conflicts with Financing Orders........................................................... 101

<u>SCHEDULES</u>

| | | |
|---|---|---|
| Schedule 1 | - | Closing Checklist |
| Schedule 2 | - | Subsidiary Guarantors |
| Schedule 2.01 | - | Commitments |
| Schedule 5.01 | - | Existence, Qualification and Power; Compliance with Laws |
| Schedule 5.02 | - | Authorizations; No Contravention |
| Schedule 5.06 | - | Litigation |
| Schedule 5.07(b) | - | Real Property |
| Schedule 5.09 | - | Environmental Compliance |
| Schedule 5.10 | - | Taxes |
| Schedule 5.14 | - | Subsidiaries and Other Equity Investments |
| Schedule 5.17 | - | Intellectual Property, Licenses |
| Schedule 5.20 | - | Material Contracts |
| Schedule 7.01(b) | - | Existing Liens |
| Schedule 7.02(c) | - | Existing Investments |
| Schedule 7.03(b) | - | Surviving Indebtedness |
| Schedule 10.02 | - | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

| | | |
|---|---|---|
| Exhibit A-1 | -- | Form of Committed Loan Notice |
| Exhibit A-2 | -- | Form of Prepayment Notice |
| Exhibit B | -- | Form of Note |
| Exhibit C | -- | Form of Compliance Certificate |
| Exhibit D | -- | Form of Assignment and Assumption |
| Exhibit E | -- | Form of Guarantee and Collateral Agreement |
| Exhibit F | -- | Form of Officer's Certificate |
| Exhibit G | -- | Form of Administrative Questionnaire |
| Exhibit H | -- | Form of Final Order |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is entered into as of [_____], 2019 among AEGERION PHARMACEUTICALS, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as hereinafter defined) (the "Borrower"), each Lender (as hereinafter defined) from time to time party hereto and CANTOR FITZGERALD SECURITIES, as administrative agent and collateral agent for the Lenders (in such capacities, together with any successor administrative agent and collateral agent, the "Administrative Agent").

## PRELIMINARY STATEMENTS

1.      On May 20, 2019 (the "Petition Date"), the Borrower and certain of its Subsidiaries filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and such reorganization case is being jointly administered under Case Number [_____] (the "Chapter 11 Case").

2.      The Borrower has requested that the Lenders make available to the Borrower a "super-priority" debtor-in-possession delayed draw term loan facility in an aggregate amount not to exceed $20,000,000, the proceeds of which the Borrower may use for the purposes permitted hereunder.

3.      The Guarantors (as hereinafter defined) have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to the Administrative Agent, for the benefit of the Secured Parties (as hereinafter defined), a lien on substantially all of their respective assets, in accordance with the priorities provided in the Loan Documents (as hereinafter defined) and the Final Order (as hereinafter defined).

Subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrower the "super-priority" debtor-in-possession delayed draw term loan facility provided for herein:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Accounting Changes" means changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions).

"Administration Fee" has the meaning specified in Section 2.06(d).

"Administrative Agent" has the meaning specified in the first paragraph of this Agreement and shall include any successor administrative agent appointed in accordance with Section 9.09.

"Administrative Agent's Office" means, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire substantially in the form of Exhibit G.

"Affiliate" means, in respect of any Person:

(a)    any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person; and for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" or "under common control with") means the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting Equity Interests or by contract or otherwise;

(b)    any Person who beneficially owns or holds 10% or more of any class of shares (or, in the case of a Person that is not a corporation, 10% or more of the partnership or other Equity Interests) of such Person; or

(c)    any Person, 10% or more of any class of shares (or in the case of a Person that is not a corporation, 10% or more of the partnership or other Equity Interests) of which is beneficially owned or held by such Person or a Subsidiary of such Person.

"Agent Parties" has the meaning specified in Section 10.02(f).

"Agent-Related Persons" means the Administrative Agent, together with its Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"Aggregate Commitments" means the Commitments of all the Lenders.  As of the Closing Date, the amount of the Aggregate Commitments is $20,000,000.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Anti-Corruption Laws" has the meaning specified in Section 5.15(g).

"Anti-Terrorism Law" means any Requirement of Law related to money laundering or financing terrorism, including the PATRIOT Act, and its implementing regulations, The Currency and Foreign Transactions Reporting Act (also known as the Bank Secrecy Act, 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended), Executive Order 13224 (effective September 24, 2001) and the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957).

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for the Loans, as notified to the Administrative Agent and the Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to the applicable provisions of Article III, be changed by such Lender upon 10 days' prior written notice to the Administrative Agent and the Borrower; provided that for the purposes of the definition of "Excluded Taxes" and Section 3.01, any such change shall be deemed an assignment made pursuant to an Assignment and Assumption.

"Applicable Rate" means a percentage per annum equal to 12.5%.

"Approved Bankruptcy Court Order" means (a) the Final Order, as such order is in effect from time to time and (b) any other order entered by the Bankruptcy Court that (x) is in form and substance satisfactory to the Required Lenders in all respects, (y) once entered, has not been vacated, reversed or stayed, and (z) has not been amended or modified except in a manner satisfactory to the Required Lenders.

"Approved Budget" means, initially, the Initial Approved Budget, and, following approval of any Supplemental Approved Budget, the "Approved Budget" as defined in and approved pursuant to the Financing Orders.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit D.

"Attorney Costs" means and includes all reasonable and documented fees, out-of-pocket expenses and actual disbursements of any law firm or other external legal counsel, limited to one counsel to the Administrative Agent (which on the date hereof is Shipman & Goodwin LLP) and one counsel to the Lenders (which on the date hereof is Latham & Watkins LLP) and, to the extent reasonably necessary, local counsel for each of the Administrative Agent and the Lenders in any relevant jurisdiction (and, in the event of any actual conflict of interest, additional counsel to the affected parties).

"Attributable Indebtedness" means, at any date, (a) in respect of any Capital Lease Obligation (other than a lease resulting from a Sale Leaseback) of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Sale Leaseback, the present value, discounted in accordance with GAAP at the interest rate implicit in the related lease, of the obligations of the lessee for net rental payments over the remaining term of such lease (including any period for which such lease has been extended or may, at the option of the lessor be extended).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning specified in the Preliminary Statements hereto.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Bridge Credit Agreement" means that certain Bridge Credit Agreement dated as of November 8, 2018 among the Borrower, the lenders party thereto and Cantor Fitzgerald Securities, as administrative agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the Laws of, or are in fact closed in, the State of New York.

"Capital Lease" means, with respect to any Person, any leasing or similar arrangement conveying the right to use any property, whether real or personal property, or a combination thereof, by that Person as lessee that, in conformity with GAAP, is required to be accounted for as a capital lease on the balance sheet of such Person.

"Capital Lease Obligation" means, with respect to any Person, all monetary or financial obligations of such Person and its Subsidiaries under any Capital Leases, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date on which such lease may be terminated by the lessee without payment of a penalty; provided that any obligations that were not required to be included on the balance sheet of such Person as capital lease obligations when incurred but are subsequently re-characterized as capital lease obligations due to a change in accounting rules after the Closing Date shall for all purposes hereunder not be treated as a Capital Lease Obligation.

"Carve-Out" means the "Carve-Out" as defined in the Financing Orders.

"Cash Equivalents" means any of the following:  (a) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, (b) insured certificates of deposit of or time deposits with any commercial bank that is a Lender or any other domestic commercial bank having capital and surplus in excess of $500,000,000 maturing not more than one year after the date of issuance, (c) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully

4

guaranteed or insured by the Government of the United States, (d) securities with maturities of 365 days or less from the date of acquisition that are issued or fully guaranteed by any state, district or territory of the United States, by any political subdivision or taxing authority of any such state, district or territory or by any foreign government, the securities of which state, district or territory, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (e) commercial paper maturing not more than two hundred and seventy (270) days from the date of issue and issued by a corporation (other than an Affiliate of any Loan Party) organized under the laws of any state of the United States of America or of the District of Columbia and, at the time of acquisition thereof, rated A 2 or higher by S&P, P 2 or higher by Moody's or F2 or higher by Fitch, (f) money market mutual or similar funds that invest substantially all of their assets in one or more type of securities satisfying the requirements of clauses (a) through (e) of this definition, (g) Investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $500,000,000, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a) and (b) of this definition, (h) agencies (LSE's), State (municipal bonds), or corporate bonds having a long term rating of at least A- or A3 from S&P, Moody's or Fitch, having maturities of not more than fifteen (15) months from the date of acquisition and (i) money market funds having a rating of AAAm/Aaa or better from S&P, Moody's or Fitch.

"Casualty Event" means any casualty, loss, damage, destruction or other similar loss with respect to real or personal property or improvements.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"Change in Law" means (a) the adoption of any law, treaty, order, policy, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law); provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented; provided that increased costs as a result of a Change in Law pursuant to clauses (x) and (y) above shall only be reimbursable by the Borrower to a Lender to the extent such Lender is requiring reimbursement therefor generally from similarly situated borrowers under comparable credit facilities.

"Change of Control" means the occurrence of any of the following events:

(a)      any direct or indirect Subsidiary of the Borrower on the Closing Date shall cease to be a Wholly-owned direct or indirect Subsidiary of the Borrower;

(b)      any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than Novelion shall have (x) acquired beneficial ownership or control of 25% or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of the Borrower; or (y) obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of the Borrower; or

(c)      those individuals who are members of the board of directors (or similar governing body) of the Borrower on the Closing Date (together with any new or replacement directors whose initial nomination for election was approved by a majority of the directors who were either directors on the Closing Date or previously so approved) shall fail to constitute a majority of the board of directors (or similar governing body) of the Borrower.

For the avoidance of doubt, neither the proposal or approval of (but not the occurrence of the effective date of) the Reorganization Plan, nor the proposal or entry into (but not the consummation of the transactions pursuant to) the definitive documents contemplated by the Restructuring Support Agreement shall constitute a Change of Control.

"Chapter 11 Case" has the meaning specified in the Preliminary Statements hereto.

"Closing Date" means the date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means a collective reference to all real and personal property required to be pledged to the Administrative Agent, for the benefit of the Secured Parties, to secure all or part of the Obligations pursuant to the Collateral Documents or the Final Order.

"Collateral Documents" means, collectively, the Final Order (with respect to the granting of Liens thereunder), the Guarantee and Collateral Agreement, and, to the extent required hereunder or reasonably requested by the Administrative Agent and the Lenders, any Guarantee and Collateral Agreement Supplement, any mortgages, any collateral assignments, any security agreements, pledge agreements, control agreements or other similar agreements, or any supplements to any of the foregoing, in each case delivered to the Administrative Agent and the Lenders in connection with this Agreement or any other Loan Document or any transaction contemplated hereby or thereby to secure or guarantee the payment of any part of the Obligations or the performance of any Loan Party's other duties and obligations under the Loan Documents. The Collateral Documents shall supplement, and shall not limit, the grant of a Lien on the Collateral pursuant to this Agreement or the Final Order.

"Commitment" means, as to each Lender, its obligations to make Loans pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the caption "Commitment".  Commitments will reduce on a dollar for dollar basis once advanced.

"Commitment Expiration Date" means the earliest to occur of (i) the date on which the entire amount of the Aggregate Commitments has been drawn, (ii) the date on which the Aggregate Commitments have been terminated pursuant to this Agreement and the Final Order and (iii) the date that is ten (10) days prior to the date set forth in clause (ii) of the definition of "Maturity Date".

"Commitment Fee" has the meaning provided in Section 2.06(a).

"Committed Loan Notice" means a notice of borrowing substantially in the form of Exhibit A-1.

"Communications" has the meaning specified in Section 10.02(e).

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Confirmation Order" means the "Confirmation Order" as defined in the Restructuring Support Agreement.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Convertible Notes" means Indebtedness evidenced by the 2.00% convertible senior notes due 2019 issued under that certain Indenture dated as of August 15, 2014 between the Borrower and The Bank of New York Mellon Trust Company, N.A., as trustee thereunder.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to the Applicable Rate plus 2.0% per annum to the fullest extent permitted by applicable Laws.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any asset or property by a Loan Party or any of its Subsidiaries (including any Sale Leaseback and any sale of Equity Interests, but excluding any issuance by a Loan Party of its own Equity Interests); provided that none of the foregoing shall be considered a "Disposition" for purpose of Section 7.05 if and only if the aggregate value of the assets or property that are the subject of such transaction is less than $100,000 in the aggregate during the term of this Agreement.

"Disqualified Equity Interests" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity

7

Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety one (91) days after the Maturity Date then in effect; provided that, if such Equity Interests are issued pursuant to a plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Disqualified Person" means any holder of any Indebtedness under the Convertible Notes or any direct competitor of the Borrower or its Subsidiaries to the extent that all such Disqualified Persons have been listed on a schedule provided to the Lenders and the Administrative Agent prior to the Closing Date.

"Dollars" means lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.07(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 10.07(b)(iii)).

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health and safety as it relates to any Hazardous Material or the environment, including, without

limitation, (a) by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages relating to Releases of Hazardous Materials or actual or alleged violations of Environmental Laws and (b) by any Governmental Authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Laws" means any and all federal, provincial, local and foreign statutes, laws, regulations, ordinances, rules, decrees or other governmental restrictions of legal effect relating to the environment, to the release of any Hazardous Materials into the environment or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials but only to the extent such Environmental Laws are legally applicable to any Loan Party pursuant to any Environmental Law.

"Environmental Liability" in respect of any Person, any and all legal obligations and liabilities under Environmental Laws for any Release caused by such Person or which is discovered or uncovered during the ownership or control of any real property by such Person and which adversely impacts any Person, property or the environment whether or not caused by a breach of applicable laws (including Environmental Laws).

"Environmental Permit" means any permit, approval, hazardous waste identification number, license or other authorization issued by or submitted to a Governmental Authority required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and Treasury regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with any Loan Party and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of any Loan Party or ERISA Affiliate as described in Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan, notification of any Loan Party or ERISA Affiliate concerning the imposition of withdrawal liability or notification that a Multiemployer Plan is insolvent or is in reorganization within the meaning of Title IV of ERISA (or that is in endangered or critical status, within the meaning of Section 305 of ERISA); (d) the

9

filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (g) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); or (h) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.07(b) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Agreements" means, collectively, the "Loan Documents" as defined in the Bridge Credit Agreement and the "Loan Documents" as defined in the Novelion Intercompany Loan Agreement.

"Exit Fee" has the meaning specified in Section 2.06(b).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not more

onerous to comply with), any regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Final Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court substantially in the form of Exhibit H, inter alia, (a) approving on a final basis this Agreement and the other Loan Documents, (b) authorizing the incurrence by the Loan Parties of the post-petition secured indebtedness under this Agreement, (c) approving the payment by the Loan Parties of the fees contemplated by this Agreement and the other Loan Documents, (d) authorizing on a final basis the Loan Parties to use cash collateral (as defined in the Bankruptcy Code), and (b) granting the Prepetition Secured Parties (as defined therein) certain adequate protection, among other related relief, which order or judgment is in effect and not stayed, and as the same may be amended, supplemented or modified from time to time after entry thereof with the consent of the Required Lenders.

"Financial Advisor" means Ducera Partners LLC, in its capacity as financial advisor to the Lenders and their counsel solely with respect to the Loan Documents.

"Financing Orders" means, collectively, the Interim Order and the Final Order.

"Fiscal Year" means the fiscal year of the Borrower and its Subsidiaries, ending on December 31 of each calendar year.

"Fitch" means Fitch Ratings, Inc. and its successors.

"Foreign Lender" means (a) if the borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is a resident or organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes.

"Foreign Subsidiary" means any direct or indirect Subsidiary of the Borrower organized outside the United States.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"<u>Fund</u>" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"<u>GAAP</u>" means generally accepted accounting principles in the United States, as in effect from time to time.

"<u>Governmental Authority</u>" means any nation or government, any provincial, state, local, municipal or other political subdivision thereof, and any entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Governmental Authorization</u>" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"<u>Granting Lender</u>" has the meaning specified in <u>Section 10.07(f)</u>.

"<u>Guarantee and Collateral Agreement</u>" means, collectively, (a) the Debtor-in-Possession Guarantee and Collateral Agreement executed by the Loan Parties and the Administrative Agent substantially in the form of <u>Exhibit E</u> and (b) each Guarantee and Collateral Agreement Supplement executed and delivered pursuant to the provisions of <u>Section 6.11</u>.

"<u>Guarantee and Collateral Agreement Supplement</u>" means a supplement to the Guarantee and Collateral Agreement, in form reasonably satisfactory to the Required Lenders, executed and delivered to the Administrative Agent pursuant to the provisions of <u>Section 6.11</u>.

"<u>Guarantee Obligations</u>" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Indebtedness or other payment obligations ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the

maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Guarantors" means the Subsidiary Guarantors.

"Hazardous Materials" means any material, substance or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous", "toxic", a "pollutant", a "contaminant", a "deleterious substance", "dangerous goods", "radioactive" or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, radon, greenhouse gases, mold, urea formaldehyde insulation, chlorofluorocarbons and all other ozone-depleting substances.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) accounts payable and other accrued liabilities incurred in the ordinary course of business not past due for more than 120 days after its stated due date (except for accounts payable contested in good faith), (ii) any earn-out obligation until such obligation is both required to be reflected as a liability on the balance sheet of such Person in accordance with GAAP and not paid after becoming due and payable and (iii) deferred or equity compensation arrangements entered into in the ordinary course of business and payable to directors, officers or employees), (e) all Indebtedness (excluding prepaid interest thereon) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed but, in the case of Indebtedness which is not assumed by such Person, limited to the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, (f) all guarantees by such Person of Indebtedness of others, (g) all Attributable Indebtedness of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty (excluding the portion thereof that has been fully cash collateralized in a manner permitted by this Agreement), (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, surety bonds and performance bonds, whether or not matured and (j) all obligations of such Person in respect of Disqualified Equity Interests.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  Anything herein to the contrary notwithstanding, obligations in respect of any Indebtedness that has been irrevocably defeased (either covenant or legal) or satisfied and discharged pursuant to the terms of the instrument creating or governing such Indebtedness shall not constitute Indebtedness.

"Indemnified Liabilities" has the meaning specified in Section 10.05(a).

13

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.05(a).

"Information" has the meaning specified in Section 10.08.

"Initial Approved Budget" means the "Initial Approved Budget" as defined in the Financing Orders.

"Intellectual Property" has the meaning specified in Section 5.17.

"Interest Payment Date" means the last Business Day of each calendar month, commencing June 30, 2019, and the Maturity Date.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Chapter 11 Case, inter alia, (a) authorizing, on an interim basis, the Loan Parties to use cash collateral (as defined in the Bankruptcy Code), and (b) granting the Prepetition Secured Parties (as defined therein) certain adequate protection, among other related relief, which order or judgment is in effect and not stayed, and as the same may be amended, supplemented or modified from time to time after entry thereof with the consent of the Required Lenders.

"Investment" in any Person, means any loan or advance to such Person, any purchase or other acquisition of any voting Equity Interests or other Equity Interests or Indebtedness or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" means any Lender that may be a party to this Agreement from time to time, including its successors and assigns as permitted hereunder (each of which is referred to herein as a "Lender").

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases but excluding operating leases) or any other security interest whatsoever, howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not, but specifically excludes any legal, contractual or equitable right of set-off.

"Loan" means an extension of credit by a Lender to the Borrower under Article II.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) any agency fee letter entered into between the Borrower and the Administrative Agent in connection with this Agreement and the other Loan Documents, (v) the Final Order and (vi) all other instruments and documents delivered from time to time by or on behalf of the Borrower or any of its Subsidiaries in connection herewith or therewith.

"Loan Parties" or "Loan Party" means, collectively or individually as the context may require, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, assets, liabilities (actual or contingent), financial condition of the Borrower and its Subsidiaries, taken as a whole, except as a result of (i) the commencement of the Chapter 11 Case or the events and conditions related and/or leading up thereto, (ii) the effects that customarily result from the commencement of a Chapter 11 Case (including the issuance of the Financing Orders), or (iii) any defaults under agreements as a result of the commencement of the Chapter 11 Case that have no effect under the terms of the Bankruptcy Code; (b) a material impairment of the ability of the Borrower to perform its material obligations under any Loan Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party; or (d) a material impairment of the Administrative Agent's or the Lenders' ability to enforce the Obligations or realize upon the Collateral.

"Material Contracts" means any Contractual Obligation of any Loan Party the failure to comply with which, or the termination (without contemporaneous replacement) of which, could reasonably be expected to have a Material Adverse Effect or otherwise result in liabilities in excess of $500,000.

"Maturity Date" means, the earliest to occur of (i) the effective date of a confirmed chapter 11 plan of reorganization, (ii) the date that is one hundred and fifty (150) days after the Petition Date, which may be extended up to an additional 60 days to the extent the "Outside Date" (as defined in the Plan Funding Agreement as in effect on the date hereof) is extended in accordance with Section 8.1(b)(ii) of the Plan Funding Agreement as in effect on the date hereof and (iii) the date on which the Loans and other Obligations hereunder are accelerated and become due and payable following the occurrence of an Event of Default, in each case, pursuant to Section 8.02.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Net Cash Proceeds" means:

(a)    with respect to the Disposition of any asset by any Loan Party or any Casualty Event the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash

15

Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of its Subsidiaries) over (ii) the sum of (A) the principal amount of any Indebtedness permitted by this Agreement that is secured by a lien (other than a Lien on the Collateral that is subordinated or junior to the Liens securing the Obligations) by the asset subject to such Disposition or Casualty Event and that is repaid (and is timely repaid) in connection therewith (other than Indebtedness under the Loan Documents), (B) the reasonable out-of-pocket expenses actually incurred and paid by the Borrower or any of its Subsidiaries in connection with such Disposition or Casualty Event (including, reasonable attorney's, accountant's and other similar professional advisor's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant, and other customary fees) to third parties (other than the Loan Parties or any of their Affiliates), (C) taxes paid or reasonably estimated to be actually payable or that are actually accrued in connection therewith with respect to the current tax year as a result of any gain recognized in connection therewith by such Person or any of the direct or indirect stockholders thereof and attributable to such Disposition or Casualty Event; _provided_ that, if the amount of any estimated taxes pursuant to this _subclause (C)_ exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute Net Cash Proceeds and (D) any reasonable reserve actually maintained in respect of (x) the sale price of such asset or assets established in accordance with GAAP, and (y) any liabilities associated with such asset or assets and retained by the Borrower or any of its Subsidiaries after such sale or other Disposition thereof, including pension and other post-employment benefit liabilities and liabilities related against any indemnification obligations associated with such transaction and it being understood that "Net Cash Proceeds" shall include any cash or Cash Equivalents (1) received upon the Disposition of any non-cash consideration received by such Person in any such Disposition, and (2) received upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in _subclause (D)_ above or, if such liabilities have not been satisfied in cash and such reserve not reversed within two years after such Disposition or Casualty Event, the amount of such reserve, in each case of _subclauses (A)_ through _(D)_ above, to the extent approved by the Bankruptcy Court (if such approval is necessary pursuant to the Bankruptcy Code); and

(b)    with respect to the incurrence or issuance of any Indebtedness by the Borrower or any of its Subsidiaries not permitted under Section 7.03, the excess, if any, of (i) the sum of the cash received in connection with such incurrence or issuance over (ii) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses (including reasonable attorney's, accountant's and other similar professional advisor's fees), incurred by such Loan Party in connection with such incurrence or issuance to third parties (other than the Loan Parties or any of their Affiliates), in the case of the foregoing clause (ii), to the extent approved by the Bankruptcy Court (if such approval is necessary pursuant to the Bankruptcy Code).

"Non-Consenting Lender" has the meaning specified in Section 3.07(c).

"Note" means a promissory note of the Borrower payable to a Lender or its assigns, substantially in the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower owing to such Lender resulting from the Loans made by such Lender.

"Novelion" means Novelion Therapeutics Inc., a corporation organized under the laws of British Columbia.

"Novelion Intercompany Loan Agreement" means the Amended and Restated Loan and Security Agreement, dated as of March 15, 2018, between Novelion and the Borrower, as the same may be amended, restated supplemented or otherwise modified from time to time.

"Novelion Intercompany Loans" means the intercompany loans advanced by Novelion to the Borrower pursuant to the Novelion Intercompany Loan Agreement

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including Guarantee Obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection

of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant" has the meaning specified in Section 10.07(d).

"Participant Register" has the meaning specified in Section 10.07(d).

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor thereof).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time since January 1, 2003.

"Permitted Affiliate Services Payments" means payments by the Borrower to Novelion consisting of reimbursements for shared services and other expenses to the extent permitted pursuant to an Approved Bankruptcy Court Order (it being understood that such payments shall be so permitted to the extent set forth in the Approved Budget, subject to Permitted Variances).

"Permitted Liens" has the meaning specified in Section 7.01.

"Permitted Variances" means the "Permitted Variances" as defined in the Financing Orders.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Petition Date" has the meaning specified in the Preliminary Statements hereto.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan Funding Agreement" means that certain Plan Funding Agreement, dated as of May [●], 2019, by and between the Borrower and Amryt Pharma plc, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Platform" has the meaning specified in Section 10.02(e).

"Prepayment Notice" means a notice of prepayment in respect of any voluntary or mandatory prepayment in substantially the form of Exhibit A-2.

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitment of such Lender at such time and the denominator of which is the amount of the Aggregate Commitments at such time; provided that if the Aggregate Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the outstanding principal amount of the Loans held by such Lender divided by the aggregate principal amount of all outstanding Loans held by all Lenders.

"Proceeding" has the meaning specified in Section 10.05(a).

"Public Lender" has the meaning specified in Section 10.02(h).

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Recipient" means the Administrative Agent or any Lender, as applicable.

"Refinancing Indebtedness" means refinancings, renewals, or extensions of Indebtedness, so long as:

(a)    such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness as of the time it is so refinanced, renewed, or extended (other than by the amount of the fees and expenses incurred in connection therewith);

(b)    such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended;

(c)    if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lenders as those that were applicable to the refinanced, renewed, or extended Indebtedness; and

(d)    the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Register" has the meaning specified in Section 10.07(c).

"Registered" means, with respect to Intellectual Property, issued by, registered with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, leeching or migration of any Hazardous Material in or into the environment (including the abandonment or disposal of any barrels, tanks, containers or receptacles containing any Hazardous Material), or out of any vessel or facility, including the movement of any Hazardous Material through the air, soil, subsoil, surface, water, ground water, rock formation or otherwise.

"Reorganization Plan" means the chapter 11 plan of reorganization for the Loan Parties, substantially in the form attached as Exhibit A to the Restructuring Support Agreement, including any schedules and exhibits attached thereto, as the same may be amended, supplemented or otherwise modified from time to time, in each case in accordance with the terms of the Restructuring Support Agreement or such chapter 11 plan, as applicable.

"Reportable Event" means with respect to any Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the aggregate principal amount of all outstanding Loans and unused Commitments at such time; provided that if there are two (2) or more Lenders that are not Affiliates, then Required Lenders shall require at least two (2) Lenders that are not Affiliates holding more than 50% of the aggregate principal amount of all outstanding Loans and unused Commitments at such time.

"Requirement of Law" means, as to any Person, any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction or settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or, except for purposes of Sections 6.02 or 6.03, any other similar officer or a Person performing similar functions of a Loan Party (and, as to any document delivered on the Closing Date, to the extent permitted or required by the terms of this Agreement, any secretary or assistant secretary of a Loan Party). Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any:

(a)    dividend or other distribution (whether in cash, securities or other property) or any payment (whether in cash, securities or other property), in each case, with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, including any sinking fund or similar deposit, on account of the purchase, retraction, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to

any Person's stockholders, partners or members (or the equivalent of any thereof and including any thereof acquired through the exercise of warrants or rights of conversion, exchange or purchase); and

(b)      payment of any management or similar type fees by a Loan Party to any Affiliate thereof.

"Restricting Information" has the meaning assigned to such term in Section 10.02(i).

"Restructuring Support Agreement" means the Restructuring Support Agreement dated as of May [__], 2019, by and among the Borrower, each of the Borrower's subsidiaries that are party thereto, certain holders of claims against the Borrower arising under the Convertible Notes indenture, the Bridge Credit Agreement and/or the Novelion Intercompany Loan Agreement, Novelion and Amrty Pharma plc, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"S&P" means Standard & Poor's Ratings Services LLC, a Standard & Poor's Financial Services LLC business, and its successors.

"Sale Leaseback" means any transaction or series of related transactions pursuant to which the Borrower or any of its Subsidiaries (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or disposed.

"Sanctions" means economic or financial sanctions or trade embargos imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, Canada, any European Union member state or Her Majesty's Treasury of the United Kingdom.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

"Sanctioned Person" means any individual or entity, at any time, that is the subject or target or Sanctions, including (a) any individual or entity listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union, Canada, any Member State of the European Union, or the United Kingdom, (b) any individual or entity operating, organized or resident in a Sanctioned Country or (c) any entity that is, in the aggregate, 50 percent or greater owned, directly or indirectly or otherwise, or where relevant under Sanctions, controlled by any such person or entity described in clause (a).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

21

"Secured Parties" means, collectively, the Administrative Agent, the Lenders and each Supplemental Administrative Agent.

"SPC" has the meaning specified in Section 10.07(f).

"Subsidiary" is, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means (a) each domestic Subsidiary of the Borrower other than Aegerion Securities Corporation, a Massachusetts corporation, including each Subsidiary listed under the heading "Subsidiary Guarantors" on Schedule 2, and (b) each other Subsidiary that becomes a Guarantor pursuant to a Guarantee and Collateral Agreement Supplement or other documentation in form and substance reasonably satisfactory to the Required Lenders.

"Supplemental Administrative Agent" has the meaning specified in Section 9.13(a) and "Supplemental Administrative Agents" shall have the corresponding meaning.

"Supplemental Approved Budget" means the "Supplemental Approved Budget" as defined in the Financing Orders.

"Tax Distributions" means, distributions from the Borrower to Novelion Services USA, Inc. ("US Parent") in the aggregate amount necessary to permit US Parent to pay all or a portion of the U.S. federal, state and local income tax liabilities which are then due and payable and directly attributable to the income of the Borrower; provided that such amounts are used by such Person for such purpose and the amount of such distributions in any taxable period shall not exceed with respect to any taxable period in which the Borrower files a consolidated, combined, unitary or similar type income tax return with US Parent or any direct or indirect parent of US Parent as the common parent of such group, the amount of U.S. federal, state and local income tax the Borrower and its Subsidiaries would be required to pay with respect to such taxable period if they filed as a separate consolidated, combined, unitary or other similar group for income tax purposes with the Borrower as the common parent of such group.

"Taxes" means any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, stamp taxes, withholdings or other charges imposed by any Governmental Authority (including additions to tax, penalties and interest with respect thereto).

"Termination of the DIP Financing" means, collectively, the termination of all Lenders' Commitments and either (x) payment in full in cash of all Obligations (other than contingent obligations, indemnities and expenses related thereto that, in each case, are not then payable or in existence or for which no claim has been asserted), or (y) upon the effective date of the confirmed Reorganization Plan, receipt of the treatment provided thereunder and under the Confirmation Order (which may include, without limitation, the receipt of cash and/or New Convertible Notes (as defined under the Reorganization Plan)).

"Threshold Amount" means $300,000.

"Ticking Fee" has the meaning specified in Section 2.06(c).

"Trade Date" has the meaning specified in Section 10.07(h).

"Uniform Commercial Code" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(g)(ii)(B)(3).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Wholly-owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, paragraph, clause, subclause, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(g)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(h)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine or neuter forms.

Section 1.03    <u>Accounting Terms</u>.  (a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP consistently applied, except as otherwise specifically prescribed herein; <u>provided</u>, <u>however</u>, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then the Lenders and the Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and the Borrower after such Accounting Change conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, (i) the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred and (ii) the Borrower shall provide to the Administrative Agent and the Lenders a written reconciliation in form and substance reasonably

satisfactory to the Required Lenders, between calculations of any baskets and other requirements hereunder before and after giving effect to such Accounting Change.

(b)    Where reference is made to a Person "and its Subsidiaries on a consolidated basis" or similar language, such consolidation shall not include any subsidiaries other than Subsidiaries.

Section 1.04    References to Agreements, Laws, Etc.    Unless otherwise expressly provided herein, (a) references to documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.05    Times of Day.    Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06    Timing of Payment or Performance.    When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

## ARTICLE II

## THE COMMITMENTS AND THE LOANS

Section 2.01    The Commitments and the Loans.    Subject to the terms and conditions set forth herein, each Lender severally agrees to make (or cause its Applicable Lending Office to make) to the Borrower, from time to time on and after the Closing Date and until the Commitment Expiration Date, term loans in one or more drawings in an aggregate principal amount not to exceed such Lender's Commitment; provided that the Loans made by all Lenders under this Section 2.01 shall not exceed in the aggregate the lesser of (i) the Aggregate Commitments and (ii) the maximum amount authorized by the Final Order. The Commitment of each Lender shall be reduced by the amount of any funding thereunder and shall be terminated on the Commitment Expiration Date. Amounts paid or prepaid in respect of the Loans may not be reborrowed. The proceeds of all Loans shall remain in a bank account maintained by the Borrower that is subject to a control agreement in favor of the Administrative Agent until such proceeds are used in accordance with Section 6.12.

Section 2.02    Borrowings of Loans.    (a) Each borrowing of Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent of such borrowing.    Each such notice must be received by the Administrative Agent not later than 12:00 noon (New York, New York time) five (5) Business Days prior to the requested date of any borrowing of Loans in the form of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.    Each borrowing of Loans shall be in a principal amount of

$1,000,000 or a whole multiple of $1,000,000 in excess thereof.  Each Committed Loan Notice shall specify, as applicable, (i) the requested date of the borrowing (which shall be a Business Day), (ii) the principal amount of Loans to be borrowed and (iii) the location and number of the relevant Borrower's account or any other designated account(s) to which funds are to be disbursed (which may be in the form of a funds flow memorandum). Notwithstanding anything to the contrary contained herein, the Borrower may not submit more than five (5) Committed Loan Notices in connection with borrowings, such Committed Loan Notices to be delivered (i) in connection with the initial borrowing on the Closing Date (if any) and (ii) in connection with the borrowings to be made (if any) thereafter in accordance with the Approved Budget (subject to the Permitted Variances) and the Final Order.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans requested.  In the case of each borrowing, each Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. (New York, New York time) on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction or waiver of the applicable conditions set forth in Section 4.02 (or, if such borrowing is the initial borrowing, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)    The failure of any Lender to make the Loan to be made by it as part of any borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any borrowing.

Section 2.03   Prepayments.  (a) Optional Prepayments.   The Borrower may, upon delivery of a Prepayment Notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans, in whole or in part subject to payment of the Exit Fee at the time of such prepayment; provided that (1) such notice must be received by the Administrative Agent not later than 12:00 noon (New York, New York time) two (2) Business Days prior to any date of prepayment of Loans; and (2) any prepayment of Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding, in each case, with accrued and unpaid interest on the Loans to be repaid.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Each prepayment of Loans pursuant to this Section 2.03(a) shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

(b)    Mandatory Prepayments.  (i) If the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any Disposition (other than any Disposition permitted under Sections 7.05(b), 7.05(c), 7.05(e), 7.05(f) or 7.05(h)), the Borrower shall, subject to

Section 2.03(c), cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds.

(ii)    If the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any Casualty Event, the Borrower shall, subject to Section 2.03(c), cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds.

(iii)    If the Borrower or any of its Subsidiaries incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event, prior to the date which is one (1) Business Day after the receipt of such Net Cash Proceeds.

(iv)    If the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any issuance of Equity Interests (including capital contributions), the Borrower shall cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event, prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds.

(v)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clauses (i) through (iv) of this Section 2.03(b) at least two (2) Business Days prior to the date of such prepayment pursuant to a Prepayment Notice.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's Prepayment Notice and of such Lender's Pro Rata Share of the prepayment, in each case, with accrued and unpaid interest on the Loans to be repaid and the Exit Fee with respect to such Loans.

(c)    Restrictions.  Notwithstanding the foregoing, to the extent any or all of the Net Cash Proceeds of any Disposition by, or Casualty Event of, a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to Section 2.03(b) is prohibited or delayed by any applicable local Requirements of Law from being repatriated to the Borrower including through the repayment of intercompany Indebtedness (each, a "Repatriation"; with "Repatriated" having a correlative meaning) (Borrower hereby agreeing to use reasonable efforts to cause the applicable Foreign Subsidiary to take promptly all actions reasonably required by such Requirements of Law to permit such Repatriation), or if the Borrower has determined in good faith that Repatriation of any such amount would reasonably be expected to have material adverse tax consequences with respect to its Subsidiaries, after taking into account any foreign tax credit or benefit actually received in connection with such Repatriation, the portion of such Net Cash Proceeds so affected (such amount, the "Excluded Prepayment Amount") will not be required to be applied to prepay Loans at the times provided in this Section 2.03; provided, that if and to the extent any such Repatriation ceases to be prohibited or delayed by applicable local Requirements of Law at any time immediately following the date on which the applicable

mandatory prepayment pursuant to this Section 2.03(c) was required to be made, the Borrower shall reasonably promptly Repatriate, or cause to be Repatriated, an amount equal to such portion of the Excluded Prepayment Amount, and the Borrower shall reasonably promptly pay such portion of the Excluded Prepayment Amount to the Lenders, which payment shall be applied in accordance with this Section 2.03. For the avoidance of doubt, the non-application of any Excluded Prepayment Amount pursuant to this Section 2.03 shall not constitute a Default or an Event of Default.

(d)      Interest.  All prepayments under this Section 2.03 shall be accompanied by all accrued interest thereon.

Section 2.04   Repayment of Loans.  The Borrower shall repay on the Maturity Date to the Administrative Agent (for the ratable account of the Lenders) the aggregate principal amount of all Loans, together with all accrued and capitalized interest (including interest paid in kind) and fees thereon (including the Exit Fee and all other outstanding Obligations), outstanding on such date; provided that, upon the effective date of the confirmed Reorganization Plan, the Obligations shall receive the treatment provided thereunder and under the Confirmation Order (which may include, without limitation, the receipt of cash and/or New Convertible Notes (as defined under the Reorganization Plan)) in full satisfaction, settlement, release and discharge thereof..

Section 2.05   Interest.  (a) Subject to the provisions of Section 2.05(b), each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate. The accrued interest shall be due and payable in cash on each Interest Payment Date.

(b)      Commencing (x) upon the occurrence and during the continuance of any Event of Default at the request of the Administrative Agent (upon the instruction of the Required Lenders) the Borrower shall pay interest on (i) the principal amount of the Loans and (ii) to the extent then due and payable all other outstanding Obligations hereunder, in each case under clauses (i) and (ii), at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand in cash.

(c)      Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto in accordance with Section 2.05(a) and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after any judgment.

Section 2.06   Fees.

(a)      Commitment Fee.  The Borrower shall pay to each Lender on the Closing Date a commitment fee (the "Commitment Fee") equal to 2.5% of the Commitment of such Lender as of the Closing Date. The Commitment Fee of each Lender shall be paid in cash and fully earned on the Closing Date and once paid shall not be refundable for any reason.

28

(b)      Exit Fee.  The Borrower shall pay to each Lender, on the earlier of (i) the date of repayment of all or a portion of any Loans and (ii) the Maturity Date, for the account of each Lender, an exit fee (the "Exit Fee") equal to 1.5% of the aggregate Loans actually advanced hereunder, payable to each Lender ratably based on the amount of Loans actually advanced by such Lender hereunder (whether or not such Lender is a Lender as of the date of the payment of the Exit Fee), subject to reduction in the case of any partial payment of the Exit Fee in connection with any partial repayment  of the Loans in accordance with this Agreement.  The Exit Fee (x) shall be fully earned on the Closing Date, (y) subject to Section 2.04, shall be paid in cash on the dates provided herein and (z) once paid shall not be refundable for any reason.

(c)      Ticking Fee.  The Borrower shall pay to each Lender a ticking fee (the "Ticking Fee") equal to such Lender's Pro Rata Share of the product of (i) 4.0% per annum multiplied by (ii) for each monthly period (or partial period if applicable), the actual daily amount by which the Aggregate Commitment exceeds the aggregate amount of Loans advanced. The Ticking Fee shall be payable monthly in arrears on the last Business Day of each calendar month, commencing May 31, 2019 and shall accrue at all times from and after the execution and delivery of this Agreement through the earlier of: (a) the Commitment Expiration Date and (b) the Termination of the DIP Financing. The Ticking Fee shall be paid in cash and fully earned when paid and once paid shall not be refundable for any reason.

(d)      Administration Fee.   The Borrower shall pay to the Lenders or their respective designees on the Closing Date, for the account of each Lender, an administration fee (the "Administration Fee") in the aggregate amount for all such Lenders equal to $50,000, paid ratably to the Lenders based on their Pro Rata Share of the Commitments.  The Administration Fee shall be paid in cash and fully earned on the Closing Date and once paid shall not be refundable for any reason.

(e)      Agent Fees.  The Borrower shall pay to the Administrative Agent, for its own account, the fees set forth in the separate fee letter as between the Borrower and the Administrative Agent.

Section 2.07    Computation of Interest and Fees.  All computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to  Section 2.09(a),  bear interest for one (1) day.   Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.08    Evidence of Indebtedness.   (a) The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise

29

affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)     In addition to the accounts and records referred to in Section 2.08(c), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(c)     Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.08(a), and by each Lender in its account or accounts pursuant to Section 2.08(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.09   Payments Generally.  (a) All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 2:00 p.m. (New York, New York time) on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. (New York, New York time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)     If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions (if any) to the Loan set forth in Article IV are not satisfied or waived in accordance

30

with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and neither the Administrative Agent nor any Lender shall be responsible for the failure of any other Lender to make its Loan.

(e)    Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the aggregate principal amount of all Loans outstanding at such time.

Section 2.10    Sharing of Payments.    If, other than as expressly provided elsewhere herein (including, without limitation, in Section 10.07), any Lender shall obtain on account of the Loans made by it in excess of its ratable share (or other share contemplated hereunder subject to the priorities set forth herein) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.    The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.10 and will in each case notify the Lenders following any such purchases or repayments.    Each Lender that purchases a

participation pursuant to this Section 2.10 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01   Taxes.

(a)   Defined Terms.   For purposes of this Section 3.01, the term "applicable law" includes FATCA.

(b)   Payments Free of Taxes.   Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.   If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)   Payment of Other Taxes by the Loan Parties.   The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)   Indemnification by the Loan Parties.   The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf, shall be conclusive absent manifest error.

(e)   Indemnification by the Lenders.   Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the

obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)        Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.01, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)        Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)        Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of

copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN (or W-8BEN-E, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or W-8BEN-E, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form provided by Administrative Agent and the other Lenders to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN (or W-8BEN-E, as applicable); or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate substantially in the form provided by Administrative Agent and the other Lenders, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form provided by Administrative Agent and the other Lenders on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative

34

Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     Treatment of Certain Refunds.   If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Survival.  Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02    [Reserved].

Section 3.03    [Reserved].

Section 3.04    Increased Cost and Reduced Return; Capital and Liquidity Requirements.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender reasonably determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

36

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.05    [Reserved].

Section 3.06    Matters Applicable to All Requests for Compensation.  The Administrative Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder, which shall be conclusive absent manifest error.  In determining such amount, the Administrative Agent or such Lender may use any reasonable averaging and attribution methods.

Section 3.07    Mitigation Obligations; Replacement of Lenders under Certain Circumstances.

(a)    Designation of a Different Applicable Lending Office.  If any Lender requests compensation under Section 3.04, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different Applicable Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.04 or Section 3.01, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 and, in each case, such Lender has declined or is unable to designate a different Applicable Lending Office in accordance with Section 3.07(a), or if any Lender is a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without

37

recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07(b)), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.04 or Section 3.01) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.07(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    such assignment does not conflict with applicable law; and

(v)    in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(c)    In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender".

Section 3.08    Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT TO LOANS

Section 4.01    Conditions to Effectiveness.    The Agreement shall be effective on the date on which all of the following conditions precedent have been first satisfied, except as otherwise agreed between the Borrower, the Administrative Agent and the Required Lenders:

(a)    The Administrative Agent's or the Lenders' (as applicable) receipt of the following, each properly executed by a Responsible Officer of the signing Loan Party, and each in form and substance reasonably satisfactory to the Required Lenders:

(i)    executed counterparts of this Agreement, the Guarantee and Collateral Agreement and each other Loan Document by each party thereto; and

(ii)    the certificates, documents, instruments, agreements and deliverables set forth on the Closing Checklist attached hereto as Schedule 1.

(b)    The Administrative Agent and each Lender shall have received the Initial Approved Budget.

(c)    All proceedings commenced in connection with the execution of this Agreement, all other Loan Documents and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related hereto and thereto) shall be satisfactory in all respects to the Administrative Agent and the Required Lenders.

(d)    The Loan Parties shall have commenced the Chapter 11 Case and all of the "first day motions," "first day orders" and all related pleadings entered or to be entered at the time of the Petition Date or shortly thereafter shall have been made available to the Administrative Agent and Lenders in advance, and shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders.

(e)    The Final Order shall have been entered by the Bankruptcy Court, within forty (40) calendar days of the Petition Date (but in any event not later than the Closing Date), which Final Order shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders and shall have been entered on the docket for the Chapter 11 Case on such prior notice to such parties in accordance with Bankruptcy Rule 4001, and the Administrative Agent and the Lenders (or their respective counsel) shall have received a copy of same, and such order shall be in full force and effect and shall not have been (i) stayed, vacated, revised or rescinded or (ii) amended or modified in a manner that is materially adverse to the Administrative Agent and the Lenders without the prior written consent of the Administrative Agent and the Required Lenders.  The Loan Parties shall be in compliance in all respects with the Final Order.

(f)    All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, including the Financing Orders, and all other motions and documents filed or to be filed with, and submitted to the Bankruptcy Court in connection

therewith, shall be satisfactory in all respects in form and substance to the Administrative Agent and the Required Lenders.

(g)     (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no order shall have been entered permitting a Person to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such orders; <u>provided</u> that this clause (ii) shall not apply to any order that is being contested in good faith by the Loan Parties.

(h)     The Borrower shall have paid all accrued and unpaid costs, fees and expenses (including applicable Attorney Costs (with respect to the reasonable and documented fees and expenses of Shipman & Goodwin LLP) and the reasonable and documented out-of-pocket fees and expenses of the Financial Advisor, and any other advisors to the Administrative Agent and the Lenders) and any other compensation required to be paid to the Administrative Agent and the Lenders on or prior to the Closing Date shall have been received (to the extent an invoice for such costs, fees and expenses has been provided to the Borrower at least two (2) Business Days prior to the Closing Date.

(i)     The Lenders shall have received on or prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act, in order to allow the Lenders to comply therewith, in each case, to the extent requested at least five (5) Business Days prior to the Closing Date.

(j)     The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower in substantially the form of <u>Exhibit F</u> certifying (i) as to clause (b) of <u>Section 4.02</u> and (ii) that no Default or Event of Default has occurred and is continuing under this Agreement.

(k)     Since the Petition Date, there shall have been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect, except for (i) the commencement of the Chapter 11 Case, (ii) the continuation of the circumstances giving rise to the filing thereof or as a result thereof, and (iii) any defaults under agreements as a result of the commencement of the Chapter 11 Case that have no effect under the terms of the Bankruptcy Code.

(l)     The Restructuring Support Agreement shall have been executed by all parties thereto and shall be in full force and effect.

Without limiting the generality of the provisions of <u>Section 9.03</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Closing Date specifying its objection thereto.

Section 4.02    <u>Conditions to all Loans</u>.  The obligation of each Lender to make Loans on any date, including on the Closing Date, is subject to satisfaction of the following conditions precedent, except as otherwise agreed between the Borrower, the Administrative Agent and the Lenders in accordance with Section 10.01:

(a)    The Administrative Agent's or the Lenders' (as applicable) receipt of the following, each properly executed by a Responsible Officer of the signing Loan Party, and each in form and substance reasonably satisfactory to the Required Lenders:

(i)    an original Note executed by the Borrower in favor of each Lender that has requested a Note at least two (2) Business Days prior to the requested date of the borrowing; and

(ii)    a Committed Loan Notice relating to the Loans.

(b)    The representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document shall be true and correct in all material respects on and as of the date of the incurrence of such Loans (before and after giving effect to the incurrence of such Loans); <u>provided</u> that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; <u>provided</u> <u>further</u> that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(c)    No Default or Event of Default shall exist, or would result from the incurrence of such Loans or from the application of the proceeds therefrom.

(d)    The aggregate outstanding amount of Loans after giving effect to such Loan shall not exceed the lesser of (i) the Aggregate Commitments and (ii) the maximum amount authorized by the Final Order, and each condition to borrowing such Loan in the Final Order shall have been satisfied.

(e)    The Final Order shall be in full force and effect, and shall not have been vacated, reversed or rescinded, and an appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective, and without the prior written consent of the Administrative Agent and the Required Lenders, such order shall not have been amended or modified. The Loan Parties shall be in compliance with the Final Order.

(f)    Such borrowing shall not be in an amount greater than is reasonably necessary to allow the Borrower to (a) maintain a cash reserve of $5,000,000, (b) make the expenditures set forth in the Approved Budget (subject to the Permitted Variances), and (c) following approval by the Bankruptcy Court of the Reorganization Plan, maintain a cash reserve reasonably sufficient to make the payments and disbursements (including estimated amounts in respect of professional fees and expenses of the Loan Parties, any statutory committee of unsecured creditors appointed in the Chapter 11 Case, the Administrative Agent, the Lenders and the Prepetition Secured Parties (as defined in the Financing Orders)) contemplated by the Reorganization Plan.

Each Committed Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in <u>Section 4.02(a)</u> through <u>(f)</u> have been satisfied on and as of the date of the applicable Loans.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01   <u>Existence, Qualification and Power; Compliance with Laws</u>. Except as set forth on <u>Schedule 5.01</u> or, in the case of clause (d), Schedule 5.06, each Loan Party and each of its Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) subject to the entry and effectiveness of the Final Order, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), orders, writs, injunctions and orders and (e) subject to any necessary approvals of the Bankruptcy Court, has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted, except, with respect to the foregoing clauses (c), (d) and (e), as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

Section 5.02   <u>Authorization; No Contravention</u>.  Subject to the entry of the Final Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transaction, (a) are within such Loan Party's corporate or other powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) except as set forth on <u>Schedule 5.02</u>, conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by <u>Section 7.01</u>), or require any payment to be made under (x) any Material Contracts to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, or (iii) violate any material applicable Law.

Section 5.03   <u>Governmental Authorization; Other Consents</u>.   No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created

42

under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the approval of the Bankruptcy Court in or pursuant to the Final Order.

Section 5.04    Binding Effect.    This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Upon entry of and subject to the Final Order, this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms.

Section 5.05    No Material Adverse Effect.    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect, except for (i) the commencement of the Chapter 11 Case, (ii) the continuation of the circumstances giving rise to the filing thereof or as a result thereof, or (iii) any defaults under agreements as a result of the commencement of the Chapter 11 Case that have no effect under the terms of the Bankruptcy Code.

Section 5.06    Litigation.    Except for the Chapter 11 Case and claims, actions, suits, investigations, litigation or proceedings stayed by 11 U.S.C. § 362 and set forth on Schedule 5.06, there is no action, suit, investigation, litigation or proceeding affecting any Loan Party or its Subsidiaries, including any Environmental Action, pending or, to the knowledge of any Loan Party, threatened in writing before any Governmental Authority or arbitrator that (i) would be reasonably likely to result in liabilities in excess of the Threshold Amount other than liabilities for which payment is stayed or excused under the Bankruptcy Code or (ii) purports to affect the legality, validity or enforceability of any Loan Document.

Section 5.07    Ownership of Property; Liens.    (a) Each Loan Party and its Subsidiaries is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, except for Permitted Liens.

(b)    Each Loan Party and each of its Subsidiaries has good and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in all, real property used in the ordinary conduct of its business, free and clear of all Liens except for defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have a Material Adverse Effect.  Set forth as Schedule 5.07(b) hereto is a complete and accurate list of all real property owned by any Loan Party or any of its Subsidiaries, showing, as of the date hereof, the street address, state and any other relevant jurisdiction, record owner and fair market value.  Set forth on Schedule 5.07(b) hereto is a complete and accurate list of all leases of real property under which any Loan Party or any Subsidiary is the tenant, showing as of the date hereof the street address, state and any other relevant jurisdiction, parties thereto, sublessee (if any), expiration date and annual base rental cost thereof.

Section 5.08    Secured, Super-Priority Obligations.    The provisions of the Collateral Documents, taken together with, and subject to the terms of, the Final Order are

43

effective to create in favor of the Administrative Agent for the benefit of the Secured Parties and any other secured parties identified therein, a legal, valid and enforceable Lien or security interest in all right, title and interest of the Loan Parties in the Collateral and all proceeds thereof with the priority set forth in the Final Order (and subject to the Carve-Out). Pursuant to the terms of the Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.

Section 5.09   Environmental Compliance.  Except as set forth on Schedule 5.09 or as would not individually be reasonably expected to result in a liability in excess of the Threshold Amount to the Loan Parties and their Subsidiaries (provided that the aggregate of all such events, circumstances, developments and liabilities could not reasonably be expected to result in a Material Adverse Effect):

(a)    The operations and properties of each Loan Party and each of its Subsidiaries comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, and no circumstances exist that would be reasonably likely to (A) to the knowledge of the Loan Parties, form the basis of an Environmental Action against any Loan Party or any Subsidiary or any of their properties or (B) cause any such property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law.

(b)    None of the properties currently or, to the knowledge of the Loan Parties, formerly, owned or operated by any Loan Party or any of its Subsidiaries is listed or, to such Loan Party's or each of its Subsidiaries' knowledge, proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no, and, to the knowledge of the Loan Parties, never have been, any underground or aboveground storage tanks other than in compliance with applicable Environmental Laws or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or, to the best of its knowledge, on any property formerly owned or operated by any Loan Party or any of its Subsidiaries other than in compliance with applicable Environmental Laws; and other than in compliance with applicable Environmental Laws, there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; and Hazardous Materials have not been released, discharged or disposed of by any Loan Party or any of its Subsidiaries on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries other than in material compliance with applicable Environmental Laws.

(c)    Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials

44

generated, used, treated, handled or stored at, or transported by or on behalf of any Loan Party or any of its Subsidiaries to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have, to the knowledge of the Loan Parties, been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any of its Subsidiaries.

(d)    The Borrower and each of its Subsidiaries has obtained all material Environmental Permits required for ownership and operation of its property and business as presently conducted.  Neither the Borrower nor any of its Subsidiaries has received any written notification pursuant to any applicable Environmental Law or otherwise has knowledge that (A) any work, repairs, construction or capital expenditures are required to be made in order to be in or continue to be in compliance with any applicable Environmental Laws or any material Environmental Permit or (B) any Environmental Permit is about to be reviewed, made subject to new limitations or conditions, revoked, withdrawn or terminated.

(e)    Except as would not reasonably be expected to result in a material liability, no Loan Party nor any of its Subsidiaries has contractually assumed any liability or obligation under or relating to any applicable Environmental Law.

(f)    Nothing contained in this Section 5.09 is intended to apply to any action, suit, investigation, litigation or proceeding (including any Environmental Action) relating to exposure to asbestos, in any form, or any asbestos containing materials.

Section 5.10    Taxes.  (a) Each of the Loan Parties and each of their respective Subsidiaries has timely filed all income and all other material tax returns and reports required to be filed, and have timely paid all Taxes (whether or not shown on such tax returns or reports) and all other amounts of federal, provincial, state, municipal, foreign and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are set forth on Schedule 5.10(a), are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP, or for which payment is stayed or excused pursuant to the Bankruptcy Code.

(b)    Except as set forth on Schedule 5.10(b) or as would not, individually or in the aggregate, be reasonably likely to result in any material liability (including because payment is stayed or excused pursuant to the Bankruptcy Code), (i) there are no claims being asserted in writing with respect to any amounts of taxes, (ii) there are no presently effective waivers or extensions of statutes in writing with respect to any amounts of taxes, and (iii) no tax returns are being examined by, and no written notification of intention to examine has been received from, the Internal Revenue Service or any other taxing authority, in each case, with respect to the Loan Parties or any of their respective Subsidiaries.

(c)    Neither the Borrower nor any of its Subsidiaries is party to any tax sharing agreement other than with an affiliate included in a consolidated or combined tax return.

Section 5.11    Compliance with ERISA.  (a) Each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws, except as is not, either individually or in the aggregate, reasonably likely to have a Material Adverse Effect.

(b)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) none of the Loan Parties or any of their Subsidiaries has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 *et seq.* or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) none of the Loan Parties or any of their Subsidiaries or any ERISA Affiliate has engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA.

Section 5.12    Labor Matters.  There are no strikes pending or, to the knowledge of any Loan Party, threatened in writing against the Borrower or any of its Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  The (i) hours worked and payments made to employees of the Borrower or any of its Subsidiaries have not been in violation in any material respect of the Fair Labor Standards Act or any other applicable law dealing with such matters and (ii) all material payments due from the Borrower or any of its Subsidiaries or for which any claim may be made against the Borrower or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary to the extent required by GAAP except for liabilities the payment of which is stayed or excused pursuant to the Bankruptcy Code.

Section 5.13    Insurance.    The properties of the Loan Parties and their Subsidiaries are insured in the manner contemplated by Section 6.07.

Section 5.14    Subsidiaries; Equity Interests.  As of the date hereof, the Loan Parties do not have any Subsidiaries other than those specifically disclosed in Schedule 5.14, and all of the outstanding Equity Interests in each such Person and each such Subsidiary have been validly issued, are fully paid and non-assessable.  As of the date hereof, Schedule 5.14 (a) sets forth the name and ownership interest of each Person that owns any Equity Interests in the direct and indirect Subsidiaries of the Borrower, (b) sets forth the name and jurisdiction of organization of the Borrower and each direct and indirect Subsidiary of the Borrower, (c) sets forth the ownership interest of each direct and indirect Subsidiary of the Borrower, including the percentage of such ownership and (d) sets forth a notation as to whether each such Subsidiary is a debtor in the Chapter 11 Case.

Section 5.15    Margin Regulations; Investment Company Act; Anti-Terrorism Laws; Sanctions and Other Regulations.    (a) None of the Loan Parties or any of their Subsidiaries is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Loans will be used for any purpose that violates Regulation U issued by the FRB.

46

(b)    None of the Loan Parties or any of their Subsidiaries is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(c)    No Loan Party nor any of its Subsidiaries or to its knowledge any of the respective officers, directors, brokers or agents of such Loan Party or Subsidiary has violated any applicable Anti-Terrorism Law in any material respect.

(d)    No Loan Party, nor any of its Subsidiaries, any of their respective directors, officers or employees, or to the knowledge of the Loan Party, any agent of the Loan Party or any Subsidiary that act in any capacity in connection with the Loans, is (i) a Sanctioned Person, (ii) organized, resident or located in a Sanctioned Country, (iii) in violation of Sanctions, or (iv) engaged in any transactions or dealings with a Sanctioned Person or in a Sanctioned Country; and each Loan Party has instituted and maintains policies and procedures designed to ensure continued compliance by each Loan Party, its Subsidiaries, and their respective directors, officers, employees and agents with Sanctions.

(e)    No Loan Party or any of its Subsidiaries or to its knowledge any of the respective officers, directors, brokers or agents of such Loan Party or Subsidiary acting or benefiting in any capacity in connection with the Loans (i) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (ii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(f)    No Loan Party nor any of its Subsidiaries or any of the respective officers, directors, brokers or agents of such Loan Party or Subsidiary will directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any individual or entity (i) for the purpose of funding, financing, or facilitating any activities, business or transaction of or with a Sanctioned Person, or in any Sanctioned Country, or (ii) in any manner that would result in a violation of Sanctions by any party to this agreement.

(g)    None of the Loan Parties or any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, employee or other person acting on behalf of the Borrower or any of its Subsidiaries has taken any action, directly or indirectly, that would result in a material violation by such persons of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder or any other applicable anti-corruption law (collectively, "Anti-Corruption Laws"); and the Loan Parties have instituted and maintain policies and procedures designed to ensure continued compliance therewith in all material respects.

(h)    None of the Loan Parties or any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005.

Section 5.16    Disclosure.    No report, financial statement, certificate or other written information furnished by or on behalf of the Borrower or any of its Subsidiaries to the Administrative Agent or any Lender in connection with the transactions contemplated hereby

and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains when furnished any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided to the extent any information is included in the Initial Approved Budget or constitutes projections or other forward-looking information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.17    Intellectual Property.    As of the date hereof, set forth on Schedule 5.17 and the schedules to the Collateral Documents is a complete and accurate list of all Registered patents, trademarks, service marks, domain names and copyrights, owned by the Borrower or any of its Subsidiaries and all IP Agreements (as defined in the Collateral Documents) as of such date, showing as of such date the jurisdiction in which each such item of Registered Intellectual Property is registered or in which an application is pending and the registration or application number.    The Borrower and each Subsidiary owns or has the right to use, all of the trademarks, service marks, trade names, domain names, copyrights, patents, know-how, technology and other intellectual property recognized under applicable Law (collectively, "Intellectual Property") that are material to the operation of their respective businesses as currently conducted and, to the knowledge of the Loan Parties, except as set forth in the "Disputes or Litigation" section of Schedule 5.17, the use of such Intellectual Property by such Person or the operation of their respective businesses is not infringing upon any Intellectual Property rights held by any other Person and there are no other disputes or litigation proceedings involving such Intellectual Property.

Section 5.18    Initial Approved Budget.    The Initial Approved Budget was prepared in good faith by the management of the Loan Parties, based on assumptions believed by the management of the Loan Parties to be reasonable at the time made and upon information believed by the management of the Loan Parties to have been accurate based upon the information available to the management of the Loan Parties at the time such Initial Approved Budget was furnished (it being understood and agreed that financial projections are not a guarantee of financial performance, actual results may differ from financial projections and such differences may be material and financial projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties).

Section 5.19    EEA Financial Institution.    Neither the Borrower nor any other Loan Party is an EEA Financial Institution.

Section 5.20    Contractual Obligations.    Set forth on Schedule 5.20 hereto are all Material Contracts to which the Loan Parties and their Subsidiaries are party as of the Closing Date.    As of the Closing Date, none of the Loan Parties or their Subsidiaries have knowledge of any events of default under any such Material Contracts.

Section 5.21    Final Order.

(a)      The Loan Parties are in compliance with the terms and conditions of the Final Order.

(b)      The Final Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, in their sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment outstanding hereunder or any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Section 6.01, Section 6.02 and Section 6.03) cause each Subsidiary to:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent and to each Lender:

(a)      Quarterly and Annual Financial Statements.  (i) As soon as available, but in any event, within fifty-five (55) days after the end of each of the first three (3) fiscal quarters of each Fiscal Year of the Borrower (commencing with the first full fiscal quarter ended after the Closing Date), unaudited internally prepared balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related unaudited internally prepared consolidated statements of income or operations and cash flows for such fiscal quarter, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to year-end adjustments, and (ii) as soon as available, but no later than one hundred twenty (120) days after the last day of Borrower's fiscal year, internally prepared consolidated financial statements of the Borrower for the fiscal year then ended (to be comprised of a consolidated balance sheet and income statement and cash flows covering the Borrower's and its Subsidiaries' operations for such fiscal year), prepared in a manner consistent with GAAP and with prior practices, and complete and correct in all material respects, certified by a Responsible Officer.

(b)      Management Discussion and Analysis Reports.  Simultaneously with the delivery of each set of consolidated financial statements referred to in Section 6.01(a), a report setting forth management's analysis and discussion of the condition (financial and otherwise) and operations, in respect of the business of the Borrower and its Subsidiaries.

(c)      Approved Budget.  The Borrower shall deliver to the Administrative Agent and the Lenders the proposed Supplemental Approved Budget and variance reports in accordance with the Final Order.

(d)      Monthly Financial Statements.  At the request of the Required Lenders, the Borrower shall provide to the Lenders a consolidated balance sheet of the Borrower and its Subsidiaries as of the end of last fiscal month, and the related consolidated statements of income or operations for such fiscal month.

(e)      [Reserved].

(f)      Other Statements.  Contemporaneous with the delivery to the lenders under the Novelion Intercompany Loan Agreement (and in any case no later than one (1) calendar day following such delivery), copies of all statements, reports, notices made available to Borrower's security holders generally, to such lenders or to any other holders of Indebtedness for borrowed money, including, without limitation, (i) notice of the occurrence of any default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto and (ii) notice of the occurrence of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(g)      Notices to Novelion Lenders.  Copies of all notices to or from, and agreements and documents (including any amendments or modifications thereto) entered into in connection with the Novelion Intercompany Loan Agreement or the holders of the Convertible Notes (or the trustee thereof), in each case, within one (1) Business Day of delivery, receipt or execution as the case may be.

Section 6.02   Certificates; Reports; Other Information.  Promptly deliver to the Administrative Agent and to each Lender:

(a)      upon delivery of the financial statements referred to in Section 6.01(a) a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower files with the SEC or with any successor Governmental Authority (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)      promptly upon receipt thereof, notice that any third party has expressed an interest in writing (either formally or informally) in acquiring all or substantially all of the Loan Parties' business;

(d)      prior to the filing thereof in the Bankruptcy Court, drafts of all material filings related to the transactions contemplated by this Agreement and the other Loan Documents; it being understood that the foregoing requirement will be deemed satisfied to the extent such drafts are delivered to counsel for the Administrative Agent and counsel for the Lenders;

(e)      all filings made with the Bankruptcy Court by any of the Loan Parties in the Chapter 11 Case (except to the extent filed under seal and disclosure to the Administrative Agent or Lenders is not permitted); it being understood that the foregoing requirement will be deemed satisfied to the extent such filings required to be delivered are available online and reasonably accessible to the Administrative Agent and Lenders; and

(f)      no later than the first Business Day after delivery thereof, all written reports given by any of the Loan Parties to any official or unofficial creditors' committee in the Chapter 11 Case, except to the extent disclosure thereof is not permitted.

Delivery of any reports, information and documents under Section 6.01 and Section 6.02 as well as any such reports, information and documents pursuant to this Agreement, to the Administrative Agent and the Lenders is for informational purposes only and the Administrative Agent's and Lenders' receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder (as to which the Administrative Agent and the Lenders are entitled to rely exclusively on the Compliance Certificates).  The Administrative Agent and the Lenders shall have no responsibility or liability for the filing, timeliness or content of any report required under Section 6.01 or Section 6.02 or any other reports, information and documents required under this Agreement (aside from any report that is expressly the responsibility of the Lenders subject to the terms hereof).

Section 6.03   Notice Requirements; Other Information.   Promptly after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent and each Lender of each of the following events or circumstances and provide to the Administrative Agent and each Lender the following information and documents:

(a)      the occurrence of any Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)      the occurrence of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)      the commencement of, or any material development in, any litigation or governmental proceeding (including without limitation pursuant to any applicable Environmental Laws) pending against the Borrower or any of the Subsidiaries that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect;

(d)      the occurrence of any ERISA Event above the Threshold Amount or the breach of any representation in Section 5.12;

(e)      any information with respect to environmental matters as required by Section 6.04(b);

(f)      copies of all notices, requests and other documents (other than any filings made with the Bankruptcy Court that are available online and reasonably accessible to

the Administrative Agent and the Lenders) received by any Loan Party or any of its Subsidiaries under or pursuant to any instrument, indenture, loan or credit or similar agreement relating to Indebtedness in excess of the Threshold Amount regarding or related to any breach or default by any party thereto or any other event that could materially impair the value of the interests or the rights of any Loan Party or otherwise have a Material Adverse Effect and copies of any amendment, modification or waiver of any provision of any such instrument, indenture, loan or credit or similar agreement relating to Indebtedness in excess of the Threshold Amount and, from time to time upon request by the Administrative Agent (at the direction of the Required Lenders), such information and reports regarding such instruments, indentures and loan and credit and similar agreements relating to Indebtedness in excess of the Threshold Amount as the Administrative Agent may reasonably request (at the direction of the Required Lenders);

(g)    a tax event or liability not previously disclosed in writing by the Borrower to the Administrative Agent which would reasonably be expected to result in a material liability, together with any other information as may be reasonably requested by the Required Lenders to enable the Required Lenders to evaluate such matters, other than any tax event or liability the payment of which is stayed or excused under the Bankruptcy Code;

(h)    any occurrence of a Change of Control; and

(i)    any change (i) in any Loan Party's corporate name, (ii) any Loan Party's identity and corporate structure, (iii) any Loan Party's taxpayer identification number or (iv) any Loan Party's jurisdiction of incorporation.

Section 6.04    <u>Environmental Matters</u>.    (a) Comply and cause each of its Subsidiaries to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all material Environmental Permits required under Environmental Laws for its operations and properties; and conduct, and cause each of its Subsidiaries to conduct, any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action required to remove and clean up all releases or threatened releases of Hazardous Materials from any of its properties, as required under, and in accordance with the requirements of all Environmental Laws; <u>provided</u>, <u>however</u>, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and, to the extent required by GAAP, appropriate reserves are being maintained with respect to such circumstances.

(b)    Promptly, and in any event within ten (10) Business Days, after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent of or, deliver to the Administrative Agent, for further distribution to each Lender, copies of any and all material, non-privileged written communications and material, non-privileged documents concerning:

(i)    any Environmental Action against or of any non-compliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that would (1) reasonably be expected to result in a liability to any Loan Party in

excess of the Threshold Amount or (2) cause any owned real property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(ii)     to the extent any of the following is reasonably expected to result in a liability to any Loan Party in excess of the Threshold Amount: (1) any occurrence of any release or threatened release of Hazardous Materials required to be reported to any Governmental Authority under applicable Environmental Law, (2) any remedial actions taken by any Loan Party or its Subsidiaries in respect of any such release or threatened release that could reasonably be expected to result in an Environmental Action or (3) the Loan Parties' discovery of any occurrence of or condition on any real property adjoining or in the vicinity of any site or facility that would be reasonably expected to cause such site or facility or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)     to the extent reasonably expected to result in a liability to any Loan Party in excess of the Threshold Amount, any action proposed to be taken by the Borrower or any of its Subsidiaries to modify current operations in a manner that would reasonably be expected to subject the Borrower and its Subsidiaries to any material additional obligations or requirements under Environmental Laws;

(iv)     copies of all material environmental reports or audits (whether produced by the Borrower or its Subsidiaries or any third party or Governmental Authority) and any Phase I or Phase II reports in respect of any sites or real property owned, leased or operated by the Borrower and its Subsidiaries that are in possession or control of any Loan Party or any of its Subsidiaries;

(v)     to the extent any of the following is reasonably expected to result in a liability to any Loan Party in excess of the Threshold Amount: copies of any and all material, non-privileged written communications with respect to (A) any Environmental Action, (B) any release or threatened release or non-compliance with any Environmental Law required to be reported to any Governmental Authority and (C) any request for information from a Governmental Authority that suggests such Governmental Authority is investigating the potential responsibility of the Borrower or any of its Subsidiaries as a potentially responsible party;

(vi)     the good faith belief that a release of Hazardous Materials, or a violation of Environmental Law reasonably likely to result in a fine or penalty in excess of the Threshold Amount, has occurred on or after the Closing Date, and within 60 days after such request and at the expense of the Borrower, any additional environmental site assessment reports for any of its or its Subsidiaries' properties described in such request prepared by an environmental consulting firm acceptable to the Required Lenders, indicating the presence or absence of such Hazardous Materials and the estimated cost of any compliance, removal or remedial action in connection with any such Hazardous Materials on such properties; without limiting the generality of the foregoing, if the Required Lenders reasonably determine at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative

Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrower, and the Borrower hereby grants and agrees to cause any Subsidiary that owns any property described in such request to grant at the time of such request to the Administrative Agent, the Lenders, such firm and any agents or representatives thereof, the right, subject to the rights of tenants, to enter onto their respective properties to undertake such an assessment; and

(vii)   any such other documents and information as the Administrative Agent (at the direction of the Required Lenders) may reasonably request from time to time.

Section 6.05   Maintenance of Existence.   (a) Preserve, renew and maintain in full force and effect its legal existence, structure and name under the Laws of the jurisdiction of its organization and (b) take all commercially reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except (i) other than with respect to any Loan Party, to the extent the Borrower's board of directors (or in the case of clause (b), a Responsible Officer) shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Subsidiaries and to the extent that the loss thereof shall not be disadvantageous to Borrower, its Subsidiaries or the Lenders in any material respect, (ii) pursuant to a transaction permitted by Section 7.04 or Section 7.05 or (iii) in the case of clause (b), failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 6.06   Maintenance of Properties.   (a) Maintain, preserve and protect all of its material properties and equipment that are used or useful in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and make all commercially reasonable and appropriate repairs, renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof except where failure to do so would not reasonably be expected to materially adversely affect the use of the related property.

Section 6.07   Maintenance of Insurance.   Maintain with financially sound and reputable insurance companies (in the good faith judgment of management of the Borrower), insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries) as are customarily carried by Person engaged in similar businesses and owning or leasing similar properties in the same general areas in which the Borrower or such Subsidiary operates. Borrower shall cause all property policies to have a lender's loss payable endorsement showing Administrative Agent as lender loss payee and use commercially reasonable efforts to cause such endorsement to provide that the insurer must give Administrative Agent at least twenty (20) days' notice before canceling, amending, or declining to renew its policy.  All liability policies shall show, or have endorsements showing, Administrative Agent as an additional insured, and all such policies (or the loss payable and additional insured endorsements) shall provide that the insurer shall give Administrative Agent at least twenty (20) days' notice before canceling, amending, or declining to renew its policy.  At any Lender's

54

request, each Loan Party shall deliver certified copies of policies and evidence of all premium payments.  Proceeds payable under any casualty policy in connection with a Casualty Event shall be subject to Section 2.03(b)(ii).

Section 6.08   Compliance with Laws.  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, except where such non-compliance is not, either individually or in the aggregate, reasonably likely to have a Material Adverse Effect.

Section 6.09   Books and Records.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and as are sufficient to permit the preparation of financial statements in conformity with GAAP consistently applied, shall be made of all material financial transactions and matters involving the assets and business of any of the Loan Parties.

Section 6.10   Inspection Rights; Lender Calls.  (a) Permit representatives and independent contractors of the Administrative Agent and each Lender (including, without limitation, financial advisors retained by or for the benefit of the Administrative Agent or the Lenders or their counsel, including the Financial Advisor) to visit and inspect any properties and books and records of the Borrower and its Subsidiaries (subject, in the case of third party customer sites, to customary access agreements) and to discuss its affairs, finances and accounts with its directors, officers, advisors and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that such visits and inspections shall be coordinated through the Required Lenders and any review of books and records shall be done no more frequently than once per month absent the continuation of an Event of Default.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants to the extent reasonably feasible.  Neither the Borrower nor any Subsidiary shall be required to disclose to the Administrative Agent or any Lender any information that, in the opinion of counsel to the Borrower or such Subsidiary, is prohibited by Law to be disclosed, is subject to attorney client privilege or constitutes attorney work product or the disclosure of which would cause a material breach of a binding non-disclosure agreement with a third party to the extent such agreement is not made in contemplation of the avoidance of this Section 6.10.

(b)     Up to one (1) time in every two-week period, upon the reasonable request of the Required Lenders, the Borrower's chief financial officer, together with the Borrower's financial advisor shall hold a conference call (at a mutually agreeable time, the cost of such call to be paid by the Borrower) with the Administrative Agent and the Lenders, on which conference calls shall be reviewed the Loan Parties' financial performance, operations, current trends and variance reports.

Section 6.11   Additional Guarantors.  Notify the Administrative Agent and the Lenders at the time that any Subsidiary becomes a debtor in the Chapter 11 Case, and (a) promptly thereafter (and in any event within five (5) days), seek an order of the Bankruptcy Court authorizing such Person to become a Guarantor and (b) immediately upon the entry of such order, (i) cause such Person to become a Guarantor by executing and delivering to the

Administrative Agent a counterpart of the Guarantee and Collateral Agreement or a Guarantee and Collateral Agreement Supplement substantially in the form attached to the Guarantee and Collateral Agreement, and (ii) deliver to the Administrative Agent any applicable documents of the types referred to in Section 4.01(a), all in form, content and scope reasonably satisfactory to the Required Lenders.

Section 6.12    Use of Proceeds.  Use the proceeds of any Loan, whether directly or indirectly, solely in the manner set forth in the Final Order and the Approved Budget, subject to the Permitted Variances.  Notwithstanding the foregoing, no part of the proceeds of any Loan shall be used directly or indirectly:

(a)    for any purpose that is prohibited under the Bankruptcy Code or the Final Order;

(b)    to make any distribution under a plan of reorganization in the Chapter 11 Case except as contemplated in the Reorganization Plan approved by the Required Lenders; or

(c)    to finance in any way payment of the fees and expenses of any Person incurred in connection with (i) the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, suits, arbitrations, proceedings, applications, motions or other litigation of any type adverse to any of the Secured Parties or any of their respective Affiliates, agents or representatives, or their respective rights and remedies under or in respect of the Loans provided pursuant to this Agreement or the Final Order; (ii) challenging the amount, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the obligations and liens and security interests granted under the Loan Documents or the Existing Agreements, including, in each case, without limitation, for lender liability or pursuant to Section 105, 510 (other than subordination of (x) the obligations under the Novelion Intercompany Loan Agreement to the obligations in respect of the New Money Loans under the Bridge Credit Agreement and (y) the obligations in respect of the Roll Up Loans under the Bridge Credit Agreement to the obligations under the Novelion Intercompany Loan Agreement), 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; or (iii) attempting to prevent, hinder or otherwise delay any of the Lenders' or the Administrative Agent's assertion, enforcement or realization upon any of the Collateral.

Notwithstanding the foregoing, the Loan Parties shall be permitted to pay compensation and reimbursement of fees and expenses of professionals allowed and payable under Sections 328, 330 and 331 of the Bankruptcy Code, as the same may be due and payable, to the extent expressly permitted by the Final Order.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative

Agent's and the Lenders' right to review and object to any such requests, motions or applications).

Section 6.13   Anti-Corruption and Sanctions Laws.  To the extent existing on the Closing Date, the Borrower will maintain in effect such policies and procedures designed to promote compliance in all material respects by the Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with the FCPA and any other applicable anti-corruption laws as well as Sanctions.

Section 6.14   Taxes.  To the extent permitted by the Bankruptcy Court and the Bankruptcy Code, pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies arising after the Closing Date imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, which, if unpaid when due and payable, may reasonably be expected to become a tax Lien upon any properties of the Borrower or any of its Subsidiaries thereof not otherwise permitted under this Agreement; provided that neither the Borrower nor any of its Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim (i) which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP unless and until any tax Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors or (ii) non-payment of which is required under the Bankruptcy Code or order of the Bankruptcy Court.

Section 6.15   End of Fiscal Years; Fiscal Quarters.  Cause (i) its fiscal year to end on or about December 31 of each calendar year and (ii) its fiscal quarters to end on or about March 31, June 30, September 30 and December 31 of each calendar year, in each case unless otherwise approved by the Required Lenders.

Section 6.16   ERISA.  (a) ERISA Events and ERISA Reports.  (i) Promptly and in any event within ten (10) days after any Loan Party, any Subsidiary or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that such Loan Party, such Subsidiary or such ERISA Affiliate has taken and proposes to take with respect thereto and (ii) on the date any records, documents or other information must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information.

(b)   Plan Terminations.  Promptly and in any event within five (5) Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(c)   Plan Annual Reports.  Promptly and in any event within 30 days after the filing thereof with the Internal Revenue Service, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Plan.

(d)   Multiemployer Plan Notices.  Promptly and in any event within five (5) Business Days after receipt thereof by any Loan Party, any Subsidiary or any ERISA Affiliate

from the sponsor of a Multiemployer Plan, copies of each notice concerning (i) the imposition of Withdrawal Liability by any such Multiemployer Plan, (ii) the reorganization or termination, or a determination that such Multiemployer Plan is in endangered or critical status, within the meaning of Title IV of ERISA, of any such Multiemployer Plan or (iii) the amount of liability incurred, or that may be incurred, by such Loan Party, such Subsidiary or such ERISA Affiliate in connection with any event described in clause (i) or (ii).

Section 6.17    Further Assurances.  Execute and deliver, or cause to be executed and delivered, to the Administrative Agent such reasonable documents and agreements, and shall take or cause to be taken such reasonable actions, as the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents.

Section 6.18    Business.    Except to the extent required or authorized by the Bankruptcy Court, the Borrower will only, and will only permit the Subsidiaries to, engage directly or indirectly in the business engaged in by the Borrower and the Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary, corollary, synergistic or complimentary thereto.

Section 6.19    Post-Closing Matters.  To the extent not prohibited by any Requirement of Law and not otherwise resulting in material adverse tax consequences to the Borrower and its Subsidiaries, at the request of the Required Lenders (or automatically to the extent requested under the Novelion Intercompany Loan Agreement), the Borrower shall cause its Foreign Subsidiaries designated by the Required Lenders to execute such guarantees, pledge agreements and security documents as shall be customary in such local jurisdictions to grant to Administrative Agent, for the benefit of the Secured Parties, a guaranty of the Obligations secured by the equity interests and substantially all assets of such Subsidiaries within 45 days of such request (or such longer period as the Required Lenders may agree in their sole discretion). In addition, the Borrower shall deliver the following within 30 days of the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion): (i) control agreements with respect to the Borrower's deposit accounts listed on the schedules to the Collateral Documents (other than any Excluded Account (as defined in the Collateral Documents)) and (ii) insurance endorsements in accordance with Section 6.07, in each case in form and substance reasonably acceptable to the Administrative Agent (subject to indemnity provisions in such control agreements being subject to the Administrative Agent's approval in its sole discretion) and the Required Lenders.

Section 6.20    Compliance with Final Order.  Comply with the Final Order to the extent the Loan Parties' compliance therewith is required at such time.

# ARTICLE VII

# NEGATIVE COVENANTS

So long as any Lender shall have any Commitment outstanding hereunder or any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or

unsatisfied, the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

Section 7.01    Liens.  Subject to the Final Order, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues (including accounts receivable), whether now owned or hereafter acquired, other than the following Liens (collectively, "Permitted Liens"):

(a)    Liens pursuant to (i) any Loan Document and (ii) any Loan Document under and as defined in the Bridge Credit Agreement, in each case which shall have the priority set forth in the Final Order;

(b)    Liens existing on the Petition Date and listed on Schedule 7.01(b);

(c)    Liens for taxes, assessments or governmental charges which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP;

(d)    statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, suppliers, construction contractors or other like Liens arising in the ordinary course of business which secure amounts not to exceed $50,000 and not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, are unfiled (or if filed have been discharged or stayed) and no other action has been taken to enforce such Lien or which are being contested in good faith, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP;

(e)    (i) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary and (ii) Liens securing the financing of insurance premiums (to the extent such Liens extend to the unearned premiums for such insurance) in the ordinary course of business;

(f)    Liens consisting of deposits made in connection with Indebtedness of the types permitted under Sections 7.03(e) or 7.03(g) (in each case, other than for borrowed money) entered into in the ordinary course of business or to secure the obligations otherwise permitted;

(g)    easements, rights-of-way, covenants, conditions, restrictions, encroachments, and other survey defects protrusions and other similar encumbrances and minor title defects affecting real property which were not incurred in connection with Indebtedness and do not in any case materially and adversely interfere with the use of the property encumbered thereby for its intended purposes;

(h)    Liens securing Indebtedness permitted under Section 7.03(c); provided

that (i) such Liens attach concurrently with or within 120 days after the acquisition, or the completion of the construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits, and (iii) with respect to Capital Leases, such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to such Capital Leases;

(i)        Liens arising by virtue of any contractual, statutory or common law provision relating to banker's Liens, rights of set-off or similar rights and remedies (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary Guarantor (so long as such Subsidiary remains a Subsidiary Guarantor) to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or such Subsidiary Guarantor or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(j)        Liens arising from precautionary Uniform Commercial Code financing statement filings regarding leases entered into by the Borrower and its Subsidiaries in the ordinary course of business;

(k)        any zoning, land-use or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property;

(l)        the modification, replacement, renewal or extension of any Lien permitted by clause (b) of this Section 7.01; provided that (i) the Lien does not extend to any additional property or additional Indebtedness (except with respect to paid-in-kind obligations pursuant to the terms of such Indebtedness as in effect on the Closing Date) other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03, and (B) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03;

(m)        nonconsensual statutory Liens arising after the Petition Date;

(n)        judgment Liens in existence for less than thirty (30) days after the entry thereof, or with respect to which execution has been stayed or the payment of which is covered in full by insurance maintained with responsible insurance companies, or which judgment Liens do not otherwise result in an Event of Default under Section 8.01(h);

(o)        any interest or title of a lessor, licensor or sublessor under any lease, license or sublease entered into by the Borrower or any of its Subsidiaries in the ordinary course of its business and covering only the assets so leased, or subleased;

(p)     other Liens not on borrowed money with respect to which the aggregate amount of the obligations secured thereby does not exceed $100,000 at any time outstanding; provided, that no such Liens shall be on Equity Interests of the Borrower or any of its direct or indirect Subsidiaries;

(q)     to the extent constituting a Lien and permitted under Section 7.05, any non-exclusive licenses of Intellectual Property granted to third parties and set forth on Schedule 5.17 and other non-exclusive licenses after the Closing Date, in each case to the extent not resulting in a legal transfer of title of the licensed Intellectual Property and in the ordinary course of business, subject to exclusivity on territory aside from the United States or Europe;

(r)     to the extent constituting Liens and permitted under Section 7.05, any leases, subleases, licenses, or sublicenses (other than licenses of Intellectual Property) granted to third parties that do not materially interfere with the Loan Parties' ordinary course of business;

(s)     Liens securing Indebtedness permitted under Section 7.03(j) which shall have the priority set forth in the Final Order;

(t)     Liens consisting of cash deposits not to exceed $200,000 securing Indebtedness permitted under Section 7.03(i); and

(u)     other Liens granted pursuant to the Financing Orders.

Section 7.02    Investments.  Make any Investments, except:

(a)     Investments by the Borrower or its Subsidiaries in cash and Cash Equivalents;

(b)     loans and advances to officers, directors or employees in the ordinary course of the business of the Borrower and its Subsidiaries in an aggregate principal amount not to exceed $50,000 at any time outstanding, to the extent permitted in an Approved Bankruptcy Court Order;

(c)     Investments existing as of the Closing Date and disclosed on Schedule 7.02(c) and Investments consisting of any modification, replacement, renewal, reinvestment or extension of any such Investment; provided that the amount of any Investment permitted pursuant to this Section 7.02(c) is not increased from the amount of such Investment on the Closing Date;

(d)     so long as immediately before and after giving effect to any such Investment, no Default has occurred and is continuing, other Investments that do not exceed $250,000 in the aggregate (net of any return or distribution of capital or repayments of principal in respect thereof) to the extent permitted in an Approved Bankruptcy Court Order;

(e)     Investments received in connection with the bankruptcy or reorganization

61

of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; and

(f)    other Investments made (i) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party, (ii) by any Loan Party in any Foreign Subsidiary for operating expenses in Latin America, Europe, Middle East and Africa and operating expenses and manufacturing costs of inventory in the United Kingdom, in each case consistent with past practices and in the ordinary course of business and to the extent permitted in an Approved Bankruptcy Court Order for such Investments in Foreign Subsidiaries in an aggregate amount and not to exceed $25,000,000 in the aggregate during the term of this Agreement and (iii) by any Subsidiary that is not a Loan Party in any Person to the extent not exceeding $100,000 outstanding at any one time.

Section 7.03   Indebtedness.    Create, incur, assume or suffer to exist any Indebtedness, except the following, without duplication:

(a)    Indebtedness of the Borrower and other Loan Parties under (i) the Loan Documents and (ii) the Loan Documents under and as defined in the Bridge Credit Agreement;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b);

(c)    additional Capital Leases incurred after the Closing Date and purchase money Indebtedness in an aggregate amount not to exceed $750,000 in the aggregate at any time outstanding, and any Refinancing Indebtedness in respect of such Indebtedness; provided that any such Indebtedness (x) in the case of additional Capital Leases or purchase money Indebtedness, shall be secured only by the asset subject to such additional Capital Leases or acquired asset in connection with the incurrence of such Indebtedness, as the case may be, and (ii) in the case of purchase money Indebtedness, shall constitute not less than 75% of the aggregate consideration paid with respect to such asset;

(d)    other unsecured Indebtedness in an aggregate principal amount not to exceed $250,000 at any time outstanding;

(e)    Indebtedness in respect of performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, indemnity, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations), and, in each case, letters of credit in respect thereof, incurred in the ordinary course of business;

(f)    non-recourse Indebtedness incurred by the Borrower or any of its Subsidiaries to finance the payment of insurance premiums of such Person;

(g)    Indebtedness owed to any Person providing worker's compensation, unemployment insurance and other social security legislation, health, disability or other

employee benefits or property, casualty or liability insurance to the Borrower or any of its Subsidiaries incurred in connection with such Person providing such benefits or insurance pursuant to customary reimbursement or indemnification obligations to such Person;

(h)    to the extent constituting Indebtedness, each of the Investments permitted pursuant to Section 7.02;

(i)    reimbursement obligations owed to banks and financial institutions with respect to credit card services in an aggregate amount at any one time not exceeding $200,000;

(j)    Indebtedness of the Borrower and the Loan Parties under the Novelion Intercompany Loan Agreement in an aggregate principal amount not to exceed the outstanding aggregate principal amount thereof as of the Closing Date plus any paid-in-kind interest in accordance with the terms thereof to the extent permitted in an Approved Bankruptcy Court Order; provided, that no Subsidiaries of the Borrower shall guaranty such Indebtedness unless such Subsidiaries also guaranty the Obligations; and

(k)    Indebtedness consisting of accounts payable incurred in the ordinary course of business past due for more than 120 days after its stated due date (except for accounts payable contested in good faith or the payment of which is stayed or excused pursuant to the Bankruptcy Code or an Approved Bankruptcy Court Order) which do not in the aggregate exceed $750,000.

Section 7.04    Fundamental Changes.    Merge, dissolve, liquidate, consolidate with or into another Person, split or allow any change to the ownership of the Borrower or any of its Subsidiaries, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

Section 7.05    Dispositions.    Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries, in each case to the extent constituting immaterial property;

(b)    Dispositions in the ordinary course of business of Cash Equivalents;

(c)    sales of inventory in the ordinary course of business;

(d)    Dispositions (other than of material Intellectual Property or of assets relating to metreleptin) for fair market value, to the extent approved by the Bankruptcy Court; provided that (i) the aggregate amount of Dispositions during any fiscal year does not exceed $250,000, (ii) immediately prior to and immediately after giving effect to such Disposition, no Default or Event of Default shall have occurred and be continuing or

would result therefrom and (iii) no less than one hundred percent (100%) of the consideration received for any such Disposition is received in cash;

(e)     the leasing, as lessor, of real or personal property not presently used or useful in such Person's business and is otherwise in the ordinary course of business;

(f)     Dispositions of equipment or other assets, to the extent that such equipment is exchanged for credit against the purchase price of similar replacement equipment or assets or the proceeds of such Dispositions are reasonably promptly applied to the purchase price of similar replacement equipment, all in the ordinary course of business;

(g)     Dispositions constituting an Intellectual Property that is not material to the conduct of the business of the Borrower and its Subsidiaries; and

(h)     Dispositions otherwise permitted by Sections 7.01, 7.02 or 7.03 and Dispositions from any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party.

Section 7.06    Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)     to the extent constituting a Restricted Payment, the payment of fees of non-insider directors to the extent permitted in an Approved Bankruptcy Court Order and the reimbursement of reasonable expenses;

(b)     the Subsidiaries of the Borrower may make direct or indirect Restricted Payments to the Borrower and other Subsidiaries of the Borrower that are Loan Parties;

(c)     so long as no Event of Default has occurred and is continuing, Restricted Payments to Novelion to be used for (i) customary director indemnification payments to Novelion's director nominees serving on the board of directors of Borrower, and (ii) financial and other reporting and similar customary administrative costs and expenses attributable and fairly allocable to the Loan Parties (including audit and professional fees and other ordinary course operating and administrative expenses incurred by Novelion in its capacity as the ultimate holding company of the Borrower), in the case of this clause (ii) to the extent permitted in an Approved Bankruptcy Court Order;

(d)     the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person (other than Disqualified Equity Interests);

(e)     Restricted Payments consisting of Tax Distributions to the extent permitted in an Approved Bankruptcy Court Order; and

(f)     Permitted Affiliate Services Payments to the extent constituting a Restricted Payment.

Section 7.07   <u>Change in Nature of Business</u>.   Except as required by the Bankruptcy Code or as set forth in any order of the Bankruptcy Court, engage in any line of business other than those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business reasonably related or ancillary thereto; <u>provided</u>, that Aegerion Securities Corporation shall not engage in any business activities,  maintain any assets or incur any Indebtedness.

Section 7.08   <u>Transactions with Affiliates</u>.   Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)   transactions to the extent permitted pursuant to an Approved Bankruptcy Court Order, including Permitted Affiliate Services Payments;

(b)   transactions contemplated by the Restructuring Support Agreement;

(c)   any transactions expressly permitted under Section 7.02, Section 7.04 and Section 7.06; <u>provided</u> that all parties to such transactions are Loan Parties or their Wholly-owned Subsidiaries;

(d)   so long as it has been approved by the Borrower's or its applicable Subsidiary's board of directors or other governing body to the extent required in accordance with applicable law, (i) customary indemnifications of non-officer directors of the Loan Parties and their respective Subsidiaries and (ii) the payment of reasonable and customary compensation and indemnification arrangements and benefit plans for officers and employees of the Loan Parties and their respective Subsidiaries in the ordinary course of business, in each case to the extent permitted in an Approved Bankruptcy Court Order and approved by all independent directors of the Borrower's board of directors; and

(e)   transactions under the agreements existing on the Closing Date and listed on Schedule 7.08.

Section 7.09   <u>Prepayments and Modifications of Certain Agreements</u>.  (a) Except in connection with a confirmed Reorganization Plan, which is satisfactory to the Administrative Agent and the Required Lenders, amend or modify any of the terms of any Indebtedness in an outstanding amount exceeding the Threshold Amount of any of the Loan Parties or their Subsidiaries arising prior to or after the Petition Date if such amendment or modification would add or change any terms in a manner adverse to the Loan Parties or the Lenders, or shorten the final maturity or average life to maturity of any such Indebtedness or require any payment to be made sooner than originally scheduled or increase the interest rate applicable thereto.

(b)   Make any payment of any Indebtedness or any claim arising prior to the Petition Date except as permitted pursuant to the Financing Orders or other order of the Bankruptcy Court and otherwise not prohibited by the terms of this Agreement, or make any voluntary, optional or other non-scheduled payment, prepayment, redemption, acquisition for value, refund, refinance or exchange of any Indebtedness of such Loan Party arising after the Petition Date (including, without limitation, any interest, premium or other amounts owing in

respect thereof), in each case whether or not mandatory, except (i) with respect to Indebtedness under the Loan Documents and (ii) for payments made pursuant to the Final Order.

(c)     Amend or modify, or permit the amendment, modification or waiver of, any provision of any Material Contract to which any Loan Party or any Subsidiary thereof is a party or by which it or any of its property or assets is bound, in each case after the original execution and delivery thereof (or, if later, the date hereof) in any substantive manner that would be adverse to the Lenders' interests hereunder, without the written consent of the Required Lenders.

Section 7.10   <u>Negative Pledge</u>.  Enter into or suffer to exist, or permit any of its Subsidiaries to enter into or suffer to exist, (x) any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except (a) agreements in favor of the Administrative Agent or (b) prohibitions or conditions under (i) any Capital Lease permitted by <u>Section 7.03(c)</u> solely to the extent that such Capital Lease prohibits a Lien on the property subject thereto, or (ii) by reason of customary provisions restricting pledges, assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (<u>provided</u> that such restrictions are limited to the property or assets subject to such leases, licenses or similar agreements, as the case may be) or (iii) any Indebtedness outstanding on the Closing Date (including, for the avoidance of doubt, the Indebtedness under the Existing Agreements and the Convertible Notes) or (y) any agreement or arrangement limiting the ability of any of its Subsidiaries to declare or pay dividends or other distributions in respect of its Equity Interests or repay or prepay any Indebtedness owed to, make loans or advances to, or otherwise transfer assets to or make Investments in, the Borrower or any of its Subsidiaries of the Borrower (whether through a covenant restricting dividends, loans, asset transfers or investments, a financial covenant or otherwise), except (a) the Loan Documents and (b) any Indebtedness outstanding on the Closing Date (including, for the avoidance of doubt, the Indebtedness under the Existing Agreements and the Convertible Notes).

Section 7.11   <u>Amendments to Organization Documents</u>.  Amend, or permit any of its Subsidiaries to amend, its certificate of incorporation or bylaws or other Organization Documents in a manner adverse to the interests of the Lenders hereunder, without the written consent of the Required Lenders.

Section 7.12   <u>Use of Proceeds</u>.  (a)  Use, directly or indirectly, the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (x) to fund, finance, or facilitate any activities, business, or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (y) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise).

(b)     Use any part of the proceeds of the Loans directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law.

Section 7.13   <u>Accounting Changes</u>.  Make any change in (a) accounting policies or reporting practices, except as required by GAAP or (b) Fiscal Year.

Section 7.14    OFAC.  (a)   Become a Sanctioned Person, (b) become organized, resident or located in a Sanctioned Country, or (c) engage in any transactions or dealings with a Sanctioned Person or in a Sanctioned Country in violation of Sanctions.

Section 7.15    Ownership of Subsidiaries.  Notwithstanding any other provisions of this Agreement to the contrary, organize, create, acquire or permit to exist after the Petition Date any Subsidiaries of the Borrower other than those existing on the Petition Date and set forth on Schedule 5.14.

Section 7.16    Compliance with Financing Orders and Approved Budget.  Except as otherwise provided herein or approved by the Required Lenders, the Loan Parties shall not use any cash or the proceeds of any Loans or Collateral in a manner or for a purpose other than in accordance with the Final Order and the Approved Budget, subject to the Permitted Variances. Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, in no event shall the Loan Parties make any expenditures, payments, repayments or prepayments, dividends, distributions, reimbursements or similar transaction to Novelion or any Subsidiary thereof (excluding Borrower and any Subsidiary thereof) during the term of this Agreement unless expressly permitted pursuant to an Approved Bankruptcy Court Order and set forth in the Approved Budget (including Permitted Affiliate Services Payments).

Section 7.17    Compliance With Certain Laws.

(a)      (i) Violate any Anti-Terrorism Laws, (ii) engage in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering or (iii) permit any of their respective Affiliates to violate these laws or engage in these actions.

(b)      (i) Deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law, (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempt to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(c)      Become an "investment company" or a company controlled by an "investment company" under the Investment Company Act of 1940, as amended.

Section 7.18    Chapter 11 Claims.  Incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim or other super-priority claim or lien which is pari passu with or senior to the claims or liens, as the case may be, of the Administrative Agent or the Secured Parties against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority to do so, except as expressly permitted by the Financing Orders, an Approved Bankruptcy Court Order or the Required Lenders.

Section 7.19    Revision of Orders; Applications to Bankruptcy Court.

(a)      Seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Final Order that is adverse to the interests of the Lenders, except for any

modifications and amendments agreed to in writing by the Administrative Agent and the Required Lenders.

(b)     Apply to the Bankruptcy Court for authority to take any action prohibited by this Article VII (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Administrative Agent and the Required Lenders or all Lenders, as applicable).

Section 7.20    Adequate Protection.  Except as permitted in the Financing Orders, incur, create, assume, suffer to exist or permit any obligation to make adequate protection payments, or otherwise provide adequate protection.

# ARTICLE VIII

# EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default.  Any of the following events referred to in this Section 8.01 shall constitute an "Event of Default":

(a)     Non-Payment.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three (3) Business Days after the same becomes due in cash, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)     Specific Covenants.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01(d), Section 6.01(f), Section 6.03(a), Section 6.05, Section 6.07, Section 6.10(b), Section 6.12, Section 6.19, Section 6.20 or Article VII; or

(c)     Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders; or

(d)     Representations and Warranties.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default.  Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any post-Petition Date Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount, unless such failure to pay is a result of the Chapter 11 Case, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs, the

effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, in each case, unless such failure to observe or perform is a result of the Chapter 11 Case; or

(f)     [Reserved]; or

(g)     [Reserved]; or

(h)     Judgments.  After the Petition Date, there is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny or fail to confirm coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)     ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which would reasonably be expected to exceed the Threshold Amount, (ii) any Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to exceed the Threshold Amount, or (iii) any Loan Party, any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties, the Subsidiaries and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an aggregate amount which would reasonably be expected to exceed the Threshold Amount; or

(j)     Invalidity of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery or entry (with respect to the Final Order) and for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document (other than as a result of the Termination of the DIP Financing), purports to revoke or rescind any Loan Document or asserts (including by

commencing or joining in any legal proceeding) that any Collateral Document is invalid or unenforceable or contests in any manner that any Loan Document constitutes a valid and enforceable agreement against it; or

(k)    <u>Change of Control; Structure</u>.  There occurs any (i) Change of Control or (ii) any change to the ownership of direct and indirect Subsidiaries of the Borrower from the ownership structure set forth on <u>Schedule 5.14</u>; or

(l)    <u>Liens</u>.  Any Collateral Document shall for any reason cease to create a valid and perfected Lien (having the priorities specified in the Final Order) on and security interest in the Collateral; or

(m)    <u>Dissolution or Liquidation</u>.  Any Loan Party voluntarily or involuntarily dissolves or is dissolved, liquidates or is liquidated or files a motion with the Bankruptcy Court seeking authorization to dissolve or liquidate; or

(n)    <u>Failure to Conduct Business</u>.  If any Loan Party is enjoined, restrained or in any way prevented by court order (other than an Approved Bankruptcy Court Order) from continuing to conduct all or any material part of its business affairs or any Loan Party or any of their respective Subsidiaries' cessation of all or any material part of its business operations (other than in connection with a sale of assets permitted by the Loan Documents or otherwise consented to by the Required Lenders); or

(o)    <u>Independent Directors</u>.  With respect to the board of directors of the Borrower, the independent directors no longer constitute 50% of such board of directors; or

(p)    <u>Financial Advisor</u>.  The Borrower no longer retains Alix Partners as its financial advisor unless replaced with a financial advisor acceptable to the Required Lenders; or

(q)    <u>Final Order</u>.  The Bankruptcy Court fails to enter the Final Order within forty (40) calendar days of the Petition Date (with such changes as the Administrative Agent and the Required Lenders may agree to), or the Bankruptcy Court enters an order (other than one subject to a stay) that reverses, vacates or stays for a period in excess of ten (10) days the effectiveness of the Final Order whether on appeal or otherwise, in each case without the written consent of the Required Lenders; or

(r)    <u>Certain Orders</u>.  An order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court (or any of the Loan Parties shall file any pleading or motion requesting entry of an order) (i) appointing a trustee under Section 1104 of the Bankruptcy Code, (ii) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, or (iii) dismissing or converting the Chapter 11 Case to a Chapter 7 case; or

(s)    <u>Non-Compliance with Final Order</u>.  Any Loan Party fails or neglects to comply with any provision of the Final Order; or

(t)    <u>Filing of Unapproved Plan</u>.  Any Person other than a Loan Party shall have filed a plan of reorganization or liquidation in the Chapter 11 Case following termination of the Loan Parties' exclusivity periods under Section 1121 of the Bankruptcy Code, unless approved by the Required Lenders; or

(u)    <u>Entry of Unapproved Order</u>.  (i) An order (other than one subject to a stay) with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court (A) permitting any administrative expense claim or any other claim (now existing or hereafter arising, of any kind or nature whatsoever) to have priority as to any of the Loan Parties that is pari passu or senior to the Obligations, other than the Carve-Out or other claims expressly permitted to have priority over the Obligations under the Final Order; (B) granting or permitting the grant of a Lien on the Collateral (other than a Permitted Lien); or (ii) an order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case which does not provide for (x) the Termination of the DIP Financing and (y) until the Termination of the DIP Financing, the continuity and priority of the Liens of the Administrative Agent in the Collateral, the super-priority administrative expense claim status of the Obligations to the same extent as is provided in the Final Order upon such dismissal; or

(v)    <u>Relief from the Automatic Stay</u>.  The Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code for any reason to any Person holding a Lien upon any pre-petition or post-petition assets of any Loan Party with respect to any Collateral as to which the Administrative Agent has been granted a first priority Lien, or any other assets of any Loan Party where the aggregate value of the property subject to all such order or orders is greater than the Threshold Amount; or

(w)    <u>Motion against the Lenders</u>.  Any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (i) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document or (ii) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in the Final Order in favor of the Administrative Agent; or

(x)    <u>Prohibited Payment</u>.  Any of the Loan Parties shall make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than those payments in respect of adequate protection permitted pursuant to the terms of the Final Order and payments authorized by the Bankruptcy Court in respect of (i) any payments required and/or permitted in the "first day orders" or any subsequent Approved Bankruptcy Court Order or (ii) accrued payroll and related expenses as of the Petition Date; or

(y)    <u>Other Bankruptcy Matters</u>.    (i) An order shall have been entered modifying (in a manner adverse to the Loan Parties) the adequate protection obligations granted in the Final Order without the prior written consent of the Administrative Agent, (ii) an order shall have been entered by the Bankruptcy Court avoiding or requiring

disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations, (iii) any Loan Party shall filed with the Bankruptcy Court a motion seeking authority to use any cash proceeds of any of the Collateral to the extent prohibited hereunder, without the written consent of the Required Lenders and the Administrative Agent or (iv) any Loan Party shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not require (x) the Termination of the DIP Financing and (y) until the Termination of the DIP Financing, the continuity and priority of the Liens of the Administrative Agent in the Collateral, the super-priority administrative expense claim status of the Obligations to the same extent as is provided in the Final Order; or

(z)      Failure to File Plan.  The Borrower shall fail to (i) file, by no later than May 21, 2019, the Reorganization Plan or a plan of reorganization in the Chapter 11 Case that contains a provision for the Termination of the DIP Financing on the effective date of such plan (or such other satisfaction of the Obligations for which each Lender has provided its prior consent) and (ii) obtain entry of a confirmation order from the Bankruptcy Court with respect to the Reorganization Plan or a plan of reorganization in the Chapter 11 Case that contains a provision for (x) the Termination of the DIP Financing (or such other satisfaction of the Obligations for which each Lender has provided its prior consent) and (y) until the Termination of the DIP Financing, the continuity and priority of the Liens of the Administrative Agent in the Collateral, the super-priority administrative expense claim status of the Obligations, in each instance, to the same extent as is provided in the Final Order by one hundred twenty-five (125) calendar days after the Petition Date; or

(aa)      Restructuring Support Agreement.  The Restructuring Support Agreement (i) is no longer in effect or (ii) is amended, modified or subject to a waiver, in the case of clause (ii), in a manner materially adverse to the interests of the Lenders without the consent of the Required Lenders.

Section 8.02   Remedies Upon Event of Default.    (a) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Final Order, if any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of the Required Lenders, take any or all of the following actions without further order of, or application to, the Bankruptcy Court:

(i)      declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

(ii)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)    set-off against any outstanding Obligations amounts held for the account of the Loan Parties as cash collateral or in the accounts of any Loan Party maintained by or with the Administrative Agent, any Lender or their respective Affiliates; and

(iv)    take any action or exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

(b)    If an Event of Default has occurred and is continuing:    (i) the Administrative Agent shall have for the benefit the Secured Parties, in addition to all other rights of the Administrative Agent and the Lenders, the rights and remedies of a secured party under the Uniform Commercial Code; (ii) the Administrative Agent may, at any time, take possession of the Collateral and keep it on any Loan Party's premises, at no cost (including any charge pursuant to Section 506(c) of the Bankruptcy Code) to the Administrative Agent or any Lender, or remove any part of it to such other place or places as the Administrative Agent may desire, or the Borrower shall, upon the Administrative Agent's demand, at the Borrower's cost, assemble the Collateral and make it available to the Administrative Agent at a place or places reasonably convenient to the Administrative Agent; and (iii) the Administrative Agent may sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable at the direction of the Required Lenders, and may, if the Administrative Agent at the direction of the Required Lenders deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale without giving a new notice of sale. Without in any way requiring notice to be given in the following manner, the Loan Parties agree that any notice by the Administrative Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to the Loan Parties if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt to the Borrower, at least ten (10) Business Days prior to such action to the Borrower's address specified herein. If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Administrative Agent or the Lenders receive payment, and if the buyer defaults in payment, the Administrative Agent may resell the Collateral without further notice to the Loan Parties.    In the event the Administrative Agent seeks to take possession of all or any portion of the Collateral by judicial process, the Loan Parties irrevocably waives:  (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Administrative Agent retain possession and not dispose of any Collateral until after trial or final judgment.   The Loan Parties agree that the Administrative Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.   The Administrative Agent is hereby granted a license or other right to use, without charge, but subject to the terms of the of licenses to the Loan Parties with respect to Intellectual Property licensed to the Loan Parties, the Loan Parties' Intellectual Property and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, provided, that such licenses to be granted hereunder with respect to  trademarks and service marks shall be subject to the maintenance of quality standards with respect to the goods and

services on which such trademarks and service marks are used sufficient to preserve the validity and enforceability of such trademark and service marks and the applicable Loan Party's rights under all licenses and all franchise agreements shall inure to the Administrative Agent's benefit for such purpose.  The proceeds of sale shall be applied first to all expenses of sale, including attorneys' fees, and then to the Obligations in accordance with Section 8.03. Following the Termination of the DIP Financing, the Administrative Agent will deliver any excess proceeds of the Collateral in accordance with the applicable order of the Bankruptcy Court. The Loan Parties shall remain liable for any deficiency.

(c)    Upon the occurrence and during the continuance of an Event of Default, subject solely to the giving of seven (7) Business Days' prior written notice as set forth in clause (d) below, the automatic stay arising pursuant to Bankruptcy Code Section 362 shall be vacated and terminated in accordance with the Final Order without further action or order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading so as to permit the Administrative Agent and the Lenders full exercise of all of their rights and remedies based on the occurrence of an Event of Default, including, without limitation, all of their rights and remedies with respect to the Collateral and the Guarantors. With respect to the Administrative Agent's and Lenders' exercise of their rights and remedies, the Loan Parties agree, waive and, release, and shall be enjoined from attempting to contest, delay, or otherwise dispute the exercise by the Administrative Agent and the Lenders of their rights and remedies before the Bankruptcy Court or otherwise.

(d)    Notwithstanding the foregoing, any exercise of remedies is subject to the giving of seven (7) Business Days' prior written notice in accordance with the terms of the Final Order.   For the avoidance of doubt, it is understood and agreed that the giving of seven (7) Business Days' prior written notice as set forth above is a one-time requirement and is not required to be delivered with any exercise of remedies after the first such exercise.

Section 8.03  <u>Application of Funds</u>.    If the circumstances described in <u>Section 2.09(f)</u> have occurred, or after the exercise of remedies provided for in <u>Section 8.02</u> any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (after giving effect to the Carve-Out and any other payments required pursuant to the Final Order):

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under <u>Section 10.04</u> and amounts payable under <u>Article III</u>) payable to the Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under <u>Section 10.04</u> and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this <u>clause Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the

Lenders in proportion to the respective amounts described in this <u>clause Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal or face amounts of the Loans, ratably among the Lenders in proportion to the respective amounts described in this <u>clause Fourth</u> held by them;

<u>Fifth</u>, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, as required by the applicable order of the Bankruptcy Court.

The Loan Parties shall remain liable for any deficiency.

## ARTICLE IX

### ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    <u>Appointment and Authorization</u>.    (a) Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or Participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Notwithstanding any provision contained in this Agreement providing for any action in the Administrative Agent's reasonable discretion or approval of any action or matter in the Administrative Agent's reasonable satisfaction, the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) which may be delivered by electronic transmission (including e-mail by such Lenders or counsel to the Required Lenders (which on the date hereof is Latham &

Watkins LLP); <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law and shall, in the Administrative Agent's sole discretion, be accompanied by indemnity or security satisfactory to the Administrative Agent and subject to the indemnification set forth in Section 9.07.  The Administrative Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party or any of their respective Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any other Agent-Related Person in any capacity.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to <u>Section 9.02</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>Article IX</u> (including <u>Section 9.07</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02    <u>Delegation of Duties</u>.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through Affiliates, agents, employees or attorneys-in-fact, such sub-agents as shall be deemed necessary by the Administrative Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or

sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct as determined by a final nonappealable judgment of a court of competent jurisdiction.

Section 9.03   Liability of the Administrative Agent.   No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final nonappealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or Participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. The Administrative Agent shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *it being understood* that the Administrative Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 9.04   Reliance by the Administrative Agent.   (a) The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by the Administrative Agent.   The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall be justified in taking any action reasonably believed to it to be

required by any order of the Bankruptcy Court. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with any order of the Bankruptcy Court or in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)    For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default". The Administrative Agent will promptly notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 9.06    Credit Decision; Disclosure of Information by the Administrative Agent. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be

furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    Indemnification of the Administrative Agent.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities to the extent incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any.  The undertaking in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation or removal of the Administrative Agent.

Section 9.08    The Administrative Agent in its Individual Capacity.    The Administrative Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though the Administrative Agent were not the Administrative Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.  With respect to its Loans, the Administrative Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include Cantor Fitzgerald Securities in its individual capacity.

Section 9.09   Successor Agents.  The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrower.  If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the retiring Administrative Agent may appoint, after consulting with the Lenders, a successor agent from among the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent", shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be, and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated.   After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Section 10.04 and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement.  If no successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.   Lenders assuming the role of Administrative Agent as specified in the immediately preceding sentence shall assume the rights and obligations of the Administrative Agent (including the indemnification provisions set forth in Section 9.07) as if each such Lender were the Administrative Agent.  Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, the successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.

Section 9.10   Administrative Agent May File Proofs of Claim.   The Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)        to file and prove an administrative claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.06 and Section 10.04 or otherwise hereunder) allowed in an applicable proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under Section 2.06 and Section 10.04 or otherwise hereunder.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11    Release of Collateral and Guarantee.    The Lenders irrevocably agree and authorize the Administrative Agent:

(a)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the Termination of the DIP Financing     , (ii) upon any permitted sale, lease, transfer or other disposition of any item of Collateral of any Loan Party (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of the Loan Party that owns such Collateral) in accordance with the terms of the Loan Documents, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under the Guarantee and Collateral Agreement pursuant to clause (b) below, or (v) in accordance with an order of the Bankruptcy Court; and

(b)      in the case of any Subsidiary, such Person ceasing to be subject to Section 6.11 as a result of a transaction permitted hereunder (as certified by a Responsible Officer) and the Borrower notifying the Administrative Agent in writing that it wishes such Guarantor to be released from its obligations under the Guarantee and Collateral Agreement.

The Administrative Agent will, at the Borrower's expense, execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of Collateral pursuant to this Section 9.11 from the assignment and security interest granted under the Collateral Documents (or the release of the Guarantor from its Guarantee Obligations in respect of the Obligations) in accordance with the terms of the Loan Documents (provided that the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer certifying that such transaction has been consummated in compliance with the Loan Documents and the execution and delivery of such documents are authorized and

81

permitted under the Loan Documents, and the Administrative Agent may conclusively rely on such certification without further inquiry).  Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property in accordance with this <u>Section 9.11</u>.

Section 9.12    <u>Other Agents; Arrangers and Managers</u>.  None of the Lenders shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such.  Without limiting the foregoing, none of the Lenders shall have or be deemed to have any fiduciary relationship with any other Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any of the other Lenders in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.13    <u>Appointment of Supplemental Administrative Agent</u>.  (a) It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems in its reasonable discretion that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "<u>Supplemental Administrative Agent</u>" and collectively as "<u>Supplemental Administrative Agents</u>").

(b)    In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this <u>Article IX</u> and of <u>Section 10.04</u> and <u>Section 10.05</u> that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)    Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the

Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.14   Certain Bankruptcy Matters.

(a)      Except to the extent provided otherwise in the Final Order and subject to the Carve-Out, the Borrower hereby agrees that the Obligations shall (i) constitute super-priority allowed administrative expense claims in the Bankruptcy Case having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against any Loan Party now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code subject to the priority set forth in the Final Order and, to the extent provided in the Final Order, shall not be subject to claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b)      The Administrative Agent's Liens and the super-priority administrative expense claim priority granted pursuant to clause (a) above have been independently granted by the Loan Documents, and may be independently granted by other Loan Documents heretofore or hereafter entered into.  The Administrative Agent's Liens and the administrative expense claim priority granted pursuant to clause (a) above, this Agreement, the Final Order and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lenders and the Administrative Agent hereunder and thereunder are cumulative.  In the event of a direct conflict between the Final Order and any other Loan Document, the Final Order shall control.

(c)      Notwithstanding anything to the contrary contained herein or elsewhere:

(i)      The Administrative Agent's Liens on Collateral of the Loan Parties shall be deemed valid and automatically perfected by entry of the Final Order, which entry shall have occurred on or prior to the Closing Date.  The Administrative Agent and the Lenders shall not be required to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on Collateral granted by or pursuant to this Agreement, the Final Order or any other Loan Document.  If the Administrative Agent (at the direction of the Required Lenders) or the Required Lenders shall, in its or their sole discretion, from time to time elect to file, register or publish any such financing statements, mortgages, hypothecs, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Administrative Agent's Liens on Collateral, all such

documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date the Final Order is entered.

(ii)    The Liens, lien priorities, super-priority administrative expense claims and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement, the Final Order or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the administrative expense claim priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever. Without limiting the generality of the foregoing, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(A)    no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Administrative Agent against the Borrower in respect of any Obligation;

(B)    the Administrative Agent's Liens on Collateral shall constitute valid, enforceable and perfected Liens with the priority set forth in the Final Order; and

(C)    the Administrative Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Administrative Agent or any Lender to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments or to otherwise perfect the Administrative Agent's Liens under applicable nonbankruptcy law.

## ARTICLE X

### MISCELLANEOUS

Section 10.01 <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Agreement, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that:

(a)    no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time:

(i)    change the number of Lenders or the percentage of (x) the Commitments or (y) the aggregate unpaid principal amount of Loans that, in each case, shall be required for the Lenders or any of them to take any action hereunder (including pursuant to any change to the definition of "Required Lenders"),

(ii)     release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Administrative Agent and the Lenders under the Guarantee and Collateral Agreement), if such release or limitation is in respect of all or substantially all of the value represented by the Guarantee and Collateral Agreement to the Lenders,

(iii)    release, or subordinate the Administrative Agent's Liens in, all or substantially all of the Collateral in any transaction or series of related transactions (other than as expressly permitted herein or in the Final Order), or

(iv)    amend any provision of this Section 10.01;

(b)     no amendment, waiver or consent shall, unless in writing and signed by each Lender specified below for such amendment, waiver or consent:

(i)     increase the Commitments of a Lender without the consent of such Lender;

(ii)    reduce the principal of, or stated rate of interest on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender; provided if the Required Lenders agree to waive, or forbear from exercising remedies with respect to, any Event of Default and such waiver or forbearance is effective in accordance with this Section 10.01 or if the Required Lenders agree to change any financial definitions that would reduce the stated rate of interest or any fees or other non-principal amounts stated to be payable hereunder or under the other Loan Documents pursuant to any amendment, waiver or consent not being effected in order to reduce the stated rate of interest or such fees or other amounts, then only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate in connection with such Event of Default or reduce the stated rate of interest or such fees in connection with such amendment, waiver or consent described in this proviso to clause (b)(ii), as applicable; or

(iii)    except as provided in the definition of "Maturity Date", postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.04 or Section 2.05, any date scheduled for payment or for any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender; or

(iv)    modify Section 8.03 in any manner that adversely affects the Lenders without the consent of each Lender directly and adversely affected thereby; or

(v)     modify Section 2.10 without the consent of each Lender directly and adversely affected thereby;

provided further that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or the other Loan Documents.

Section 10.02 Notices and Other Communications; Facsimile and Electronic Copies. (a) General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission) (and, as to service of process, only in writing and in accordance with applicable law) and, to the extent set forth in Section 10.02(e), in an electronic medium and delivered as set forth in Section 10.02(e). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to any Loan Party:

Aegerion Pharmaceuticals, Inc.
245 First Street
Riverview II, 18th Floor
Cambridge, MA  02142
Attention:  Barbara Chan
Facsimile No.: (617) 945-7968
Email: barbara.chan@aegerion.com

With a copy (which shall not constitute notice) to:

AlixPartners
300 N. LaSalle Street Suite 1900
Chicago, IL 60654
Attention: John Castellano
Email: JCastellano@alixpartners.com

With a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Leonard Klingbaum, Esq.
Facsimile No.: (212) 728-9290
Email: lklingbaum@willkie.com

(ii)    if to the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time; and

(iii)    if to any other Lender, to the address, facsimile number or electronic mail address specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(b)), when delivered; provided that notices and other communications to the Borrower and the Administrative Agent pursuant to Article II shall not be effective until actually received by such Person during the Person's normal business hours.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)    Effectiveness of Facsimile Documents and Signatures.  Loan Documents may be transmitted and/or signed by facsimile or other electronic transmission (including a .pdf or .tif copy); provided that original copies are delivered promptly thereafter (it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission).

(c)    Reliance by the Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) in good faith purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct by such Agent-Related Person or such Lender as determined by a final non-appealable judgment.

(d)    Notice to other Loan Parties.  The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this Section 10.02 with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

(e)    The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new Loan, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the

effectiveness of this Agreement and/or any Loan hereunder (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower.  In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.  The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "Platform").

(f)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.    IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S    OR    THE    ADMINISTRATIVE    AGENT'S    TRANSMISSION    OF COMMUNICATIONS THROUGH THE PLATFORM, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(g)    The Administrative Agent agrees that the receipt in accordance with Section 10.02 of the Communications by the Administrative Agent at its e-mail address set forth on  Schedule 10.02  shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(h)    Each Loan Party hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to any Loan Party or its securities) (each, a "Public Lender").  Each Loan Party hereby agrees that (i) Communications that are to be made available on the Platform to Public Lenders who notify the Borrower and the Administrative Agent of such Lender's status as a Public Lender shall be clearly and conspicuously marked by such Loan Party as "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Communications "PUBLIC," each Loan Party shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Communications as either publicly available information or not material information (although it may contain sensitive business information and remains subject to the confidentiality undertakings of Section 10.08) with respect to such Loan Party or its securities for purposes of United States Federal and state securities laws, (iii) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information," and (iv) the Administrative Agent shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

(i)    EACH LENDER ACKNOWLEDGES THAT UNITED STATES FEDERAL AND STATE SECURITIES LAWS PROHIBIT ANY PERSON WITH MATERIAL, NON-PUBLIC INFORMATION ABOUT AN ISSUER FROM PURCHASING OR SELLING SECURITIES OF SUCH ISSUER OR, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, FROM COMMUNICATING SUCH INFORMATION TO ANY OTHER PERSON.  EACH LENDER AGREES TO COMPLY WITH APPLICABLE LAW AND ITS RESPECTIVE CONTRACTUAL OBLIGATIONS WITH RESPECT TO CONFIDENTIAL AND MATERIAL NON-PUBLIC INFORMATION.  Each Lender that is not a Public Lender confirms to the Administrative Agent that such Lender has adopted and will maintain internal policies and procedures reasonably designed to permit such Lender to take delivery of Restricting Information (as defined below) and maintain its compliance with applicable law and its respective contractual obligations with respect to confidential and material non-public information.  A Public Lender may elect not to receive Communications and Information that contains material non-public information with respect to the Loan Parties or their securities (such Communications and Information, collectively, "Restricting Information"), in which case it will identify itself to the Administrative Agent as a Public Lender.  Such Public Lender shall not take delivery of Restricting Information and shall not participate in conversations or other interactions with the Agent Parties, any Lender or any Loan Party in which Restricting Information may be discussed.  No Agent Party, however, shall by making any Communications and Information (including Restricting Information) available to a Lender (including any Public Lender), by participating in any conversations or other interactions with a Lender (including any Public Lender) or otherwise, be responsible or liable in any way for any decision a Lender (including any Public Lender) may make to limit or to not limit its access to the Communications and Information.  In particular, no Agent Party shall have, and the Administrative Agent, on behalf of all Agent Parties, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender (including any Public Lender) has elected to receive Restricting Information, such Lender's policies or procedures regarding the safeguarding of material nonpublic information or such Lender's compliance with applicable laws related thereto.  Each Public Lender acknowledges that circumstances may arise that require it to refer to Communications and Information that

89

might contain Restricting Information. Accordingly, each Public Lender agrees that it will nominate at least one designee to receive Communications and Information (including Restricting Information) on its behalf and identify such designee (including such designee's contact information) on such Public Lender's Administrative Questionnaire. Each Public Lender agrees to notify the Administrative Agent in writing from time to time of such Public Lender's designee's address to which notice of the availability of Restricting Information may be sent. Each Public Lender confirms to the Administrative Agent and the Lenders that are not Public Lenders that such Public Lender understands and agrees that the Administrative Agent and such other Lenders may have access to Restricting Information that is not available to such Public Lender and that such Public Lender has elected to make its decision to enter into this Agreement and to take or not take action under or based upon this Agreement, any other Loan Document or related agreement knowing that, so long as such Person remains a Public Lender, it does not and will not be provided access to such Restricting Information. Nothing in this <u>Section 10.02(i)</u> shall modify or limit a Lender's (including any Public Lender) obligations under <u>Section 10.08</u> with regard to Communications and Information and the maintenance of the confidentiality of or other treatment of Communications or Information.

Section 10.03 <u>No Waiver; Cumulative Remedies</u>. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04 <u>Costs and Expenses</u>. The Borrower agrees (a) to pay or reimburse the Administrative Agent and Lenders for all reasonable and documented out-of-pocket costs and expenses incurred before, on or after the Closing Date in connection with the preparation, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof requested by the Borrower or negotiated in consultation with Borrower (in each case, whether or not the transactions contemplated thereby are consummated), including all Attorney Costs, (b) to pay or reimburse the Administrative Agent and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all Attorney Costs and other costs and expenses incurred in connection with any workout or restructuring in respect of the Loans and all such costs and expenses incurred during any legal proceeding, including any proceeding in the Chapter 11 Case and (c) without limiting the generality of the foregoing, to pay all reasonable and documented out-of-pocket fees and expenses of any financial advisory, appraisers or accounting firm retained by or for the benefit of the Administrative Agent or Lenders or by Latham & Watkins LLP, as counsel to the Lenders, including, without limitation, the fees and expenses of the Financial Advisor. The Borrower's obligation to pay all such reasonable and documented out-of-pocket costs, expenses and charges includes, without limitation, any such costs, expenses and charges that accrue after any conversion of the Chapter 11 Case to proceedings administered under Chapter 7 of the Bankruptcy Code. The foregoing costs and expenses shall include all reasonable search, filing, recording and title

insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by the Administrative Agent. The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail. If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

Section 10.05 Indemnification by the Borrower. (a) Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless the Administrative Agent, each Agent-Related Person (including without limitation, Shipman & Goodwin LLP), each Lender and their respective Affiliates, directors, officers, employees, counsel, agents, trustees, management companies (including employees of such management companies), advisors and attorneys-in-fact (including without limitation, Latham & Watkins LLP and Ducera Partners LLC) (collectively the "Indemnitees") from and against any and all liabilities, obligations, losses, taxes, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including one counsel to the Administrative Agent and a separate counsel to the Lenders, taken as a whole) (and, in the event of any actual conflict of interest, additional counsel to the affected parties) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability related to the Borrower, any Subsidiary or any other Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (any of the foregoing described in this clause (iv), a "Proceeding") (all the foregoing described in clauses (i) to (iv), collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee and whether brought by an Indemnitee, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereby are consummated; provided that such indemnity shall not, as to any Indemnitees, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee as determined by a final non-appealable judgment of a court of competent jurisdiction. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through the Platform, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document. All amounts due in respect of costs, expenses

and disbursements under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; provided, that each Indemnitee receiving any such reimbursement shall repay such amounts to the relevant Loan Party in the event that such Indemnitee shall not be entitled thereto pursuant to the provisions hereof. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

(b)    The Borrower shall not be liable for any settlement of any Proceedings effected without its consent (which consent shall not be unreasonably withheld or delayed), but if settled with the Borrower's consent or if there is a final judgment for the plaintiff in such Proceedings, the Borrower shall indemnify and hold harmless each Indemnitee from and against any Indemnified Liabilities in accordance with the foregoing clause (a). The Borrower shall not, without the prior written consent of an Indemnitee (which consent shall not be unreasonably withheld or delayed), effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnitee unless (i) such settlement includes an unconditional release of such Indemnitee in form and substance satisfactory to such Indemnitee from all liability on claims that are the subject matter of such Proceedings, (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnitee and (iii) contains customary confidentiality and non-disparagement provisions.

(c)    In the event that an Indemnitee is requested or required to appear as a witness in any action brought by or on behalf of or against the Borrower or any of its Subsidiaries or Affiliates in which such Indemnitee is not named as a defendant, the Borrower shall reimburse such Indemnitee for all reasonable and documented expenses incurred by it in connection with such Indemnitee's appearing and preparing to appear as such a witness, including without limitation, the reasonable and documented fees and expenses of its legal counsel.

Section 10.06 Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding in the Chapter 11 Case or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 10.07  <u>Successors and Assigns</u>.

(a)    <u>Successors and Assigns Generally</u>.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>Section 10.07(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 10.07(d)</u>, (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.07(e)</u> or (iv) to an SPC in accordance with the provisions of <u>Section 10.07(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>Section 10.07(d)</u> and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.    Any Lender may at any time assign to one or more assignees all or a portion of its Commitment and/or the Loans at the time owing to it (and its rights and obligations under this Agreement relating thereto); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in <u>paragraph (b)(i)(B)</u> of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in <u>paragraph (b)(i)(A)</u> of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000 unless the Borrower consents (such consent not to be unreasonably withheld or delayed and shall not be required if an Event of Default exists).

(ii)    <u>Proportionate Amounts</u>.   Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and

obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)   <u>Required Consents</u>.  Any such assignment shall require the prior written consent of the Borrower, which consent shall not be unreasonably withheld, conditioned, delayed or burdened (<u>provided</u>, that it shall be deemed to be reasonable for the Borrower not to consent to any assignment to any Disqualified Person); <u>provided</u>, <u>however</u>, that (A) no consent of the Borrower shall be required for an assignment to a Lender, to an Affiliate of a Lender, to an Approved Fund or, if an Event of Default has occurred and is continuing, to any other assignee other than to any Disqualified Person, and (B) the Borrower shall be deemed to have consented to any such assignment unless it objects thereto by written notice delivered to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

(iv)   <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; <u>provided</u> that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and the tax documentation required pursuant to Section 3.01.

(v)   <u>No Assignment to Certain Persons</u>.  No such assignment shall be made to the Borrower or any of the Borrower's Affiliates or Subsidiaries or any Disqualified Person.

(vi)   <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>Section 10.07(c)</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>10.04</u> and <u>10.05</u> with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)    Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries or any Disqualified Person) (each, a "Participant") in all or a portion of its Commitment and/or the Loans at the time owing to it (and its rights and obligations under this Agreement relating thereto); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 9.07 with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 10.01(a) or Section 10.01(b) that directly and adversely affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 (subject to the requirements and limitations therein, including the requirements under Section 3.01(g) (it being understood that the documentation required under Section 3.01(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Sections 3.01 or 3.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 3.07(b) with respect to any Participant.  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.10 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address

of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    SPCs.  Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01 or 3.04), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(g)    Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the

Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

Section 10.08  Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any Governmental Authority or examiner regulating any Lender or the Administrative Agent; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) to any pledgee referred to in Section 10.07(e) or Section 10.07(g), Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (f) with the written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 by the disclosing party; (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); (i) to the extent not known by it to consist of non-public information, (j) for purposes of establishing a "due diligence" defense or (k) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments and the Loans.  For the purposes of this Section 10.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, relating to the Borrower or any of their Subsidiaries or their business, other than any such information that is publicly available to the Administrative Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.

Section 10.09  Setoff.    In addition to any rights and remedies of the Administrative Agent and the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, subject to the Final Order, each Lender and its Affiliates

and the Administrative Agent and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent and its Affiliates, as the case may be, to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness.    Each Lender and the Administrative Agent agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender or the Administrative Agent, as the case may be; _provided_ that the failure to give such notice shall not affect the validity of such setoff and application.    The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have.

Section 10.10 Counterparts.    This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.    Delivery by facsimile transmission or other electronic transmission (including a .pdf or .tif copy) of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document; _provided_ that original signatures shall be promptly delivered thereafter, it being understood that that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission.

Section 10.11 Integration.    The Loan Documents comprise the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.    Subject to Section 10.21, in the event of any conflict or inconsistency between the provisions of this Agreement and those of any other Loan Document (other than the Financing Orders), the provisions of this Agreement shall control; _provided_ that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict or inconsistency with this Agreement.    Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.12 Survival of Representations and Warranties.    All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.    Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the

98

Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.13 <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.14 <u>GOVERNING LAW</u>.  (a) THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE (EXCEPT, WITH RESPECT TO ANY OTHER LOAN DOCUMENT, AS OTHERWISE EXPRESSLY PROVIDED THEREIN); <u>PROVIDED</u> THAT THE ADMINISTRATIVE AGENT AND THE LENDERS SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

(b)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL, EXCEPT AS OTHERWISE SET FORTH IN THE LOAN DOCUMENTS, BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM JURISDICTION, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE JURISDICTION OF THOSE COURTS.  THE BORROWER, THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

Section 10.15 <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND,

ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.15 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.16 Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent, and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, the Administrative Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Required Lenders.

Section 10.17 Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  The provision of this Section 10.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.18 PATRIOT Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the PATRIOT Act.  The Borrower agrees to provide, and to cause each other Loan Party to provide, such information promptly upon request.

Section 10.19 No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges and agrees that it has informed its other Affiliates, that: (i) (A) no fiduciary, advisory or agency relationship between any of the Borrower and its Subsidiaries and the Administrative Agent or any Lender is intended to be or has been created in respect of any of the transactions contemplated hereby and by the other Loan Documents, irrespective of whether the Administrative Agent or any Lender has advised or is advising any of the Borrower and its Subsidiaries on other matters, (B) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Loan Parties, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (C) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (D) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each of the Lenders is and has been acting solely as a

100

principal and, except as may otherwise be expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person and (B) none of the Administrative Agent or any Lender has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent or any Lender has any obligation to disclose any of such interests and transactions to the Borrower or any of its Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.20 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 10.21 <u>Conflicts with Financing Orders</u>.  In the event of a conflict between any provision of any Loan Document (other than the Financing Orders) and any Financing Order, such Financing Order shall govern.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

AEGERION PHARMACEUTICALS, INC.,
as Borrower

By: /s/ *Barbara Chan*
Name: Barbara Chan
Title: President

CANTOR FITZGERALD SECURITIES,
as Administrative Agent

By: /s/ *James Buccola*
Name: James Buccola
Title: Head of Fixed Income

ATHYRIUM OPPORTUNITIES II
ACQUISITION, LP,
as a Lender

By: Athyrium Opportunities Associates II
LP, its general partner

By: Athyrium GP Holdings LLC, its general
partner


By:     /s/ *Andrew C. Hyman*
Name: Andrew C. Hyman
Title: Authorized Signatory




ATHYRIUM OPPORTUNITIES III
ACQUISITION, LP,
as a Lender

By: Athyrium Opportunities Associates III
LP, its general partner

By: Athyrium Opportunities Associates III
GP LLC, its general partner


By:     /s/ *Andrew C. Hyman*
Name: Andrew C. Hyman
Title: Authorized Signatory

[Signature Page to Debtor-in-Possession Credit Agreement]

1992 MSF INTERNATIONAL, LTD.,
as a Lender


By:      /s/ *Jonathan Segal*
Name: Jonathan Segal
Title: Managing Director




1992 TACTICAL CREDIT MASTER FUND,
L.P.,
as a Lender


By:      /s/ *Jonathan Segal*
Name: Jonathan Segal
Title: Managing Director

[Signature Page to Debtor-in-Possession Credit Agreement]